Michael L. Collins, Esq. (Attorney ID No. 068092013)
**KING MOENCH & COLLINS LLP**
200 Schulz Drive, Suite 402
Red Bank, NJ 07701
732-546-3670
mcollins@kingmoench.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF MONTVALE, TOWNSHIP OF DENVILLE, BOROUGH OF HILLSDALE, TOWNSHIP OF MANNINGTON, TOWNSHIP OF MILLBURN, TOWNSHIP OF MONTVILLE, BOROUGH OF TOTOWA, BOROUGH OF ALLENDALE, BOROUGH OF WESTWOOD, TOWNSHIP OF HANOVER, TOWNSHIP OF WYCKOFF, BOROUGH OF WHARTON, BOROUGH OF MENDHAM, TOWNSHIP OF WEST AMWELL, BOROUGH OF NORWOOD, BOROUGH OF FRANKLIN LAKES, TOWNSHIP OF CEDAR GROVE, TOWNSHIP OF EAST HANOVER, TOWNSHIP OF HOLMDEL, TOWNSHIP OF WALL, TOWNSHIP OF WARREN, TOWNSHIP OF LITTLE FALLS, MICHAEL GHASSALI, individually and in his official capacity as MAYOR OF MONTVALE, ANNETTE ROMANO, individually in her official capacity as MAYOR AND TOWNSHIP COMMITTEE MEMBER of the TOWNSHIP OF MILLBURN, BEN STOLLER, individually and in his official capacity as TOWNSHIP COMMITTEE MEMBER of the TOWNSHIP OF MILLBURN, FRANK SACCOMANDI, IV, individually and in his official capacity as TOWNSHIP COMMITTEE MEMBER of the TOWNSHIP OF MILLBURN, LOU D'ANGELO, individually and in his official capacity as COUNCIL PRESIDENT of the BOROUGH OF TOTOWA, RUDOLPH E. | DOCKET NO.: <br><br> Civil Action <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT** |

BOONSTRA, individually and in his official capacity as MAYOR AND TOWNSHIP COMMITTEE MEMBER of the TOWNSHIP OF WYCKOFF, JAMES P. BARSA individually and in his capacity as MAYOR of the BOROUGH OF NORWOOD, CHARLES J.X. KAHWATY, individual and in his official capacity as MAYOR of the BOROUGH OF FRANKLIN LAKES, and BRIAN FOSTER, individually and in his official capacity as MAYOR AND TOWNSHIP COMMITTEE MEMBER of the TOWNSHIP OF HOLMDEL,

                    Plaintiffs,

    v.

MATTHEW J. PLATKIN, in his official capacity as ATTORNEY GENERAL OF THE STATE OF NEW JERSEY and MICHAEL J. BLEE, in his official capacity as ACTING ADMINISTRATIVE DIRECTOR OF THE COURTS,

                    Defendants.

Plaintiffs (hereafter the "Plaintiffs") hereby state by way of Complaint, as follows:

### PARTIES

1.      Plaintiff Borough of Montvale is a municipal corporation of the State of New Jersey with principal offices at 12 Depiero Drive, Montvale, New Jersey 07645.

2.      Plaintiff Township of Denville is a municipal corporation of the State of New Jersey with principal offices at 1 Saint Mary's Place, Denville, NJ 07834.

3.      Plaintiff Borough of Hillsdale is a municipal corporation of the State of New Jersey with principal offices at 380 Hillsdale Avenue, Hillsdale, New Jersey 07642.

4.      Plaintiff Township of Mannington is a municipal corporation of the State of New Jersey with principal offices at 491 Route 45, Mannington, New Jersey 08079.

5.      Plaintiff Township of Millburn is a municipal corporation of the State of New Jersey with principal offices at 375 Millburn Avenue, Millburn, New Jersey 07041.

6.      Plaintiff Borough of Montville is a municipal corporation of the State of New Jersey with principal offices at 195 Changebridge Road, Montville, New Jersey 07045.

7.      Plaintiff Borough of Totowa is a municipal corporation of the State of New Jersey with principal offices at 537 Totowa Road, Totowa, New Jersey, 07512.

8.      Plaintiff Borough of Allendale is a municipal corporation of the State of New Jersey with principal offices at 500 W Crescent Avenue, Allendale, New Jersey 07401.

9.      Plaintiff Borough of Westwood is a municipal corporation of the State of New Jersey with principal offices at 101 Washington Avenue, Westwood, New Jersey 07675.

10.     Plaintiff Township of Hanover is a municipal corporation of the State of New Jersey with principal offices at 1000 Route 10, Whippany, New Jersey 07981.

11.     Plaintiff Township of Wyckoff is a municipal corporation of the State of New Jersey with principal offices at 340 Franklin Avenue, Wyckoff, New Jersey 07481.

12.     Plaintiff Borough of Wharton is a municipal corporation of the State of New Jersey with principal offices at 10 Robert Street, Wharton, New Jersey 07885.

13.     Plaintiff Borough of Mendham is a municipal corporation of the State of New Jersey with principal offices at 2 West Main Street, Mendham, New Jersey 07945.

14.     Plaintiff Township of West Amwell is a municipal corporation of the State of New Jersey with principal offices at 150 Rocktown Lambertville Road, Lambertville, New Jersey 08530.

15.     Plaintiff Borough of Norwood is a municipal corporation of the State of New Jersey with principal offices at 455 Broadway, Norwood, New Jersey 07648.

16.     Plaintiff Borough of Franklin Lakes is a municipal corporation of the State of New Jersey with principal offices at 480 DeKorte Drive, Franklin Lakes, New Jersey 07417.

17.     Plaintiff Township of Cedar Grove is a municipal corporation of the State of New Jersey with principal offices at 525 Pompton Avenue, Cedar Grove, NJ 07009.

18.     Plaintiff Township of East Hanover is a municipal corporation of the State of New Jersey with principal offices at 411 Ridgedale Avenue, East Hanover, NJ 07936.

19.     Plaintiff Township of Holmdel is a municipal corporation of the State of New Jersey with principal offices at 4 Crawfords Corner Road, Holmdel, NJ 07733.

20.     Plaintiff Township of Wall is a municipal corporation of the State of New Jersey with principal offices at 2700 Allaire Road, Wall, NJ 07719.

21.     Plaintiff Township of Warren is a municipal corporation of the State of New Jersey with principal offices located at 46 Mountain Boulevard, Warren, NJ 07059.

22.     Plaintiff Township of Little Falls is a municipal corporation of the State of New Jersey with principal offices located at 225 Main Street, Little Falls, NJ 07424.  (The foregoing plaintiffs are hereafter referred to as the "Plaintiff Municipalities" or "Municipalities").

23.     Plaintiff Michael Ghassali is an individual with an address of 20 Serrell Drive, Montvale, New Jersey 07645. He is a resident, citizen, and taxpayer in the State of New Jersey. He resides in and is the elected Mayor of the Borough of Montvale, which is classified as a non-urban aid municipality under the Law.

24.     Plaintiff Annette Romano is an individual with an address of 15 Cypress Street, Millburn, New Jersey 07041.  She is a resident, citizen, and taxpayer in the State of New Jersey. She resides in and is the elected Mayor and Township Committee Member of the Township of Millburn, which is classified as a non-urban aid municipality under the Law.

25.     Plaintiff Ben Stoller is an individual with an address of 422 Wyoming Avenue, Millburn, New Jersey 07041.  He is a resident, citizen, and taxpayer in the State of New Jersey. He resides in and is an elected Township Committee Member of the Township of Millburn, which is classified as a non-urban aid municipality under the Law.

26.     Plaintiff Frank Saccomandi, IV is an individual with an address of 17 Lee Terrace, Short Hills, New Jersey.  He is a resident, citizen, and taxpayer in the State of New Jersey.  He is an elected Township Committee Member of the Township of Millburn, which is classified as a non-urban aid municipality under the Law.

27.     Plaintiff Lou D'Angelo is an individual with an address of 89 Columbus Avenue, Totowa, New Jersey 07512. He is a resident, citizen, and taxpayer in the State of New Jersey. He resides in and is the elected Council President of the Borough of Totowa, which is classified as a non-urban aid municipality under the Law.

28.     Plaintiff Rudolph E. Boonstra is an individual with an address of 633 Lawlins Road, Wyckoff, New Jersey 07481. He is a resident, citizen, and taxpayer in the State of New Jersey. He

resides in and is the elected Mayor and Township Committee Member of the Township of Wyckoff, which is classified as a non-urban aid municipality under the Law.

29.    Plaintiff James P. Barsa is an individual with an address of 95 Glen Avenue, Norwood, New Jersey 07648.  He is a resident, citizen, and taxpayer in the State of New Jersey. He resides in and is the elected Mayor of the Borough of Norwood, which is classified as a non-urban aid municipality under the Law.

30.    Plaintiff Charles J.X. Kahwaty is an individual with an address of 636 Navaho Trail Drive, Franklin Lakes, New Jersey 07417. He is a resident, citizen, and taxpayer in the State of New Jersey. He resides in and is the elected Mayor of the Borough of Franklin Lakes, which is classified as a non-urban aid municipality under the Law.

31.    Plaintiff Brian Foster is an individual with an address of 4 Iron Hill Drive, Holmdel, New Jersey 07733. He is a resident, citizen, and taxpayer in the State of New Jersey. He resides in and is the elected Mayor and Township Committee Member of the Township of Holmdel, which is classified as a non-urban aid municipality under the Law. (The foregoing plaintiffs are hereafter referred to as the "Individual Plaintiffs", and collectively, the Plaintiff Municipalities and Individual Plaintiffs all constitute "Plaintiffs.").

32.    Defendant Matthew J. Platkin is the Attorney General of the State of New Jersey, who serves as the chief law enforcement officer of the State of New Jersey. Attorney General Platkin is named in his official capacity because the constitutionality of New Jersey's statutes is at issue. Accordingly, no further notices are required under Fed. R. Civ. P. 5.1(a) or 28 U.S.C. § 2403(b).

33.    Defendant Michael J. Blee is the Acting Administrative Director of the Courts, whose position is established pursuant to N.J. CONST. art. VI, § 7, ¶ 1. He is vested with certain

statutory duties and obligations relating to both New Jersey's affordable housing mandates and the Affordable Housing Dispute Resolution Program as provided in the Law (as defined hereafter).

## JURISDICTION AND VENUE

34.    This Court has federal question jurisdiction over the subject matter of this case in Count I pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the subject matter of this case in Count II pursuant to 28 U.S.C. § 1367(a).

35.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claims occurred within the District of New Jersey.

## NATURE OF THE ACTION

36.    This lawsuit seeks judicial relief addressing equal protection issues with New Jersey Public Law 2024, Chapter 2 (the "Law"), which the Legislature adopted in 2024, imposing affordable housing obligations upon New Jersey municipalities for the 2025-2034 "Fourth Round" period and for each successive decade into perpetuity. A true copy of the Law is attached as **Exhibit A**.

37.    The Law establishes a classification that imposes a "prospective need" affordable housing obligation upon non-urban aid municipalities, while exempting urban aid municipalities from having any prospective need obligation (the "Urban Aid Classification").

38.    This is an action for declaratory judgment by Plaintiffs challenging the validity, enforceability and constitutionality of the Urban Aid Classification that was adopted by the New Jersey Legislature because it violates the equal protection clause to the United States Constitution and its analogue in the New Jersey Constitution.

## STANDING

39.     Plaintiffs' rights, status, and other relations as municipal corporations, elected officials, and residents of non-urban aid municipalities are adversely affected by the Law.

40.     The Municipalities are directly and negatively impacted by the Law as they suffer adverse financial consequences as a result of the mandates set forth in the Urban Aid Classification, including the need to bear compliance costs, the costs to develop mandated affordable housing, as well as the infrastructure costs and ongoing operational costs relating to the same, all while sister urban aid municipalities and their citizens are absolved of any such obligation.

41.     The Individual Plaintiffs are directly and negatively impacted by the Law, as it imposes affirmative obligations, to which they object, upon the municipalities that they are elected to represent, including but not limited to affirmatively requiring them and their fellow members of their municipal governing bodies to take actions relative to the Law's Fourth Round prospective need obligations, all while elected officials and residents of urban aid municipalities remain in communities that are exempt from such effects.

42.     The Individual Plaintiffs are directly and negatively impacted by the Law, as they are forced to make decisions as elected officials adverse to their interests and desires as well as those of their constituents, all while elected officials and residents of urban aid municipalities remain in communities that are exempt from such effects.

43.     The Individual Plaintiffs are harmed because the Law requires them to affirmatively vote and/or act to file an "action" with the Affordable Housing Dispute Resolution Program, and to suffer the consequences of said process, or else they stand to be deprived of the ability to exercise the municipality's zoning powers that are delegated to them by the New Jersey Legislature in accordance with the New Jersey Constitution, all while elected officials and residents of urban aid municipalities remain in communities that are exempt from such effects.

44.    The Law requires the Individual Plaintiffs to make decisions and take actions inconsistent with their desires as elected officials to carry out the will of their constituents, including having to support expending costs at taxpayer expense for initiatives that they do not support and for effectuating the re-zoning of properties inconsistent with their vision for their communities. These requirements apply whether a Plaintiff and their municipality files an "action" with the Affordable Housing Dispute Resolution Program or not.

45.    Each of the Individual Plaintiffs are also residents and taxpayers of municipalities that are classified as non-urban aid municipalities.

46.    As residents of non-urban aid municipalities, the Individual Plaintiffs are harmed by living in municipalities that are subject to the prospective need obligations under the Law's Urban Aid Classification, unlike the residents of urban aid municipalities, whose communities are exempt from any such compliance or obligation under the Urban Aid Classification.

47.    As residents of non-urban aid municipalities, the Individual Plaintiffs are harmed by having to pay increased costs that will need to be borne by them as taxpayers to address the prospective need obligation imposed by the Urban Aid Classification, including but not limited to the need to fund infrastructure, services, and affordable housing development costs to satisfy the requirements of the Law and ensuing impacts of the high-density housing that it fosters, all imposed upon their communities against the will of themselves and the community at large, all while residents of urban aid municipalities remain in communities that are exempt from such effects.

48.    As residents of non-urban aid municipalities, the Individual Plaintiffs are harmed by living in a community whose population density will increase as a result of the Law, resulting in negative externalities including increased traffic and/or diminution in property values, while

residents of urban aid municipalities remain in communities that are exempt from such effects imposed by the Law.

## RELEVANT FACTS COMMON TO ALL COUNTS

49.    Under the Law and its Urban Aid Classification, a non-urban aid municipality is subject to a "prospective need" affordable housing obligation and is required to zone for the inclusion of new affordable housing units prescribed by a formula established in the Law, all while an urban aid municipality is entirely exempt from any such obligation.

50.    The Law and its Urban Aid Classification exact compliance from non-urban aid municipalities by obligating them to enter into the Affordable Housing Dispute Resolution Program and follow a process leading to a required re-zoning of the municipality to accommodate the mandated affordable housing units prescribed by the prospective need formula established in the Law, or else the non-urban aid municipality stands to suffer the loss of its legislatively-delegated municipal zoning powers through so-called exclusionary zoning litigation, which pierces a non-urban aid municipality's zoning powers delegated to it by the New Jersey Legislature in accordance with the New Jersey Constitution.

51.    The Law established the Urban Aid Classification of statutory dimension for the first time in New Jersey.

52.    The Law "declares" that it is "intended to implement the Mount Laurel doctrine," a reference to a series of cases of the New Jersey Supreme Court. A closer review of this case law reveals that the Urban Aid Classification is not of state constitutional dimension, and even if it were, it would still need to comport with the requirements of the federal constitution, which it does not.

53.     In 1975, the New Jersey Supreme Court entered its <u>Mount Laurel I</u> decision that interpreted the General Welfare Clause of the New Jersey Constitution to recognize a constitutional obligation that municipalities, "in the exercise of their delegated power to zone, 'afford[ ] a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing.'" <u>In re Adoption of N.J.A.C. 5:96</u>, 215 N.J. 578, 584 (2013) (citations omitted) (alteration in original).

54.     In 1983, the New Jersey Supreme Court entered its <u>Mount Laurel II</u> decision and "fashion[ed]" an "extraordinarily detailed remedy" that was "designed to curb exclusionary zoning practices and to foster development of affordable housing for low- and moderate-income individuals" at that time. <u>Ibid.</u>

55.     To effectuate the <u>Mount Laurel II</u> judicial remedy after the Court's 1983 opinion, designated <u>Mount Laurel</u> New Jersey Superior Court judges "adopted methodologies to determine need and to allocate the need on a regional basis." <u>In re Adoption of N.J.A.C. 5:94 & 5:95 By N.J. Council On Affordable Hous.</u>, 390 N.J. Super. 1, 17 (App. Div. 2007).

56.     In 1984, New Jersey Superior Court Judge Eugene Serpentelli wrote the seminal opinion on this issue, <u>AMG Realty Co. v. Warren Twp.</u>, 207 N.J. Super. 388, 442-43 (Law Div. 1984), setting forth such a methodology, which among other things, established an exclusion for urban aid municipalities. In relevant part, he wrote:

> [S]elected urban aid municipalities do not have an obligation to handle more than the regional average of substandard housing and, therefore, they have no regional obligation, because realism requires a recognition that **their present circumstances** render it impossible for them to absorb more than the regional average.
> . . . .
> This formula excludes selected urban towns from the growth area calculation because they are the traditional core areas or similar towns not likely to attract Mount Laurel type housing and because they generally lack significant vacant land. Non-growth

municipalities obviously cannot contribute to a count of growth acreage.

Ibid. [(Emphasis added)].

57.    In direct response, the Legislature adopted the Fair Housing Act ("FHA"), N.J.S.A. 52:27D-302 et seq., which "codified the core constitutional holding undergirding the Mount Laurel obligation and included particularized means by which municipalities could satisfy their obligation, mirroring the judicially crafted remedy." In re Adoption of N.J.A.C. 5:96, 215 N.J. at 584.

58.    The urban aid exception, which was judicially adopted by Judge Serpentelli in 1983 based upon the "[then-]present circumstances," was continued through regulations promulgated by the Council on Affordable Housing, a state agency established pursuant to the subsequently adopted FHA, for both the First Round and Second Round, and then by the New Jersey Superior Court in the Third Round. See In re Mun. of Princeton, 480 N.J. Super. 70 (Law Div. 2018).

59.    Notably, in 2013, the New Jersey Supreme Court held that its "remedy, imposed thirty years ago, should not now be viewed as a constitutional straightjacket to legislative innovation," In re Adoption of N.J.A.C. 5:96, 215 N.J. at 586, further writing as follows:

Having had three decades of experience with the current affordable housing remedy, we cannot say that there may not be other remedies that may be successful at producing significant numbers of low- and moderate-income housing—remedies that are consistent with statewide planning principles, present space availability, and economic conditions. New Jersey in 2013, quite simply, is not the same New Jersey that it was in 1983. Changed circumstances may merit reassessing how to approach the provision of affordable housing in this state. Assumptions used in devising a remedy in 1983 do not necessarily have the same validity today. That assessment, however, is best made by the policymakers of the Legislature who can evaluate the social science and public policy data presented to this Court. Indeed, at oral argument, the many parties to this litigation were questioned as to whether their arguments were better suited for legislative hearings on the subject.

That said, our response to the overarching question previously identified is that **the constitutional obligation and the judicial remedy ordered by this Court in Mount Laurel II, and in place today through the FHA, are distinct and severable**. The exceptional circumstances leading this Court to create a judicial remedy thirty years ago, which required a specific approach to the identification and fulfillment of present and prospective need for affordable housing in accordance with housing regions in our state, should not foreclose efforts to assess whether alternative approaches are better suited to modern planning, development, and economic conditions in the Garden State. The policymaking branches may arrive at another approach to fulfill the constitutional obligation to promote ample affordable housing to address the needs of the people of this state and, at the same time, deter exclusionary zoning practices. We hold that our remedy, imposed thirty years ago, should not now be viewed as a constitutional straitjacket to legislative innovation.

[Id. at 585-86 (emphasis added)].

60.     The New Jersey Supreme Court further wrote that while "deterring exclusionary municipal zoning practices and concomitantly encouraging development of affordable housing in housing regions where it is needed were the goals of the obligation recognized under the General Welfare Clause of the New Jersey Constitution[,]" at the same time "[h]ow to respond to the constitutional obligation imposed on municipalities in the exercise of their delegated power to zone is a separate question, and one that might be adequately addressed in different ways tailored to today's circumstances." Id. at 610.

61.     Accordingly, the New Jersey Supreme Court concluded: "We therefore recognize, and hold, that the constitutional obligation identified in Mount Laurel I and refined and made applicable to all municipalities in Mount Laurel II is distinct from the judicial remedy that this Court embraced." Ibid.

62.     The New Jersey Supreme Court also noted the following dicta from Mount Laurel II (the "Mount Laurel II Precepts"):

(a)    "Development merely for development's sake is not the constitutional goal."

(b)    The Constitution "does not require bad planning."

(c)    The Constitution "does not require suburban spread."

(d)    The Constitution "does not require rural municipalities to encourage large scale housing developments."

Ibid. (citing S. Burlington Cty. NAACP v. Mount Laurel, 92 N.J. 158, 238 (1983)).

63.    The New Jersey Supreme Court specifically explained that the Mount Laurel II remedy's "utilization of a pre-fixed allocation of municipal obligations based on forecasted projected growth has been criticized for the crudeness inherent whenever one presumes to anticipate development cycles[,]" and that alternative approaches may be constitutionally viable. In re Adoption of N.J.A.C. 5:96, 215 N.J. at 611.

64.    The Court then concluded that the "Mount Laurel II" judicial remedy was "fashioned based on a record created thirty years ago" and therefore "should not be viewed as the only one that presently can secure satisfaction of the constitutional obligation to curb exclusionary zoning and promote the development of affordable housing in the housing regions of this state." Id. at 612.

65.    Despite the New Jersey Supreme Court's invitation, the Legislature adopted the Law, which parallels the same approach that has been followed over three decades under the FHA, administered through COAH and then the courts, arbitrarily and capriciously failing to account for changes to the State over the past three decades leading to today's circumstances.

66.    Plaintiffs have obtained an expert report from E-Consult Solutions, Inc., titled "Trends in Household Change and the Urban Aid Exemption, 1970-2020" (the "Memorandum"). A true copy of the Memorandum is attached as **Exhibit B**.

67.     The Memorandum is co-authored by Dr. Peter Angelides, who previously qualified as an expert before the New Jersey Superior Court in past litigation involving affordable housing. *See* In re Mun. of Princeton, 480 N.J. Super. at 70.

68.     In the 1980s, when the Urban Aid Classification was first established, many exempt municipalities were in decline as evinced by large losses in population and households that began in the mid-twentieth century and carried through to the 1990s.

69.     Today, nearly 40 years later, while some of the underlying conditions that affected many of these exempt municipalities persist, several exempt municipalities are growing, overall, and exempt municipalities now comprise half of the state's growth in households.

70.     Specifically, in the 1970s, New Jersey experienced 102% of its growth in households in non-urban aid municipalities and -2% in urban aid municipalities.

71.     In the 2010s (which is the decade used for currently applicable "Fourth Round" calculations under the Law), the State experienced 50% of its change in households in urban aid municipalities and 50% in non-urban aid municipalities.

72.     In the 1990s, the Low-Income Housing Tax Credit ("LIHTC") program funded the development of 2,710 units in urban aid municipalities (comprising 3% of the prospective need) and 4,602 units in non-urban aid municipalities (comprising 4% of the prospective need).

73.     During the 2010s, the LIHTC program funded the development of 6,635 units in urban aid municipalities (comprising 8% of the prospective need) and 8,188 units in non-urban aid municipalities (comprising 10% of the prospective need).

74.     The economic conditions that supported the judicial establishment of an urban aid exception in 1983 no longer exist.

75.    When the <u>Mount Laurel</u> doctrine and its corresponding remedy were established, the urban aid municipalities were experiencing population declines, and the State's entire net population growth was contained in the non-urban aid municipalities. It followed that the urban aid municipalities lacked the same economic ability to produce affordable housing units as non-urban aid municipalities, leading to the urban aid exemption in 1983.

76.    Four decades later, the State's population growth is exactly even (50%/50%) between the urban aid and non-urban aid municipalities.

77.    There is an upward trajectory in the number of LIHTC housing units developed in the urban aid municipalities, all as part of a trend that outpaces the growth in such units developed in non-urban aid municipalities.

78.    The population and LIHTC data establish that the urban aid municipalities no longer possess economic conditions that prevent them from developing affordable housing units and there is no longer any justification for them to be exempt from a prospective need housing obligation.

79.    For these reasons, the statutory establishment of an Urban Aid Classification based upon the present conditions in 2024 was arbitrary, capricious, and unreasonable.

80.    Furthermore, the Urban Aid Classification is itself statistically flawed as it imposes prospective need strictly upon non-urban aid municipalities – approximately half of which is generated by growth in neighboring urban aid municipalities – all while failing to adjust for affordable housing that is already being created in urban aid municipalities and thus satisfying the purported "prospective need" in the region.

81.    Urban aid municipalities are developing a significant number of affordable housing units that are not being counted in the fair share formula under the Law.

82.    This results in a statistical over-imposition of fair share upon the non-urban aid municipalities – including the municipalities to which Plaintiffs represent and reside in.

83.    Over the past decade, 6,635 LIHTC affordable housing units were developed in urban-aid municipalities, along with 8,118 LIHTC affordable housing units in non-urban aid municipalities.

84.    This means that 45% of the State's LIHTC affordable housing development occurred in urban aid municipalities over the past decade, based on publicly available information.

85.    The fixed number of LIHTC units is underinclusive of the total number of affordable housing units that have been developed in urban aid municipalities, as many affordable housing units are created outside of the LIHTC program, so the amount of affordable housing development in the urban aid municipalities and in the aggregate is higher.

86.    The Law requires that prospective need be calculated as 40% of the region's population growth between the past two censuses, which has been calculated at 84,697 units.

87.    This calculation includes the significant population growth that is being experienced today in the urban-aid municipalities.

88.     The Law's calculated prospective need is then spread among the non-urban aid municipalities only to allocate them each their supposed "fair share," while each of the urban aid municipalities are exempt and do not count towards same.

89.    Under the Law, neither the overall calculated prospective need – nor each non-urban aid municipality's obligation – is adjusted in any way for the significant development of affordable housing that is occurring in the urban aid municipalities.

90.    The result is that the non-urban aid municipalities are being subjected to a "fair share" prospective need calculation that is an overestimation because it does not account for

affordable housing development that is occurring and contributing towards satisfying the need in the region.

91.    Over the past decade, 8% of the prospective need was satisfied through LIHTC development in urban aid municipalities.

92.    This means that the LIHTC calculation alone bears out that the Law's formula overestimates each non-urban aid municipality's fair share by 8%.

93.    The actual overestimation is higher, as that percentage does not take into account a) the overall trend of an increase in affordable housing development in the urban aid municipalities that is likely to continue in the Fourth Round, as well as b) the non-LIHTC affordable housing development occurring in the urban aid municipalities. The prospective need calculation being imposed upon the non-urban aid municipalities is not a "fair share" at all.

94.    In sum, the Urban Aid Classification arbitrarily requires non-urban aid municipalities to assume the entire prospective need affordable housing obligation under the Law, even though the urban aid municipalities are responsible today for 50% of the State's population growth and trigger a corresponding amount in supposed "prospective need" in affordable housing.

95.    At the same time, the Urban Aid Classification imposes "prospective need" solely upon non-urban aid municipalities, half of which is generated by neighboring urban-aid municipalities, while failing to mathematically account for the affordable housing development occurring in urban-aid municipalities that satisfies the purported prospective need in the region.

96.    Considering the New Jersey Legislature expressed that it adopted the Law and the Urban Aid Classification to "implement" the Mount Laurel doctrine, the Legislature has represented that it included the Urban Aid Classification because it felt it was obligated to do so under New Jersey's unclear state judicial case law.

97.    This exact scenario was envisioned by former New Jersey Supreme Court Justice Helen Hoens and current New Jersey Supreme Court Justice Anne Patterson in 2013 when they dissented from a 3-2 opinion of the Court that struck down COAH's third round regulations. In re Adoption of N.J.A.C. 5:96, 215 N.J. at 621. Their dissent said that the Court's majority opinion, which confirms that the Urban Aid Classification is not of state constitutional dimension, "le[ft] the Legislature with no guidance concerning what alternate statutory approach might comply with the majority's interpretation of the Constitution. That lack of guidance, perhaps unintentionally, will greatly diminish the likelihood that the Legislature will attempt a future change of course." Id. at 622 (Hoens, J., dissenting). The dissent further contended that the majority's opinion "risks subjecting us to an endless cycle of repeating that which has not worked in the past." Id. at 632 (Hoens, J., dissenting).

98.    The Law's adoption of the Urban Aid Classification demonstrates this precise scenario—an endless cycle of repeating that which has not worked, and more importantly, based upon present circumstances, presents federal constitutional infirmity.

## CLAIMS FOR RELIEF

## COUNT I

### U.S. CONST. amend. XIV, 42 U.S.C. § 1983

**VIOLATION OF PLAINTIFFS' RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (EQUAL PROTECTION)**

99.    Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein.

100.    The Equal Protection Clause of the United States Constitution applies to the Law and the actions taken by Defendants relating to same.

101.    State actors including but not limited to Defendants deny the equal protection guaranteed under the United States Constitution when they treat persons similarly situated differently under the law.

102.    The Urban Aid Classification treats Plaintiffs and New Jersey citizens differently depending upon the New Jersey municipality in which they live.

103.    A valid reason must exist for differentiating among members of the same class.

104.    The Supreme Court of the United States has determined that the traditional test for finding a denial of equal protection under State law is whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid State objective.

105.    A classification must rest on some ground that is fairly and substantially related to the object for which it is proposed.

106.    Equal protection under the Constitution guarantees that the Legislature does not act arbitrarily or capriciously.

107.    The Urban Aid Classification bears no rational relation to the governmental objective to be achieved.

108.    The Urban Aid Classification contains a flawed formula resulting in overcounting "prospective need" and is therefore arbitrary, capricious, and unreasonable.

109.    The Law, through its Urban Aid Classification, fails judicial review under an equal protection analysis under the Fourteenth Amendment to the United States Constitution, even if a rational basis review is applied.

**WHEREFORE**, Plaintiffs seek a declaratory judgment that the Law and its Urban Aid Classification violate the Fourteenth Amendment to the United States Constitution, invalidation of

the Law, injunctive relief barring enforcement of the Law, reasonable attorneys' fees, and such

other relief as this Court may deem proper and just.

## COUNT II

### N.J. CONST. art. I, § I; 28 U.S.C. § 1367

### VIOLATION OF PLAINTIFFS' EQUAL PROTECTION RIGHTS UNDER THE NEW JERSEY CONSTITUTION

110.    Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth

herein.

111.    The New Jersey Constitution's General Welfare Clause has been interpreted as

providing an equal protection right, N.J. State Bar Ass'n v. State, 387 N.J. Super. 24, 40 (App.

Div. 2006), which is an analogue to the Fourteenth Amendment to the United States Constitution.

112.    The New Jersey Supreme Court has rejected the federal two-tier approach and

instead apply "a more flexible balancing test." Barone v. Dep't of Human Servs., Div. of Med.

Assistance & Health Servs., 107 N.J. 355, 368 (1987). "The court must balance: (1) the nature of

the affected right; (2) the extent to which the governmental restriction intrudes upon it; and (3) the

public need for the restriction." Garden State Equality v. Dow, 434 N.J. Super. 163, 207 (Law Div.

2013) (citing Lewis v. Harris, 188 N.J. 415, 443 (2006)). "Where a statute is challenged because

it 'does not apply evenhandedly to similarly situated people,' the means selected by the Legislature

must "bear a substantial relationship to a legitimate government purpose." Ibid. (quoting Lewis,

188 N.J. at 443). "A 'real and substantial relationship between the classification and the

governmental purpose which it purportedly serves' must be shown to sustain the classification."

Ibid. (quoting Barone, 107 N.J. at 355).

113.    The Law, through its terms and classifications, fails judicial review under an equal protection analysis under the General Welfare Clause to the New Jersey Constitution.

**WHEREFORE**, Plaintiffs seek a declaratory judgment that the Law and its Urban Aid Classification violate the New Jersey Constitution, invalidation of the Law, injunctive relief barring enforcement of the Law, reasonable attorneys' fees, and such other relief as this Court may deem proper and just.

DATE: April 24, 2025

By: **/s/ Michael L. Collins**
Michael L. Collins
KING MOENCH & COLLINS LLP
200 Schulz Drive, Suite 402
Red Bank, NJ 07701
(732) 546-3670
mcollins@kingmoench.com
*Attorneys for Plaintiffs*

# EXHIBIT A

# CHAPTER 2

AN ACT concerning affordable housing, including administration and municipal obligations, amending, supplementing, and repealing various parts of the statutory law, and making an appropriation.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

1.  Section 2 of P.L.1985, c.222 (C.52:27D-302) is amended to read as follows:

C.52:27D-302  Findings.

2.  The Legislature finds that:

a.  The New Jersey Supreme Court, through its rulings in Southern Burlington County NAACP v. Mount Laurel, 67 N.J. 151 (1975) and Southern Burlington County NAACP v. Mount Laurel, 92 N.J. 158 (1983), has determined that every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region's present and prospective needs for housing for low- and moderate-income families.

b.  In the second Mount Laurel ruling, the Supreme Court stated that the determination of the methods for satisfying this constitutional obligation "is better left to the Legislature," that the court has "always preferred legislative to judicial action in their field," and that the judicial role in upholding the Mount Laurel doctrine "could decrease as a result of legislative and executive action."

c.  The interest of all citizens, including low- and moderate-income families in need of affordable housing, and the needs of the workforce, would be best served by a comprehensive planning and implementation response to this constitutional obligation.

d.  There are a number of essential ingredients to a comprehensive planning and implementation response, including the establishment of reasonable fair share housing guidelines and standards, the initial determination of fair share by officials at the municipal level and the preparation of a municipal housing element, State review of the local fair share study and housing element, and continuous State funding for low- and moderate-income housing to replace the federal housing subsidy programs which have been almost completely eliminated.

e.  The State can maximize the number of low- and moderate-income units provided in New Jersey by allowing its municipalities to adopt appropriate phasing schedules for meeting their fair share, so long as the municipalities permit a timely achievement of an appropriate fair share of the regional need for low- and moderate-income housing as required by the Mount Laurel I and II opinions and other relevant court decisions.

f.  The State can also maximize the number of low- and moderate-income units by creating new affordable housing and by rehabilitating existing, but substandard, housing in the State. Because the Legislature has determined, pursuant to P.L.2008, c.46 (C.52:27D-329.1 et al.), that it is no longer appropriate or in harmony with the Mount Laurel doctrine to permit the transfer of the fair share obligations among municipalities within a housing region, it is necessary and appropriate to create a new program to create new affordable housing and to foster the rehabilitation of existing, but substandard, housing.

g.  Since the urban areas are vitally important to the State, construction, conversion, and rehabilitation of housing in our urban centers should be encouraged.  However, the provision of housing in urban areas must be balanced with the need to provide housing throughout the State for the free mobility of citizens.

h.  The Supreme Court of New Jersey in its Mount Laurel decisions demands that municipal land use regulations affirmatively afford a realistic opportunity for a variety and

P.L. 2024, CHAPTER 2

2

choice of housing including low- and moderate-cost housing, to meet the needs of people desiring to live there. While provision for the actual construction of that housing by municipalities is not required, they are encouraged but not mandated to expend their own resources to help provide low- and moderate-income housing.

i.  (Deleted by amendment, P.L.2024, c.2)

j.  The Legislature finds that the use of regional contribution agreements, which permits municipalities to transfer a certain portion of their fair share housing obligation outside of the municipal borders, should no longer be utilized as a mechanism for the creation of affordable housing.

k.  The Legislature finds that the role of the Council on Affordable Housing, as intended in the original enactment of the "Fair Housing Act," has not developed in practice as was intended in the legislation.

l.  The council's inability to function ultimately led the Supreme Court in 2015 to order the temporary dissolution of the requirement that administrative remedies be exhausted prior to resolving affordable housing disputes before the court and allowed the courts to resume their role as the forum of first resort for evaluating municipal compliance with Mount Laurel obligations pursuant to guidelines laid out by the Supreme Court's order.

m. The Legislature finds that the council's inability to function led to a "gap period" that frustrated the intent of the Legislature and compliance with constitutional and statutory obligations and that it is necessary to establish definitive deadlines for municipal action and any challenges to those actions to avoid such a "gap period" from being repeated in the future.

n.  The Legislature finds that although the court-led system that has developed since 2015 has resulted in a significant number of settlement agreements and increased production of affordable housing, the system could operate more expeditiously to produce affordable housing, and at a lower cost to all parties, if appropriate standards are established by the Legislature to be applied throughout the State, including more clarity on calculation on fair share affordable housing obligations using transparent and established data sources to eliminate the lengthy and costly processes of determining those obligations that have characterized both the Council on Affordable Housing and court-led system.

o.  The Legislature determines that, considering the unique history of the "Fair Housing Act," the Council on Affordable Housing shall be abolished and that, pursuant to the formulas and process established pursuant to sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3), a municipality shall be authorized to seek approval of its fair share affordable housing obligation, adopted pursuant to binding resolution and then filed with the court, with the guidance of calculations published by the Department of Community Affairs, but that advocates for the low- and moderate-income households of the State shall be provided with an opportunity to contest the municipal determination.

p.  The Legislature declares that the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), as amended and supplemented by P.L.2024, c.2 (C.52:27D-304.1 et al.), is intended to implement the Mount Laurel doctrine, and that municipalities in compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) are also in compliance with the Mount Laurel doctrine.

q.  The Legislature finds that the population of persons aged 65 years and older in the State has grown from approximately 13 percent in 1990, to 17 percent in 2021, and that such growth, in conjunction with expected future growth, makes it appropriate for the Legislature to allow up to 30 percent of the units towards a municipality's prospective affordable housing obligation to be satisfied through the creation of age-restricted housing.

P.L. 2024, CHAPTER 2

3

r.  The "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the "State Planning Act," P.L.1985, c.398 (C.52:18A-196 et al.) were enacted concurrently to address the ruling of the New Jersey Supreme Court in Southern Burlington County NAACP v. Mount Laurel, 92 N.J. 158 (1983) and associated land use planning concerns.

s.  The Legislature, in amending and supplementing the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), intends to facilitate comprehensive planning in alignment with smart growth principles and the State Development and Redevelopment Plan.

t.  The Legislature declares that the changes made to affordable housing methodologies, obligations, and fair share plans, as determined to be a necessity by the Legislature, through the enactment of P.L.2024, c.2 (C.52:27D-304.1 et al.), are made with the intention of furthering consistency with the State Development and Redevelopment Plan.

2.  Section 4 of P.L.1985, c.222 (C.52:27D-304) is amended to read as follows:

C.52:27D-304  Definitions.

4.  As used in P.L.1985, c.222 (C.52:27D-301 et al.):

a.  "Council" means the Council on Affordable Housing established in P.L.1985, c.222 (C.52:27D-301 et al.), abolished pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1).

b.  "Housing region" means a geographic area established pursuant to subsection b. of section 6 of P.L.2024, c.2 (C.52:27D-304.2).

c.  "Low-income housing" means housing affordable according to federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income equal to 50 percent or less of the median gross household income for households of the same size within the housing region in which the housing is located.

d.  "Moderate-income housing" means housing affordable according to federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income equal to more than 50 percent but less than 80 percent of the median gross household income for households of the same size within the housing region in which the housing is located.

e.  (Deleted by amendment, P.L.2024, c.2)

f.  "Inclusionary development" means a residential housing development in which a substantial percentage of the housing units are provided for a reasonable income range of low- and moderate-income households.

g.  "Conversion" means the conversion of existing commercial, industrial, or residential structures for low- and moderate-income housing purposes where a substantial percentage of the housing units are provided for a reasonable income range of low- and moderate-income households.

h.  "Development" means any development for which permission may be required pursuant to the "Municipal Land Use Law," P.L.1975, c.291 (C.40:55D-1 et seq.).

i.  "Agency" means the New Jersey Housing and Mortgage Finance Agency established by P.L.1983, c.530 (C.55:14K-1 et seq.).

j.  "Prospective need" means a projection of housing needs based on development and growth which is reasonably likely to occur in a region or a municipality, as the case may be, as a result of actual determination of public and private entities.  Prospective need shall be determined by the methodology set forth pursuant to sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3) for the fourth round and all future rounds of housing obligations.

P.L. 2024, CHAPTER 2
4

k. "Person with a disability" means a person with a physical disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, aging, or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment, deafness or hearing impairment, the inability to speak or a speech impairment, or physical reliance on a service animal, wheelchair, or other remedial appliance or device.

l. "Adaptable" means constructed in compliance with the technical design standards of the barrier free subcode adopted by the Commissioner of Community Affairs pursuant to the "State Uniform Construction Code Act," P.L.1975, c.217 (C.52:27D-119 et seq.) and in accordance with the provisions of section 5 of P.L.2005, c.350 (C.52:27D-123.15).

m. "Very low-income housing" means housing affordable according to federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income equal to 30 percent or less of the median gross household income for households of the same size within the housing region in which the housing is located.

n. "Accessory dwelling unit" means a residential dwelling unit that provides complete independent living facilities with a private entrance for one or more persons, consisting of provisions for living, sleeping, eating, sanitation, and cooking, including a stove and refrigerator, and is located within a proposed or existing primary dwelling, within an existing or proposed structure that is accessory to a dwelling on the same lot, constructed in whole or part as an extension to a proposed or existing primary dwelling, or constructed as a separate detached structure on the same lot as the existing or proposed primary dwelling.

o. "Builder's remedy" means court-imposed, site-specific relief for a litigant who seeks to build affordable housing for which the court requires a municipality to utilize zoning techniques, such as mandatory set-asides or density bonuses, including techniques which provide for the economic viability of a residential development by including housing that is not for low- and moderate-income households.

p. "Commissioner" means the Commissioner of Community Affairs.

q. "Compliance certification" means the certification obtained by a municipality pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1), that protects the municipality from exclusionary zoning litigation during the current round of present and prospective need and through July 1 of the year the next round begins, which is also known as a "judgment of compliance" or "judgment of repose." The term "compliance certification" shall include a judgment of repose granted in an action filed pursuant to section 13 of P.L.1985, c.222 (C.52:27D-313).

r. "County-level housing judge" means a judge appointed pursuant to section 5 of P.L.2024, c.2 (C.52:27D-313.2), to resolve disputes over the compliance of municipal fair share affordable housing obligations and municipal fair share plans and housing elements, with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).

s. "Deficient housing unit" means housing that: (1) is over fifty years old and overcrowded; (2) lacks complete plumbing; or (3) lacks complete kitchen facilities.

t. "Department" means the Department of Community Affairs.

u. "Exclusionary zoning litigation" means litigation to challenge the fair share plan, housing element, or ordinances or resolutions implementing the fair share plan or housing element of a municipality based on alleged noncompliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) or the Mount Laurel doctrine, which litigation shall include, but shall not be limited to, litigation seeking a builder's remedy.

P.L. 2024, CHAPTER 2
5

v.  "Fair share plan" means the plan or proposal that is in a form which may readily be adopted, with accompanying ordinances and resolutions, pursuant to subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1), by which a municipality proposes to satisfy its obligation to create a realistic opportunity to meet its fair share of low- and moderate-income housing needs of its region and which details the affirmative measures the municipality proposes to undertake to achieve its fair share of low- and moderate-income housing, as provided in the municipal housing element, and addresses the development regulations necessary to implement the housing element, including, but not limited to, inclusionary requirements and development fees, and the elimination of unnecessary housing cost-generating features from the municipal land use ordinances and regulations.

w.  "Highlands-conforming municipality" means a municipality that has adopted a land development ordinance implementing the municipality's plan conformance petition and which land development ordinance has been certified by the Highlands Water Protection and Planning Council as consistent with the "Highlands Water Protection and Planning Act," P.L.2004, c.120 (C.13:20-1 et seq.), the Highlands regional master plan, and the municipality's plan conformance approval.  The term "land development ordinance" shall be inclusive of any amendment to the municipality's land development ordinances that is adopted to further the municipality's petition of plan conformance.

x.  "Housing element" means that portion of a municipality's master plan consisting of reports, statements, proposals, maps, diagrams, and text designed to meet the municipality's fair share of its region's present and prospective housing needs, particularly with regard to low- and moderate-income housing, and which shall contain the municipal present and prospective obligation for affordable housing, determined pursuant to subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1).

y.  "Program" means the Affordable Housing Dispute Resolution Program, established pursuant to section 5 of P.L.2024, c.2 (C.52:27D-313.2).

z.  "State Development and Redevelopment Plan" or "State Plan" means the plan prepared pursuant to sections 1 through 12 of the "State Planning Act," P.L.1985, c.398 (C.52:18A-196 et al.), designed to represent a balance of development and conservation objectives best suited to meet the needs of the State, and for the purpose of coordinating planning activities and establishing Statewide planning objectives in the areas of land use, housing, economic development, transportation, natural resource conservation, agriculture and farmland retention, recreation, urban and suburban redevelopment, historic preservation, public facilities and services, and intergovernmental coordination pursuant to subsection f. of section 5 of P.L.1985, c.398 (C.52:18A-200).

aa.  "Transitional housing" means temporary housing that:

includes, but is not limited to, single-room occupancy housing or shared living and supportive living arrangements;

provides access to on-site or off-site supportive services for very low-income households who have recently been homeless or lack stable housing;

is licensed by the department; and

allows households to remain for a minimum of six months.


C.52:27D-304.1  Council on Affordable Housing abolished; report to Governor, Legislature, municipalities.

3. a. The Council on Affordable Housing, established by the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), is abolished.  Each municipality shall determine its municipal present and prospective obligations in accordance with the formulas established in sections 6

and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3) and may take into consideration the calculations in the report published by the department in accordance with this section.

b.   Following the expiration of the third round of affordable housing obligations on July 1, 2025, a municipality shall have immunity from exclusionary zoning litigation if the municipality complies with the deadlines established in P.L.2024, c.2 (C.52:27D-304.1 et al.) for both determining present and prospective obligations and for adopting a housing element and fair share plan to meet those obligations.

(1) Immunity from exclusionary zoning litigation shall not limit the ability of an interested party to challenge a municipality for failure to comply with the terms of its compliance certification.  However, a municipality's actions to comply with the terms of its compliance certification shall retain a presumption of validity if challenged for an alleged failure described in this paragraph.

(2) Immunity from exclusionary zoning litigation shall not limit the ability of an interested party to bring a challenge before the program alleging that, despite the issuance of compliance certification, a municipality's fair share obligation, fair share plan, housing element, or ordinances implementing the fair share plan or housing element are in violation of the Mount Laurel doctrine.  However, the decisions of the program shall retain a presumption of validity if challenged for an alleged violation described in this paragraph.

c.   Prior to the beginning of each new 10-year round of housing obligations beginning with the fourth round on July 1, 2025, the Department of Community Affairs shall conduct a calculation of regional need and municipal present and prospective obligations in accordance with the formulas established in sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3).

d.   For the fourth round of affordable housing obligations, the department shall prepare and submit a report to the Governor, and, pursuant to section 2 of P.L.1991, c.164 (C.52:14-19.1), to the Legislature providing a report on the calculations of regional need and municipal obligations for each region of the State within the earlier of seven months following the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.) or December 1, 2024.  To assist in this calculation, the Highlands Water Protection and Planning Council shall provide a list of Highlands-conforming municipalities to the department no less than five business days following the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.).  The department shall provide the report to each municipality in the State at the same time that it submits the report to the Governor and Legislature and shall also publish such report on the department's Internet website.  For the fifth round, and each subsequent new round of housing obligations, the department shall prepare and submit a report to each municipality in the State, the Governor, and, pursuant to section 2 of P.L.1991, c.164 (C.52:14-19.1), to the Legislature on these calculations on or before August 1 of the year prior to the start of the new round and shall also publish such report on the department's Internet website.  For each 10-year round of housing obligations, a municipality may take into consideration the calculations in the report prepared by the department pursuant to this subsection in determining its present and prospective obligations.

e.   Nothing in the provisions of subsections c., d., or f. of this section shall be interpreted to render any calculation in a report by the department published pursuant to this section binding on any municipality or other entity, nor to render any failure by the department to timely conduct the calculations or publish a report required by this section to alter the deadlines or process set forth in this section.  The ultimate determination of a municipality's present and prospective need shall be through the process as set forth below.

P.L. 2024, CHAPTER 2
7

f. (1) (a) With consideration of the calculations contained in the relevant report published by the department pursuant to this section, for each 10-year round of affordable housing obligations beginning with the fourth round, a municipality shall determine its present and prospective fair share obligation for affordable housing in accordance with the formulas established in sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3) by resolution, which shall describe the basis for the municipality's determination and bind the municipality to adopt a housing element and fair share plan pursuant to paragraph (2) of this subsection based on this determination as may be adjusted by the program as set forth in this subsection.

(b) For the fourth round of affordable housing obligations, this determination of present and prospective fair share obligation shall be made by binding resolution no later than January 31, 2025.  After adoption of this binding resolution, the municipality shall file an action regarding the resolution with the program no later than 48 hours following adoption.  The resolution, along with the date of filing with the program, shall be published on the program's publicly accessible Internet website.  The municipality shall also publish the resolution on its publicly accessible Internet website, if the municipality maintains one.  If the municipality does not meet this deadline, it shall lose immunity from exclusionary zoning litigation until such time as the municipality is determined to have come into compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine.  A determination of the municipality's present and prospective obligation may be established before a county-level housing judge as part of any resulting declaratory judgment action pursuant to section 13 of P.L.1985, c.222 (C.52:27D-313), as amended by P.L.2024, c.2 (C.52:27D-304.1 et al.), or through exclusionary zoning litigation.  If the municipality meets this January 31 deadline, then the municipality's determination of its obligation shall be established by default and shall bear a presumption of validity beginning on March 1, 2025, as the municipality's obligation for the fourth round, unless challenged by an interested party on or before February 28, 2025.  The municipality's determination of its fair share obligation shall have a presumption of validity, if established in accordance with sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3), in any challenge initiated through the program.  An interested party may file a challenge with the program, after adoption of the binding resolution and prior to March 1, 2025, alleging that the municipality's determination of its present and prospective obligation does not comply with the requirements of sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3).  For the fifth round, and each subsequent new round of housing obligations, the deadlines established in this subparagraph shall be on the last day of January, the last day of February, and the first day of March, respectively, of the year of the start of each new round.

(c) The Administrative Director of the Courts shall establish procedures for the program to consider a challenge and resolve a dispute initiated by an interested party pursuant to subparagraph (b) of this paragraph.  To resolve a challenge, the program shall apply an objective assessment standard to determine whether or not the municipality's calculation of its obligation is compliant with the requirements of sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3).  Any challenge must state with particularity how the municipal calculation fails to comply with sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3) and include the challenger's own calculation of the fair share obligations in compliance with sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3).  The program shall establish procedures to summarily dismiss any objection or challenge that does not meet these minimum standards.  For the purpose of efficiency, the program shall, in its own discretion, permit multiple challenges to the same municipal determination to be consolidated.  The program's approach to resolving a dispute may include: (i) a finding that

P.L. 2024, CHAPTER 2
8

the municipality's determination of its present and prospective need obligation did not facially comply with the requirements of sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3) and thus the municipality's immunity shall be revoked; (ii) an adjustment of the municipality's determination of its present and prospective need obligation to comply with the requirements of sections 6 and 7 of P.L.2024, c.2 (C.52:27D-304.2 and C.52:27D-304.3) without revoking immunity; or (iii) a rejection of a challenge and affirm the municipality's determination.  The decision shall be provided to the municipality and all parties that have filed challenges no later than March 31 of the year when the current round is expiring and the new round is beginning and concurrently posted on the program's Internet website.  The Administrative Director of the Courts shall establish procedures for any further appellate review of such determinations and may establish an expedited process for consolidated review of any such challenges by the Supreme Court, provided that any party seeking appellate review shall not change the deadlines established for municipal filing of a housing element and fair share plan, and implementing ordinances.

(2) (a) A municipality shall adopt a housing element and fair share plan as provided for by the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), and propose drafts of the appropriate zoning and other ordinances and resolutions to implement its present and prospective obligation established in paragraph (1) of this subsection on or before June 30, 2025.  After adoption of the housing element and fair share plan, and the proposal of drafts of the appropriate zoning and other ordinances and resolutions, the municipality shall within 48 hours of adoption or by June 30, 2025, whichever is sooner, file the same with the program as part of the action initiated pursuant to subparagraph (b) of paragraph (1) of this subsection through the program's Internet website.  Any municipality that does not do so by June 30, 2025, shall not retain immunity from exclusionary zoning litigation until such time as the municipality is determined to have come into compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine and shall be subject to review through the declaratory judgment process as established in paragraph (3) of this subsection.  As part of its housing element and fair share plan, the municipality shall include an assessment of the degree to which the municipality has met its fair share obligation from the prior rounds of affordable housing obligations as established by prior court approval, or approval by the council, and determine to what extent this obligation is unfulfilled or whether the municipality has credits in excess of its prior round obligations.  If a prior round obligation remains unfulfilled, or a municipality never received an approval from court or the council for any prior round, the municipality shall address such unfulfilled prior round obligation in its housing element and fair share plan.  Units included as part of the municipality's unfulfilled prior round obligation shall not count towards the cap on units in the municipality's prospective need obligation.  In addressing prior round obligations, the municipality shall retain any sites that, in furtherance of the prior round obligation, are the subject of a contractual agreement with a developer, or for which the developer has filed a complete application seeking subdivision or site plan approval prior to the date by which the housing element and fair share plan are required to be submitted, and shall demonstrate how any sites that were not built in the prior rounds continue to present a realistic opportunity, which may include proposing changes to the zoning on the site to make its development more likely, and which may also include the dedication of municipal affordable housing trust fund dollars or other monetary or in-kind resources.  The municipality shall only plan to replace any sites planned for development as provided by a prior court approval, settlement agreement, or approval by the council, with alternative development plans, if it is determined that the previously planned sites no longer present a realistic opportunity, and the sites in the alternative development plan

P.L. 2024, CHAPTER 2
9

provide at least an equivalent number of affordable units and are otherwise in compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine. If a municipality proposes to replace a site for which a complete application seeking subdivision or site plan approval has not been filed prior to the date by which the housing element and fair share plan is required to be submitted, there shall be a rebuttable presumption in any challenge filed to the municipality's plan that any site for which a zoning designation was adopted creating a realistic opportunity for the development of a site prior to July 1, 2020, or July 1 of every 10th year thereafter, as applicable, may be replaced with one or more alternative sites that provide a realistic opportunity for at least the same number of affordable units and is otherwise in compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine.  To the extent a municipality has credits, including bonus credits, from units created during a prior round that are otherwise permitted to be allocated toward the municipality's unfulfilled prior round obligation or present or prospective need obligation in an upcoming round, the municipality shall be entitled to rely on the rules, including rules for bonus credits, applicable for the round during which those credits were accumulated.  If a municipality has credits in excess of its prior round obligations, and such excess credits represent housing that will continue to be deed-restricted and affordable through the current round, the municipality may include such housing, and applicable bonus credits, towards addressing the municipality's new calculation of prospective need.  Consistent with subsection k. of section 11 of P.L.1985, c.222 (C.52:27D-311), the total number of bonus credits shall in no circumstance exceed 25 percent of the municipality's prospective obligation in any round.  The municipality may in its plan lower its prospective need obligation to the extent necessary to prevent establishing a prospective need obligation that requires the municipality to provide a realistic opportunity for more than 1,000 housing units, after the application of any excess credits, or to prevent a prospective need obligation that exceeds 20 percent of the total number of households in a municipality according to the most recent federal decennial census, not including any prior round obligation.  If a municipality is subject to both a 1,000 unit cap or 20 percent cap, it may apply whichever cap results in a lower prospective need obligation.  For the fifth round, and for each subsequent new round of housing obligations, the deadlines in this paragraph shall be June 30 for the adoption of the housing element and fair share plan, and the proposal of drafts of the appropriate zoning and other ordinances and resolutions to implement its present and prospective obligation, of the year of the start of the new round.

(b) Following the filing, in an action, of an adopted housing element and fair share plan pursuant to subparagraph (a) of this paragraph, an interested party may file a response on or before August 31, 2025 alleging that the municipality's fair share plan and housing element are not in compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) or the Mount Laurel doctrine.  Such allegation shall not include a claim that a site on real property proposed by the interested party is a better site than a site in the plan, but rather shall be based on whether the housing element and fair share plan as proposed is compliant with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) or the Mount Laurel doctrine.  To resolve a challenge, the program shall apply an objective assessment standard to determine whether or not the municipality's housing element and fair share plan is compliant with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine.  Any interested party that files a challenge shall specify with particularity which sites or elements of the municipal fair share plan do not comply with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) or the Mount Laurel doctrine, and the basis for alleging such non-compliance.  The program shall establish procedures to summarily dismiss any objection or

P.L. 2024, CHAPTER 2
10

challenge that does not meet these minimum standards.  For the purpose of efficiency, the program shall, in its own discretion, permit multiple challenges to the same municipal housing element and fair share plan to be consolidated.  If a municipality's fair share plan and housing element is not challenged on or before August 31, 2025, then the program shall apply an objective standard to conduct a limited review of the fair share plan and housing element for consistency and to determine whether it enables the municipality to satisfy the fair share obligation, applies compliant mechanisms, meets the threshold requirements for rental and family units, does not exceed limits on other unit or category types, and is compliant with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine. The program shall issue a compliance certification unless these objective standards are not met.  The program shall facilitate communication between the municipality and any interested parties for a challenge and provide the municipality until December 31, 2025 to commit to revising its fair share plan and housing element in compliance with the changes requested in the challenge, or provide an explanation as to why it will not make all of the requested changes, or both.  Upon resolution of a challenge, the program shall issue compliance certification, conditioned on the municipality's commitment, as necessary, to revise its fair share plan and housing element in accordance with the resolution of the challenge.  The program may also terminate immunity if it finds that the municipality is not determined to come into constitutional compliance at any point in the process.  If by December 31, 2025 the municipality and any interested party that filed a response have resolved the issues raised in the response through agreement or withdrawal of the filing, then the program shall review the fair share plan and housing element for consistency and to determine whether it is compliant with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine and issue a compliance certification unless these objective standards are not met.  For the fifth round, and each subsequent new round of housing obligations, the deadline established in this subparagraph for an interested party to file a challenge shall be August 31, and for the municipality to revise its housing element and fair share plan in response, shall be December 31 of the year of the beginning of the new round.

(c)  For the fourth round of affordable housing obligations, the implementing ordinances and resolutions, proposed pursuant to subparagraph (a) of this paragraph, and incorporating any changes from the program, shall be adopted on or before March 15, 2026.  For the fifth round, and each subsequent new round of housing obligations, the deadline established in this subparagraph for the implementing ordinances and resolutions shall be on March 15 of the year following the beginning of the new round.  After adoption of the implementing ordinances and resolutions by the municipality, the municipality shall immediately file the ordinances and resolutions with the program through the program's Internet website.  Failure to meet the March 15 deadline shall result in the municipality losing immunity from exclusionary zoning litigation.

(d)  The program may permit a municipality that still has a remaining dispute by interested parties to retain immunity from exclusionary zoning litigation into the year following the year in which a new round begins if the program, or county-level housing judge, determines that the municipality has been unable to resolve the issues disputed despite being determined to come into constitutional compliance. The Administrative Director of the Courts shall develop procedures to enable a county-level housing judge to resolve this dispute over the issuance of compliance certification through a summary proceeding in Superior Court following the year in which the new round begins.  A judge shall be permitted to serve as a county-level housing judge for more than one county in the same vicinage.  The pendency of such a dispute shall not stay the deadline for adoption of implementing ordinances and resolutions pursuant to this

P.L. 2024, CHAPTER 2
11

paragraph.  The implementing ordinances and resolutions adopted prior to the resolution of the dispute may be subject to changes to reflect the results of the dispute.  As an alternative to adopting all necessary implementing ordinances and resolutions by the March 15 deadline, a municipality involved in a continuing dispute over the issuance of compliance certification may adopt a binding resolution by this date to commit to adopting the implementing ordinances and resolutions following resolution of the dispute, with necessary adjustments to reflect the resolution of the dispute.

(e)  Once a municipality has received a compliance certification or otherwise has had its fair share obligation and housing element and fair share plan finally determined via judgment of repose or other judgment, the municipality shall make the municipality's fair share plan and housing element, as well as any subsequently adopted implementing ordinances and resolutions, or amendments thereto, available to the department and the program for publication on the department's and program's respective Internet websites.

(3)  (a)  If a municipality fails to materially adhere to any of the deadlines established in paragraphs (1) or (2) of this subsection due to circumstances beyond the control of the municipality, including, but not limited to, an inability to meet a deadline due to an extreme weather event, then the program, or the county level housing judge, in accordance with court rules, may permit a municipality to have a grace period to come into compliance with the timeline, the length of which, and effect of which on later deadlines, shall be determined on a case-by-case basis.

(b)  A municipality that has not adopted and published a binding resolution pursuant to paragraph (1) of this subsection or that has not adopted and filed a housing element and fair share plan pursuant to paragraph (2) of this subsection may seek compliance certification by filing an action pursuant to section 13 of P.L.1985, c.222 (C.52:27D-313), provided that any exclusionary zoning litigation filed by a plaintiff against such a municipality prior to such time may proceed notwithstanding such filing.  In a municipality that has adopted and published a binding resolution pursuant to paragraph (1) of this subsection and has adopted and filed a housing element and fair share plan pursuant to paragraph (2) of this subsection, a court shall not consider exclusionary zoning litigation during the timeframe after the timely submission of a binding resolution or fair share plan and housing element of a municipality, or both, and before a challenge is submitted, or during the timeframe of a challenge that is pending resolution with the program pursuant to this subsection.  A court may  consider exclusionary zoning litigation after such timeframe upon a finding that the municipality: (i) is determined to be constitutionally noncompliant with its responsibilities pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) or is participating in the program in bad faith; (ii) has failed to meet the deadlines established pursuant to P.L.2024, c.2 (C.52:27D-304.1 et al.); or (iii) has, after receiving compliance certification, failed to comply with the terms of that certification by not actually allowing for the development of the affordable housing as provided for in its fair share plan and housing element through actions or omissions, or both, of a municipality or its subordinate boards.

(c)  All parties shall bear their own fees and costs in proceedings before the program.

(d)  A determination by the program as to the present and prospective need obligation or as to issuance of compliance certification pursuant to this section shall be considered a final decision, subject to appellate review pursuant to the procedures set forth in subparagraph (c) of paragraph (1) of subsection f. of this section.

(e)  A municipality shall not be deemed out of compliance with the deadlines of P.L.2024, c.2 (C.52:27D-304.1 et al.), or lose immunity from exclusionary zoning litigation, due to a

failure by the program to promptly maintain and update its Internet website or other operational failure of the program.

g.  A compliance certification, issued pursuant to P.L.2024, c.2 (C.52:27D-304.1 et al.), shall be accompanied by a written report that shall set forth the basis of the issuance of the certification and shall be in a format to be developed and approved by the Administrative Director of the Courts.

4.  Section 13 of P.L.1985, c.222 (C.52:27D-313) is amended to read as follows:

C.52:27D-313  Petition for substantive certification.

13.  a.  If a municipality has adopted a housing element and fair share plan pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1), but has failed to satisfy the June 30 deadline established pursuant to paragraph (2) of subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1), for any round of affordable housing obligations, the municipality may request and be provided with a grace period pursuant to paragraph (3) of subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1), if authorized by the program or county-level housing judge, as determined by the rules of court.  If a municipality that has not satisfied this June 30 deadline is not provided with a grace period, the municipality may institute an action for declaratory judgment granting it repose in the Superior Court for the 10-year period constituting the current round of fair share obligations.  The municipality shall publish notice of its filing of a declaratory judgment action in a newspaper of general circulation within the municipality and county and shall make available to the public information on the element and ordinances by submitting such information to the program to be published on the Internet website of the program in accordance with  section 3 of P.L.2024, c.2 (C.52:27D-304.1).

b.  (Deleted by amendment, P.L.2024, c.2)

c.  (1)  A municipality or other interested party may file an action through the program seeking a realistic opportunity review at the midpoint of the certification period and shall provide for notice to the public, including a realistic opportunity review of any inclusionary development site in the housing element and fair share plan that has not received preliminary site plan approval prior to the midpoint of the 10-year round.  If such an action is initiated by a municipality, the municipality may propose one or more alternative sites with an accompanying development plan or plans that provide a realistic opportunity for the same number of affordable units and is otherwise in compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) and the Mount Laurel doctrine, provided that if the facts demonstrate that the municipality or its subordinate boards have prevented the site from receiving site plan approval, then the program shall reject the municipality's challenge.

(2)  Any party may file a request for information from the program regarding the progress of development at any inclusionary development site in the housing element and fair share plan of a municipality or at any alternative site proposed by the municipality.  The program may respond to a request independently or in coordination with the department.

C.52:27D-313.2  "Affordable Housing Dispute Resolution Program" established.

5.  a.  There is established an Affordable Housing Dispute Resolution Program that shall have the purpose of efficiently resolving disputes involving the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), to consist of an odd number of members, of at least three and no more than seven members who shall lead the administration of the program.  The Administrative Director of the Courts shall update the assignment of designated Mount Laurel judges to indicate which current or retired and on-recall judges of the Superior Court shall

P.L. 2024, CHAPTER 2
13

serve as members, within 60 days following the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.).  The Administrative Director of the Courts may appoint other qualified experts as members if sufficient current and retired judges are unavailable.  The Administrative Director of the Courts shall take into consideration in making such appointments experience in the employment of alternative dispute resolution methods and in relevant subject matter.

b.  The Administrative Director of the Courts shall designate a member to serve as chair. The Administrative Director of the Courts shall make new appointments as needs arise for new appointments.

c.  The program, in its discretion and in accordance with Rules of Court, may consult or employ the services of one or more special masters or staff to assist it in rendering determinations, resolving disputes, and facilitating communication as required by subparagraph (b) of paragraph (2) of subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1).  In addition, the program may incorporate any existing or newly established court mediation or alternative dispute resolution process to assist the program in resolving disputes and facilitating communication among municipalities and interested parties.

d.  The Administrative Director of the Courts shall establish a filing system via an Internet website in which the public is able to access, without cost, filings made pursuant to P.L.2024, c.2 (C.52:27D-304.1 et al.) and such other related filings as the Administrative Director of the Courts may include on the filing system.

e.  The Administrative Director of the Courts may assign additional responsibilities to the program for resolving disputes arising out of or related to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).

f.  The Administrative Director of the Courts shall establish procedures for the purpose of efficiently resolving disputes involving the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), for circumstances in which the program is unable to address the dispute within the time limitations established pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1).  As a part of the procedures established pursuant to this section, in order to facilitate an appropriate level of localized control of affordable housing decisions, for each vicinage, the Chief Justice of the Supreme Court shall designate a Superior Court judge who sits within the vicinage, or a retired judge who, during the judge's tenure as a judge, served within the vicinage, to serve as county-level housing judge to resolve disputes over the compliance, of fair share plans and housing elements of municipalities within their designated county or counties, with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), as well as disputes that arise with respect to ongoing compliance or noncompliance with obligations created by fair share plans, housing elements, and the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).  A judge shall be permitted to serve as a county-level housing judge for more than one county in the same vicinage.

g.  The Administrative Director of the Courts shall promulgate, maintain, and apply a Code of Ethics that is modeled upon the Code of Judicial Conduct of the American Bar Association, as amended and adopted by the Supreme Court of New Jersey, and may establish additional, more restrictive ethical standards in order to meet the specific needs of the program and of county-level housing judges.


C.52:27D-304.2  Municipal present need, 10-year round, determination of affordable housing obligations.

6. a. Municipal present need for each 10-year round of affordable housing obligations shall be determined by estimating the deficient housing units occupied by low- and moderate-income households in the region, following a methodology similar to the methodology used to determine third round municipal present need, through the use of most recent datasets made

P.L. 2024, CHAPTER 2
14

available through the federal decennial census and the American Community Survey, including the Comprehensive Housing Affordability Strategy dataset thereof.

b.  For the purpose of determining regional need for the 10-year round of low- and moderate-income housing obligations, running from July 1, 2025 through June 30, 2035, and each 10-year round thereafter:

(1)  The regions of the State shall be comprised as follows:

(a)  Region 1 shall consist of the counties of Bergen, Hudson, Passaic, and Sussex;

(b)  Region 2 shall consist of the counties of Essex, Morris, Union, and Warren;

(c)  Region 3 shall consist of the counties of Hunterdon, Middlesex, and Somerset;

(d)  Region 4 shall consist of the counties of Mercer, Monmouth, and Ocean;

(e)  Region 5 shall consist of the counties of Burlington, Camden, and Gloucester; and

(f)  Region 6 shall consist of the counties of Atlantic, Cape May, Cumberland, and Salem.

(2)  Regional prospective need for a 10-year round of low- and moderate-income housing obligations shall be determined through the calculation provided in this subsection.  Projected household change for a 10-year round in a region shall be estimated by establishing the household change experienced in the region between the most recent federal decennial census, and the second-most recent federal decennial census.  This household change, if positive, shall be divided by 2.5 to estimate the number of low- and moderate-income homes needed to address low- and moderate-income household change in the region and to determine the regional prospective need for a 10-year round of low- and moderate-income housing obligations.  If household change is zero or negative, the number of low- and moderate-income homes needed to address low- and moderate-income household change in the region and the regional prospective need shall be zero.

C.52:27D-304.3   Present, prospective fair share obligation, low- and moderate-income housing, methodologies.

7. a. The present and prospective fair share obligation for low- and moderate-income housing for each municipality in the State shall be determined as described in this section.  In addition, the March 8, 2018 unpublished decision of the Superior Court, Law Division, Mercer County, In re Application of Municipality of Princeton shall be referenced as to datasets and methodologies that are not explicitly addressed by this section.  These determinations of municipal present and prospective need shall be based on a determination of the present and prospective regional need for low- and moderate-income housing, established pursuant to section 6 of P.L.2024, c.2 (C.52:27D-304.2).  These calculations of municipal present and prospective need shall use necessary datasets that are updated to the greatest extent practicable.

b.  A municipality's present need obligation shall be determined by estimating the existing deficient housing units currently occupied by low- and moderate-income households within the municipality, following a methodology comparable to the methodology used to determine third round present need, through the use of datasets made available through the federal decennial census and the American Community Survey, including the Comprehensive Housing Affordability Strategy dataset thereof.

c.  A municipality's prospective fair share obligation of the regional prospective need for the upcoming 10-year round shall be determined in accordance with this subsection:

(1)  If a municipality is a qualified urban aid municipality, the municipality shall be exempt from responsibility for any fair share prospective need obligation for the upcoming 10-year round.  For the purposes of this section, a municipality is a qualified urban aid municipality if the municipality, as of July 1 of the year prior to the beginning of a new round, is designated

by the department, pursuant to P.L.1978, c.14 (C.52:27D-178 et seq.), to receive State aid and the municipality meets at least one of the following criteria:

(a)  The ratio of substandard existing deficient housing units currently occupied by low- and moderate-income households within the municipality, compared to all existing housing in the municipality, is greater than the equivalent ratio in the region;

(b)  The municipality has a population density greater than 10,000 persons per square mile of land area; or

(c)  The municipality has a population density of more than 6,000, but less than 10,000 persons per square mile of land area, and less than five percent vacant parcels not used as farmland, as measured by the average of:

(i)  The number of vacant land parcels in the municipality as a percentage of the total number of parcels in the municipality; and

(ii)  The valuation of vacant land in the municipality as a percentage of total valuations in the municipality.

(2)  A municipality's equalized nonresidential valuation factor shall be determined.  To determine this factor, the changes in nonresidential property valuations in the municipality, since the beginning of the round preceding the round being calculated, shall be calculated using data published by the Division of Local Government Services in the department.  For the purposes of this paragraph, the beginning of the round of affordable housing obligations preceding the fourth round shall be the beginning of the gap period in 1999.  The change in the municipality's nonresidential valuations shall be divided by the regional total change in nonresidential valuations to determine the municipality's share of the regional change as the equalized nonresidential valuation factor.

(3)  A municipality's income capacity factor shall be determined.  This factor shall be determined by calculating the average of the following measures:

(a)  The municipal share of the regional sum of the differences between the median municipal household income, according to the most recent American Community Survey Five-Year Estimates, and an income floor of $100 below the lowest median household income in the region; and

(b)  The municipal share of the regional sum of the differences between the median municipal household incomes and an income floor of $100 below the lowest median household income in the region, weighted by the number of the households in the municipality.

(4)  A municipality's land capacity factor shall be determined.  This factor shall be determined by estimating the area of developable land in the municipality's boundaries, and regional boundaries, that may accommodate development through the use of the "land use / land cover data" most recently published by the Department of Environmental Protection, data from the American Community Survey and Comprehensive Housing Affordability Strategy dataset thereof, MOD-IV Property Tax List data from the Division of Taxation in the Department of the Treasury, and construction permit data from the Department of Community Affairs and weighing such land based on the planning area type in which such land is located. After the weighing factors are applied, the sum of the total developable land area that may accommodate development in the municipality and in the region shall be determined.  The municipality's share of its region's developable land shall be its land capacity factor. Developable  land that may accommodate development shall be weighted based on the planning area type in which such land is located, as designated pursuant to P.L.1985, c.398 (C.52:18A-196 et seq.), P.L.1979, c.111 (C.13:18A-1 et seq.), or P.L.2004, c.120 (C.13:20-1 et seq.), as follows:

(a)  Planning Area 1 (Metropolitan) shall have a weighting factor of 1.0;

P.L. 2024, CHAPTER 2
16

(b)  Planning Area 2 (Suburban) shall have a weighting factor of 1.0;

(c)  Planning Area 3 (Fringe) shall have a weighting factor of 0.5;

(d)  Planning Area 4 (Rural) shall have a weighting factor of 0.0;

(e)  Planning Area 5 (Environmentally Sensitive) shall have a weighting factor of 0.0;

(f)  Centers in Planning Areas 1 and 2 shall have a weighting factor of 1.0;

(g)  Centers in Planning Areas 3, 4, and 5 shall have a weighting factor of 0.5;

(h)  Pinelands Regional Growth Area shall have a weighting factor of 0.5;

(i)  Pinelands Town shall have a weighting factor of 0.5;

(j)  All other Pinelands shall have a weighting factor of 0.0;

(k)  Meadowlands shall have a weighting factor of 1.0;

(l)  Meadowlands Center shall have a weighting factor of 1.0;

(m)  Highlands Preservation Area shall have a weighting factor of 0.0;

(n)  Highlands Planning Area Existing Community Zone and Highlands Designated Center in a Highlands-conforming municipality, as determined by the Highlands Water Protection and Planning Council pursuant to the list provided to the department pursuant to subsection d. of section 3 of P.L.2024, c.2 (C.52:27D-304.1), shall have a weighting factor of 1.0;

(o)  Highlands Planning Area, State-designated sewer service area, Highlands municipality that is not a Highlands-conforming municipality as determined by the Highlands Water Protection and Planning Council pursuant to the list provided to the department pursuant to subsection d. of section 3 of P.L.2024, c.2 (C.52:27D-304.1), shall have a weighting factor of 1.0; and

(p)  All other Highlands Planning Areas shall have a weighting factor of 0.0.

(5) The equalized nonresidential valuation factor, income capacity factor, and land capacity factor, determined in paragraphs (2), (3), and (4) of this subsection, shall be averaged to yield the municipality's average allocation factor for distributing gross regional prospective need to the municipality.  The regional prospective need shall then be multiplied by the municipality's average allocation factor to determine the municipality's gross prospective need for the 10-year round.

8.  Section 4 of P.L.1995, c.244 (C.2A:50-56) is amended to read as follows:

C.2A:50-56  Notice of intention to foreclose.

4.  a.  Upon failure to perform any obligation of a residential mortgage by the residential mortgage debtor and before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation and commence any foreclosure or other legal action to take possession of the residential property which is the subject of the mortgage, the residential mortgage lender shall give a notice of intention, which shall include a notice of the right to cure the default as provided in section 5 of P.L.1995, c.244 (C.2A:50-57), at least 30 days, but not more than 180 days, in advance of such action as provided in this section, to the residential mortgage debtor, and, if the mortgage is secured by a residence for which a restriction on affordability was recorded in the county in which the property is located, the clerk of the municipality in which the subject property is located, the municipal housing liaison, if one has been appointed by the municipality.  For the purposes of this section, "restriction on affordability" means any conditions recorded with a mortgage or a deed which would limit the sale of such property to income qualified households pursuant to the rules adopted to effectuate the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).

b.  Notice of intention to take action as specified in subsection a. of this section shall be in writing, provided to the Department of Community Affairs in accordance with subsection a.

of section 2 of P.L.2019, c.134 (C.46:10B-49.2), sent to the debtor by registered or certified mail, return receipt requested, at the debtor's last known address, and, if different, to the address of the property which is the subject of the residential mortgage. The notice is deemed to have been effectuated on the date the notice is delivered in person or mailed to the party.

c.    The written notice shall clearly and conspicuously state in a manner calculated to make the debtor aware of the situation:

(1)   the particular obligation or real estate security interest;

(2)   the nature of the default claimed;

(3)   the right of the debtor to cure the default as provided in section 5 of P.L.1995, c.244 (C.2A:50-57);

(4)   what performance, including what sum of money, if any, and interest, shall be tendered to cure the default as of the date specified under paragraph (5) of this subsection c.;

(5)   the date by which the debtor shall cure the default to avoid initiation of foreclosure proceedings, which date shall not be less than 30 days after the date the notice is effective, and the name and address and phone number of a person to whom the payment or tender shall be made;

(6)   that if the debtor does not cure the default by the date specified under paragraph (5) of this subsection c., the lender may take steps to terminate the debtor's ownership in the property by commencing a foreclosure suit in a court of competent jurisdiction;

(7)   that if the lender takes the steps indicated pursuant to paragraph (6) of this subsection c., a debtor shall still have the right to cure the default pursuant to section 5 of P.L.1995, c.244 (C.2A:50-57), but that the debtor shall be responsible for the lender's court costs and attorneys' fees in an amount not to exceed that amount permitted pursuant to the Rules Governing the Courts of the State of New Jersey;

(8)   the right, if any, of the debtor to transfer the real estate to another person subject to the security interest and that the transferee may have the right to cure the default as provided in P.L.1995, c.244 (C.2A:50-53 et seq.), subject to the mortgage documents;

(9)   that the debtor is advised to seek counsel from an attorney of the debtor's own choosing concerning the debtor's residential mortgage default situation, and that, if the debtor is unable to obtain an attorney, the debtor may communicate with the New Jersey Bar Association or Lawyer Referral Service in the county in which the residential property securing the mortgage loan is located; and that, if the debtor is unable to afford an attorney, the debtor may communicate with the Legal Services Office in the county in which the property is located;

(10)  the possible availability of financial assistance for curing a default from programs operated by the State or federal government or nonprofit organizations, if any, as identified by the Commissioner of Banking and Insurance and, if the property is subject to restrictions on affordability, the address and phone number of the municipal affordable housing liaison and of the New Jersey Housing and Mortgage Finance Agency. This requirement shall be satisfied by attaching a list of such programs promulgated by the commissioner;

(11)  the name and address of the lender and the telephone number of a representative of the lender whom the debtor may contact if the debtor disagrees with the lender's assertion that a default has occurred or the correctness of the mortgage lender's calculation of the amount required to cure the default;

(12)  that if the lender takes the steps indicated pursuant to paragraph (6) of this subsection, the debtor has the option to participate in the Foreclosure Mediation Program following the filing of a mortgage foreclosure complaint by initiating mediation pursuant to paragraph (2) of subsection a. of section 4 of P.L.2019, c.64 (C.2A:50-77). Notice of the option to participate in the Foreclosure Mediation Program shall adhere to the requirements of section 3 of

P.L. 2024, CHAPTER 2
18

P.L.2019, c.64 (C.2A:50-76) and any court rules, procedures, or guidelines adopted by the Supreme Court;

(13)  that the debtor is entitled to housing counseling, at no cost to the debtor, through the Foreclosure Mediation Program established by the New Jersey Judiciary, including information on how to contact the program;

(14)  that if the property which is the subject of the mortgage has more than one dwelling unit but less than five, one of which is occupied by the debtor or a member of the debtor's immediate family as the debtor's or member's residence at the time the loan is originated, and is not properly maintained and meets the necessary conditions for receivership eligibility, established pursuant to section 4 of the "Multifamily Housing Preservation and Receivership Act," P.L.2003, c.295 (C.2A:42-117), the residential mortgage lender shall file an order to show cause to appoint a receiver; and

(15)  that the lender is either licensed in accordance with the "New Jersey Residential Mortgage Lending Act," sections 1 through 39 of P.L.2009, c.53 (C.17:11C-51 through C.17:11C-89) or exempt from licensure under the act in accordance with applicable law.

d.   The notice of intention to foreclose required to be provided pursuant to this section shall not be required if the debtor has voluntarily surrendered the property which is the subject of the residential mortgage.

e.   The duty of the lender under this section to serve notice of intention to foreclose is independent of any other duty to give notice under the common law, principles of equity, State or federal statute, or rule of court and of any other right or remedy the debtor may have as a result of the failure to give such notice.

f.   Compliance with this section and subsection a. of section 2 of P.L.2019, c.134 (C.46:10B-49.2) shall be set forth in the pleadings of any legal action referred to in this section. If the plaintiff in any complaint seeking foreclosure of a residential mortgage alleges that the property subject to the residential mortgage has been abandoned or voluntarily surrendered, the plaintiff shall plead the specific facts upon which this allegation is based.

g.   If more than 180 days have elapsed since the date the notice required pursuant to this section is sent, and any foreclosure or other legal action to take possession of the residential property which is the subject of the mortgage has not yet been commenced, the lender shall send a new written notice at least 30 days, but not more than 180 days, in advance of that action.

h.   If the property which is the subject of the notice of intention to foreclose has more than one dwelling unit but less than five, one of which is occupied by the debtor or a member of the debtor's immediate family as the debtor's or member's residence at the time the loan is originated, and is not properly maintained and meets the necessary conditions for receivership eligibility, established pursuant to section 4 of the "Multifamily Housing Preservation and Receivership Act," P.L.2003, c.295 (C.2A:42-117), the residential mortgage lender shall file an order to show cause to appoint a receiver.

9.  Section 2 of P.L.2005, c.306 (C.5:18-2) is amended to read as follows:

C.5:18-2  Grants to assist low-income families.

2.  The New Jersey Council on Physical Fitness and Sports, established under P.L.1999, c.265 (C.26:1A-37.5 et seq.) is authorized to provide grants to assist low-income families in purchasing the protective eyewear.  As used in this section, a "low-income family" means a family which qualifies for low-income housing under the standards promulgated by the New Jersey Housing and Mortgage Finance Agency pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).

P.L. 2024, CHAPTER 2
19

10.  Section 25 of P.L.2004, c.120 (C.13:20-23) is amended to read as follows:

C.13:20-23  Regional master plan considered in allocation of prospective fair housing share.

25. a. The  regional master plan shall be taken into account as part of the determination of obligations pursuant to the method in section 7 of P.L.2024, c.2 (C.52:27D-304.3) regarding the allocation of the prospective fair share of the housing need under the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) for any fair share period subsequent to the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.) if a municipality is in the Highlands Region.

b.  Nothing in P.L.2004, c.120 (C.13:20-1 et al.) shall affect protections provided through a grant of substantive certification or a judgment of repose granted prior to August 10, 2004.

11.  Section 5 of P.L.2009, c.53 (C.17:11C-55) is amended to read as follows:

C.17:11C-55  Inapplicability of act.

5.  The requirements of this act shall not apply to:

a.  Depository institutions; but subsidiaries and service corporations of these institutions shall not be exempt.  A depository institution may register with the department for the purpose of sponsoring individuals, licensed as mortgage loan originators subject to subparagraph (b) of paragraph (1) of subsection c. of section 4 of P.L.2009, c.53 (C.17:11C-54), provided that such registered entity obtains and maintains bond coverage for mortgage loan originators consistent with section 13 of P.L.2009, c.53 (C.17:11C-63).  A depository institution registered with the department in accordance with this subsection a. shall otherwise remain exempt from the licensing requirements of P.L.2009, c.53 (C.17:11C-51 et seq.).

b.  A registered mortgage loan originator that is registered under the federal "Secure and Fair Enforcement for Mortgage Licensing Act of 2008," title V of Pub.L.110-289 (12 U.S.C. s.5101 et seq.).

c.  A licensed attorney who negotiates the terms of a residential mortgage loan on behalf of a client as an ancillary matter to the attorney's representation of the client, unless the attorney is compensated by a residential mortgage lender, residential mortgage broker, or mortgage loan originator.

d.  A person licensed as a real estate broker or salesperson pursuant to R.S.45:15-1 et seq., and not engaged in the business of a residential mortgage lender or residential mortgage broker. Any person holding a license under this act as a residential mortgage lender or broker shall be exempt from the licensing and other requirements of R.S.45:15-1 et seq. in the performance of those functions authorized by this act.

e.  Any employer, other than a residential mortgage lender, who provides residential mortgage loans to his employees as a benefit of employment which are at an interest rate which is not in excess of the usury rate in existence at the time the loan is made, as established in accordance with the law of this State, and on which the borrower has not agreed to pay, directly or indirectly, any charge, cost, expense or any fee whatsoever, other than that interest.

f.  The State of New Jersey or a municipality, or any agency or instrumentality thereof, which, in accordance with a housing element that has previously received substantive certification from the Council on Affordable Housing, or a judgment of repose or other court approval, pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), or in fulfillment of a regional contribution agreement with a municipality that has received a certification, employs or proposes to employ municipally generated funds, funds obtained through any State or federal subsidy, or funds acquired by the municipality under a regional contribution agreement, to finance the provision of affordable housing by extending loans or

advances, the repayment of which is secured by a lien, subordinate to any prior lien, upon the property that is to be rehabilitated.

g.   Any individual who offers or negotiates terms of a residential mortgage loan:

(1)  with or on behalf of an immediate family member; or

(2)  secured by a dwelling that serves as the individual's residence.

h.   Any person who, during a calendar year takes three or fewer residential mortgage loan applications or offers or negotiates the terms of three or fewer residential mortgage loans or makes three or fewer residential mortgage loans related to manufactured housing structures which are:

(1)  titled by the New Jersey Motor Vehicle Commission;

(2)  located in a mobile home park as defined in subsection e. of section 3 of P.L.1983, c.400 (C.54:4-1.4); and

(3)  exempt from taxation as real property pursuant to subsection b. of section 4 of P.L.1983, c.400 (C.54:4-1.5).

i.   A bona fide not for profit entity and any individuals directly employed by that entity, so long as the entity maintains its tax exempt status under Section 501(c)(3) of the Internal Revenue Code of 1986 and otherwise meets the definition of "bona fide not for profit entity" in section 3 of P.L.2009, c.53 (C.17:11C-53), as periodically determined by the department in accordance with rules established by the commissioner.


12.   Section 2 of P.L.1991, c.465 (C.39:4-10.2) is amended to read as follows:


C.39:4-10.2  Violations, warnings, fines; "Bicycle and Skating Safety Fund."

2.  a.   A person who violates a requirement of this act shall be warned of the violation by the enforcing official.  The parent or legal guardian of that person also may be fined a maximum of $25 for the person's first offense and a maximum of $100 for a subsequent offense if it can be shown that the parent or guardian failed to exercise reasonable supervision or control over the person's conduct.  Penalties provided in this section for a failure to wear a helmet may be waived if an offender or his parent or legal guardian presents suitable proof that an approved helmet was owned at the time of the violation or has been purchased since the violation occurred.

b.   All money collected as fines under subsection a. of this section and subsection a. of section 2 of P.L.1997, c.411 (C.39:4-10.6) shall be deposited in a nonlapsing revolving fund to be known as the "Bicycle and Skating Safety Fund."  Interest earned on money deposited in the fund shall accrue to the fund.  Money in the fund shall be utilized by the director to provide educational programs devoted to bicycle, roller skating and skateboarding safety.  If the director determines that sufficient money is available in the fund, he also may use, in a manner prescribed by rule and regulation, the money to assist low-income families in purchasing approved bicycle helmets.  For the purposes of this subsection, "low-income family" means a family which qualifies for low-income housing under the standards promulgated by the New Jersey Housing and Mortgage Finance Agency pursuant to the provisions of P.L.1985, c.222 (C.52:27D-301 et seq.).


13.   Section 33 of P.L.2008, c.46 (C.40:55D-8.2) is amended to read as follows:


C.40:55D-8.2  Findings, declarations relative to Statewide non-residential development fees.

33.  The Legislature finds and declares:

P.L. 2024, CHAPTER 2
21

a. The collection of development fees from builders of residential and non-residential properties has been authorized by the court through the powers established pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.). Due to the Legislature's determination that the role of the Council on Affordable Housing has not developed in practice as intended, the Legislature further determines that authority relating to rulemaking on the collection of residential and non-residential development fees is appropriately delegated to the Department of Community Affairs, given the department's existing roles related to local government finance and the funding and financing of affordable housing throughout the State.

b. New Jersey's land resources are becoming more scarce, while its redevelopment needs are increasing. In order to balance the needs of developing and redeveloping communities, a reasonable method of providing for the housing needs of low-, moderate-, and middle-income households, without mandating the inclusion of housing in every non-residential project, must be established.

c. A Statewide non-residential development fee program, which permits municipalities that have obtained or are in the process of seeking compliance certification to retain these fees for use in the municipality will provide a fair and balanced funding method to address the State's affordable housing needs, while providing an incentive to all municipalities to obtain compliance certification.

d. Whereas, pursuant to P.L.1977, c.110 (C.5:12-1 et seq.), organizations are directed to invest in the Casino Reinvestment Development Authority to ensure that the development of housing for families of low and moderate income shall be provided. The Casino Reinvestment Development Authority shall work to effectuate the purpose and intent of P.L.1985, c.222 (C.52:27D-301 et al.).

e. (Deleted by amendment P.L.2024, c.2)

f. The negative impact of a State policy that over-relies on a municipal fee structure and of State programs that require a municipality to impose fees and charges on developers must be balanced against any public good expected from such regulation. It is undisputable that the charging of fees at high levels dissuades commerce from locating within a State or municipality or locality and halts non-residential and residential development, and these ill effects directly increase the overall costs of housing, and could impede the constitutional obligation to provide for a realistic opportunity for housing for families at all income levels.

14. Section 34 of P.L.2008, c.46 (C.40:55D-8.3) is amended to read as follows:

C.40:55D-8.3 Definitions relative to Statewide non-residential development fees.

34. As used in sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7):

"Construction" means new construction and additions, but does not include alterations, reconstruction, renovations, and repairs as those terms are defined under the State Uniform Construction Code promulgated pursuant to the "State Uniform Construction Code Act," P.L.1975, c.217 (C.52:27D-119 et seq.).

"Commissioner" means the Commissioner of Community Affairs.

"Department" means the Department of Community Affairs.

"Developer" means the legal or beneficial owner or owners of a lot or of any land proposed to be included in a proposed development, including the holder of an option or contract to purchase, or other person having an enforceable proprietary interest in such land.

"Equalized assessed value" means the assessed value of a property divided by the current average ratio of assessed to true value for the municipality in which the property is situated,

P.L. 2024, CHAPTER 2
22

as determined in accordance with sections 1, 5, and 6 of P.L.1973, c.123 (C.54:1-35a through C.54:1-35c).

"Mixed-use development" means any development which includes both a non-residential development component and a residential development component, and shall include developments for which (1) there is a common developer for both the residential development component and the non-residential development component, provided that for purposes of this definition, multiple persons and entities may be considered a common developer if there is a contractual relationship among them obligating each entity to develop at least a portion of the residential or non-residential development, or both, or otherwise to contribute resources to the development; and (2) the residential and non-residential developments are located on the same lot or adjoining lots, including but not limited to lots separated by a street, a river, or another geographical feature.

"Non-residential development" means:  (1) any building or structure, or portion thereof, including but not limited to any appurtenant improvements, which is designated to a use group other than a residential use group according to the State Uniform Construction Code promulgated to effectuate the "State Uniform Construction Code Act," P.L.1975, c.217 (C.52:27D-119 et seq.), including any subsequent amendments or revisions thereto; (2) hotels, motels, vacation timeshares, and child-care facilities; and (3) the entirety of all continuing care facilities within a continuing care retirement community which is subject to the "Continuing Care Retirement Community Regulation and Financial Disclosure Act," P.L.1986, c.103 (C.52:27D-330 et seq.).

"Non-residential development fee" means the fee authorized to be imposed pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7).

"Relating to the provision of housing" shall be liberally construed to include the construction, maintenance, or operation of housing, including but not limited to the provision of services to such housing and the funding of any of the above.

"Spending plan" means a method of allocating funds collected and to be collected pursuant to an approved municipal development fee ordinance, or pursuant to P.L.2008, c.46 (C.52:27D-329.1 et al.) for the purpose of meeting the housing needs of low- and moderate-income individuals.

"Treasurer" means the Treasurer of the State of New Jersey.


15.  Section 35 of P.L.2008, c.46 (C.40:55D-8.4) is amended to read as follows:


C.40:55D-8.4    Fee imposed on construction resulting in non-residential development; exemptions.

35.  a.  Beginning on the effective date of P.L.2008, c.46 (C.52:27D-329.1 et al.), a fee is imposed on all construction resulting in non-residential development, as follows:

(1)  A fee equal to two and one-half percent of the equalized assessed value of the land and improvements, for all new non-residential construction on an unimproved lot or lots; or

(2)  A fee equal to two and one-half percent of the increase in equalized assessed value, of the additions to existing structures to be used for non-residential purposes.

b.  All non-residential construction of buildings or structures on property used by churches, synagogues, mosques, and other houses of worship, and property used for educational purposes, which is tax-exempt pursuant to R.S.54:4-3.6, shall be exempt from the imposition of a non-residential development fee pursuant to this section, provided that the property continues to maintain its tax exempt status under that statute for a period of at least three years

from the date of issuance of the certificate of occupancy.  In addition, the following shall be exempt from the imposition of a non-residential development fee:

(1)  parking lots and parking structures, regardless of whether the parking lot or parking structure is constructed in conjunction with a non-residential development, such as an office building, or whether the parking lot is developed as an independent non-residential development;

(2)  any non-residential development which is an amenity to be made available to the public, including, but not limited to, recreational facilities, community centers, and senior centers, which are developed in conjunction with or funded by a non-residential developer;

(3)  non-residential construction resulting from a relocation of or an on-site improvement to a nonprofit hospital or a nursing home facility;

(4)  projects that are located within a specifically delineated urban transit hub, as defined pursuant to section 2 of P.L.2007, c.346 (C.34:1B-208);

(5)  projects that are located within an eligible municipality, as defined under section 2 of P.L.2007, c.346 (C.34:1B-208), when a majority of the project is located within a one-half mile radius of the midpoint of a platform area for a light rail system; and

(6)  projects determined by the New Jersey Transit Corporation to be consistent with a transit village plan developed by a transit village designated by the Department of Transportation.

A  developer  of  a  non-residential  development  exempted  from  the  non-residential development fee pursuant to this section shall be subject to it at such time the basis for the exemption set forth in this subsection no longer applies, and shall make the payment of the non-residential development fee, in that event, within three years after that event or after the issuance of the final certificate of occupancy of the non-residential development whichever is later.

For purposes of this subsection, "recreational facilities and community center" means any indoor or outdoor buildings, spaces, structures, or improvements intended for active or passive recreation,  including  but  not  limited  to  ball  fields,  meeting  halls,  and  classrooms, accommodating  either  organized  or  informal  activity;  and  "senior  center"  means  any recreational facility or community center with activities and services oriented towards serving senior citizens.

If a property which was exempted from the collection of a non-residential development fee thereafter ceases to be exempt from property taxation, the owner of the property shall remit the fees required pursuant to this section within 45 days of the termination of the property tax exemption.  Unpaid non-residential development fees under these circumstances may be enforceable by the municipality as a lien against the real property of the owner.

c.  (1)  Unless authorized to pay directly to the municipality in which the non-residential construction is occurring in accordance with paragraph (2) of this subsection, developers shall pay non-residential development fees imposed pursuant to P.L.2008, c.46 (C.52:27D-329.1 et al.) to the Treasurer, in accordance with subsection g. of this section in a manner and on such forms as required by the Treasurer, provided that a certified proof concerning the payment shall be furnished by the Treasurer, to the municipality.

(2)  The department shall maintain on its Internet website a list of each municipality that is authorized to use the development fees collected pursuant to this section and that has a confirmed status of compliance with the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.) or is in the process of seeking compliance certification, which compliance shall include a spending plan pursuant to section 8 of P.L.2008, c.46 (C.52:27D-329.2) for all development fees collected.

(3)  No later than 180 days following the enactment of P.L.2024, c.2 (C.52:27D-304.1 et al.), any municipality that is or has been authorized to retain and expend non-residential development fees shall provide the department with a detailed accounting of all such fees that

have been collected and expended since the inception of the municipal authorization to collect and retain said fees.

(4)  Beginning with the year after the enactment of P.L.2024, c.2 (C.52:27D-304.1 et al.), by February 15, every municipality that is or has been authorized to retain and expend non-residential development fees shall provide the department with a detailed accounting of all such fees that have been collected and expended previous year.

d.  The payment of non-residential development fees required pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7) shall be made prior to the issuance of a certificate of occupancy for such development.  A final certificate of occupancy shall not be issued for any non-residential development until such time as the fee imposed pursuant to this section has been paid by the developer.  A non-residential developer may deposit with the appropriate entity the development fees as calculated by the municipality under protest, and the local code enforcement official shall thereafter issue the certificate of occupancy provided that the construction is otherwise eligible for a certificate of occupancy.

e.  The construction official responsible for the issuance of a building permit shall notify the local tax assessor of the issuance of the first building permit for a development which may be subject to a non-residential development fee.  Within 90 days of receipt of that notice, the municipal tax assessor, based on the plans filed, shall provide an estimate of the equalized assessed value of the non-residential development.  The construction official responsible for the issuance of a final certificate of occupancy shall notify the local assessor of any and all requests for the scheduling of a final inspection on property which may be subject to a non-residential development fee.  Within 10 business days of a request for the scheduling of a final inspection, the municipal assessor shall confirm or modify the previously estimated equalized assessed value of the improvements of the non-residential development in accordance with the regulations adopted by the Treasurer pursuant to P.L.1971, c.424 (C.54:1-35.35); calculate the non-residential development fee pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7); and thereafter notify the developer of the amount of the non-residential development fee.  Should the municipality fail to determine or notify the developer of the amount of the non-residential development fee within 10 business days of the request for final inspection, the developer may estimate the amount due and pay that estimated amount consistent with the dispute process set forth in subsection b. of section 37 of P.L.2008, c.46 (C.40:55D-8.6).  Upon tender of the estimated non-residential development fee, provided the developer is in full compliance with all other applicable laws, the municipality shall issue a final certificate of occupancy for the subject property.  Failure of the municipality to comply with the timeframes or procedures set forth in this subsection may subject it to penalties to be imposed by the commissioner; any penalties so imposed shall be deposited into the "New Jersey Affordable Housing Trust Fund" established pursuant to section 20 of P.L.1985, c.222 as amended by section 17 of P.L.2008, c.46 (C.52:27D-320).

A developer of a mixed-use development shall be required to pay the Statewide non-residential development fee relating to the non-residential development component of a mixed-use development subject to the provisions of P.L.2008, c.46 (C.52:27D-329.1 et al.).

Non-residential construction which is connected with the relocation of the facilities of a for-profit hospital shall be subject to the fee authorized to be imposed under this section to the extent of the increase in equalized assessed valuation in accordance with regulations to be promulgated by the Director of the Division of Taxation, Department of the Treasury.

f.  Any municipality that is not in compliance with the requirements established pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7), or regulations of the commissioner adopted thereto, may be subject to forfeiture of any or all

funds remaining within its municipal development trust fund.  Any funds so forfeited shall be deposited into the New Jersey Affordable Housing Trust Fund established pursuant to section 20 of P.L.1985, c.222 as amended by section 17 of P.L.2008, c.46 (C.52:27D-320).

g.  The Treasurer shall credit to the "Urban Housing Assistance Fund," established pursuant to section 13 of P.L.2008, c.46 (C.52:27D-329.7) annually from the receipts of the fees authorized to be imposed pursuant to this section an amount equal to $20 million; all receipts in excess of this amount shall be deposited into the "New Jersey Affordable Housing Trust Fund," established pursuant to section 20 of P.L.1985, c.222 as amended by section 17 of P.L.2008, c.46 (C.52:27D-320), to be used for the purposes of that fund.

The Treasurer shall adopt such regulations as necessary to effectuate sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7), in accordance with the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.).

16.  Section 36 of P.L.2008, c.46 (C.40:55D-8.5) is amended to read as follows:

C.40:55D-8.5  Regulations.

36.  a.  The commissioner shall promulgate, in accordance with the provisions of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.), such regulations as are necessary for the prompt and effective implementation of the provisions and purposes of section 8 of P.L.2008, c.46 (C.52:27D-329.2), including, but not limited to, provisions for the payment of any necessary administrative costs related to the assessment of properties and collection of any development fees by a municipality.

b.  The commissioner shall adopt and promulgate, in accordance with the provisions of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.), such regulations as are necessary for the effectuation of P.L.2008, c.46 (C.52:27D-329.1 et al.), including but not limited to, regulations necessary for the establishment, implementation, review, monitoring, and enforcement of a municipal affordable housing trust fund and spending plan.

17.  Section 38 of P.L.2008, c.46 (C.40:55D-8.7) is amended to read as follows:

C.40:55D-8.7  Certain local ordinances void.

38.  a.  Except as expressly provided in P.L.2008, c.46 (C.52:27D-329.1 et al.), including subsection b. of this section, any provision of a local ordinance which imposes a fee for the development of affordable housing upon a developer of non-residential property, including any and all development fee ordinances adopted in accordance with any regulations of the department, or any provision of an ordinance which imposes an obligation relating to the provision of housing affordable to low- and moderate-income households, or payment in-lieu of building as a condition of non-residential development, shall be void and of no effect.  A provision of an ordinance which imposes a development fee which is not prohibited by any provision of P.L.2008, c.46 (C.52:27D-329.1 et al.) shall not be invalidated by this section.

b.  No affordable housing obligation shall be imposed concerning a mixed-use development that would result in an affordable housing obligation greater than that which would have been imposed if the residential portion of the mixed-use development had been developed independently of the non-residential portion of the mixed-use development.

c.  Whenever the developer of a non-residential development regulated under P.L.1977, c.110 (C.5:12-1 et seq.) has made or committed itself to make a financial or other contribution relating to the provision of housing affordable to low- and moderate-income households, the non-residential development fee authorized pursuant to P.L.2008, c.46 (C.52:27D-329.1 et al.)

P.L. 2024, CHAPTER 2
26

shall be satisfied through the investment obligations made pursuant to P.L.1977, c.110 (C.5:12-1 et seq.).

18.  Section 39 of P.L.2009, c.90 (C.40:55D-8.8) is amended to read as follows:

C.40:55D-8.8  Applicability of section.

39.  The provisions of this section shall apply only to those developments for which a fee was imposed pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7), known as the "Statewide Non-residential Development Fee Act."

a.   A developer of a property that received preliminary site plan approval, pursuant to section 34 of P.L.1975, c.291 (C.40:55D-46), or final approval, pursuant to section 38 of P.L.1975, c.291 (C.40:55D-50) prior to July 17, 2008 and that was subject to the payment of a nonresidential development fee prior to the enactment of P.L.2009, c.90 (C.52:27D-489a et al.), shall be entitled to a return of any moneys paid that represent the difference between moneys committed prior to July 17, 2008 and monies paid on or after that date.

b.   A developer of a non-residential project that, prior to July 17, 2008, has been referred to a planning board by the State, a governing body, or other public agency for review pursuant to section 22 of P.L.1975, c.291 (C.40:55D-31) and that was subject to the payment of a nonresidential development fee prior to the enactment of P.L.2009, c.90 (C.52:27D-489a et al.), shall be entitled to a return of any moneys paid that represent the difference between moneys committed prior to July 17, 2008 and moneys paid on or after that date.

c.   If moneys are required to be returned under subsection a., b. or d. of this section, a claim shall be submitted, in writing, to the same entity to which the moneys were paid, within 120 days of the effective date of P.L.2009, c.90 (C.52:27D-489a et al.).  The entity to whom the funds were paid shall promptly review all requests for returns, and the fees paid shall be returned to the claimant within 30 days of receipt of the claim for return.

d.   A developer of a non-residential project that paid a fee imposed pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7), subsequent to July 17, 2008 but prior to the effective date of P.L.2009, c.90 (C.52:27D-489a et al.), shall be entitled to the return of those moneys paid, provided that the provisions of section 37 of P.L.2008, c.46 (C.40:55D-8.6), as amended by P.L.2009, c.90 do not permit the imposition of a fee upon the developer of that non-residential property.

e.   (Deleted by amendment, P.L.2024, c.2)

f.   A developer of a non-residential project that paid a fee imposed pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through C.40:55D-8.7), subsequent to June 30, 2010 but prior to the effective date of P.L.2011, c.122, shall be entitled to the return of those monies paid, provided that said monies have not already been expended by the municipality on affordable housing projects, and provided that the provisions of section 37 of P.L.2008, c.46 (C.40:55D-8.6), as amended by P.L.2011, c.122 do not permit the imposition of a fee upon the developer of that non-residential property.  If moneys are eligible to be returned under this subsection, a claim shall be submitted, in writing, to the same entity to which the moneys were paid, within 120 days of the effective date of P.L.2011, c.122.  The entity to whom the funds were paid shall promptly review all requests for returns, to ensure applicability of section 37 of P.L.2008, c.46 (C.40:55D-8.6) and the fees paid shall be returned to the claimant within 30 days of receipt of the claim for return.

P.L. 2024, CHAPTER 2
27

19.  Section 3 of P.L.1993, c.32 (C.40:55D-40.3) is amended to read as follows:

C.40:55D-40.3  Site Improvement Advisory Board.

3.  a.  There is established in, but not of, the department a Site Improvement Advisory Board, to devise statewide site improvement standards pursuant to section 4 of P.L.1993, c.32 (C.40:55D-40.4).  The board shall consist of the commissioner or the commissioner's designee, who shall be a non-voting member of the board, the Director of the Division of Codes and Standards in the Department of Community Affairs, who shall be a voting member of the board, the Executive Director of the New Jersey Housing and Mortgage Finance Agency, or the executive director's designee, who shall be a voting member of the board, and nine other voting members, to be appointed by the commissioner.  The other members shall include two professional planners, one of whom serves as a planner for a governmental entity or whose professional experience is predominantly in the public sector and who has worked in the public sector for at least the previous five years and the other of whom serves as a planner in private practice and has particular expertise in private residential development and has been involved in private sector planning for at least the previous five years, and one representative each from:

(1)  The New Jersey Society of Professional Engineers;
(2)  The New Jersey Society of Municipal Engineers;
(3)  The New Jersey Association of County Engineers;
(4)  The New Jersey Federation of Planning Officials;
(5)  (Deleted by amendment, P.L.2024, c.2);
(6)  The New Jersey Builders' Association;
(7)  The New Jersey Institute of Technology;
(8)  The New Jersey State League of Municipalities.

b.  Among the members to be appointed by the commissioner who are first appointed, four shall be appointed for terms of two years each, four shall be appointed for terms of three years each, and two shall be appointed for terms of four years each.  Thereafter, each appointee shall serve for a term of four years.  Vacancies in the membership shall be filled in the same manner as original appointments are made, for the unexpired term.  The board shall select a chair from among its members.  Members may be removed by the commissioner for cause.

c.  Board members shall serve without compensation, but may be entitled to reimbursement, from moneys appropriated or otherwise made available for the purposes of this act, for expenses incurred in the performance of their duties.

20.  Section 3 of P.L.1992, c.79 (C.40A:12A-3) is amended to read as follows:

C.40A:12A-3  Definitions.

3.  As used in P.L.1992, c.79 (C.40A:12A-1 et seq.):

"Bonds" means any bonds, notes, interim certificates, debentures or other obligations issued by a municipality, county, redevelopment entity, or housing authority pursuant to P.L.1992, c.79 (C.40A:12A-1 et al.).

"Comparable, affordable replacement housing" means newly-constructed or substantially rehabilitated housing to be offered to a household being displaced as a result of a redevelopment project, that is affordable to that household based on its income under the guidelines established by the New Jersey Housing and Mortgage Finance Agency for maximum affordable sales prices or maximum fair market rents, and that is comparable to the household's dwelling in the redevelopment area with respect to the size and amenities of the

P.L. 2024, CHAPTER 2
28

dwelling unit, the quality of the neighborhood, and the level of public services and facilities offered by the municipality in which the redevelopment area is located.

"Development" means the division of a parcel of land into two or more parcels, the construction, reconstruction, conversion, structural alteration, relocation, or enlargement of any building or other structure, or of any mining, excavation or landfill, and any use or change in the use of any building or other structure, or land or extension of use of land, for which permission may be required pursuant to the "Municipal Land Use Law," P.L.1975, c.291 (C.40:55D-1 et seq.).

"Electric vehicle charging station" means an electric component assembly or cluster of component assemblies designed specifically to charge batteries within electric vehicles by permitting the transfer of electric energy to a battery or other storage device in an electric vehicle.

"Governing body" means the body exercising general legislative powers in a county or municipality according to the terms and procedural requirements set forth in the form of government adopted by the county or municipality.

"Housing authority" means a housing authority created or continued pursuant to this act.

"Housing project" means a project, or distinct portion of a project, which is designed and intended to provide decent, safe and sanitary dwellings, apartments or other living accommodations for persons of low and moderate income; such work or undertaking may include buildings, land, equipment, facilities and other real or personal property for necessary, convenient or desirable appurtenances, streets, sewers, water service, parks, site preparation, gardening, administrative, community, health, recreational, educational, welfare or other purposes. The term "housing project" also may be applied to the planning of the buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration and repair of the improvements and all other work in connection therewith.

"Parking authority" means a public corporation created pursuant to the "Parking Authority Law," P.L.1948, c.198 (C.40:11A-1 et seq.), and authorized to exercise redevelopment powers within the municipality.

"Persons of low and moderate income" means persons or families who are, in the case of State assisted projects or programs, so defined by the  New Jersey Housing and Mortgage Finance Agency, or in the case of federally assisted projects or programs, defined as of  "low and very low income" by the United States Department of Housing and Urban Development.

"Public body" means the State or any county, municipality, school district, authority or other political subdivision of the State.

"Public electric vehicle charging station" means an electric vehicle charging station located at a publicly available parking space.

"Public housing" means any housing for persons of low and moderate income owned by a municipality, county, the State or the federal government, or any agency or instrumentality thereof.

"Public hydrogen fueling station" means publicly available equipment to store and dispense hydrogen fuel to vehicles according to industry codes and standards.

"Publicly assisted housing" means privately owned housing which receives public assistance or subsidy, which may be grants or loans for construction, reconstruction, conservation, or rehabilitation of the housing, or receives operational or maintenance subsidies either directly or through rental subsidies to tenants, from a federal, State or local government agency or instrumentality.

"Publicly available parking space" means a parking space that is available to, and accessible by, the public and may include on-street parking spaces and parking spaces in surface lots or parking garages, but shall not include: a parking space that is part of, or associated with, a

private residence; or a parking space that is reserved for the exclusive use of an individual driver or vehicle or for a group of drivers or vehicles, such as employees, tenants, visitors, residents of a common interest development, or residents of an adjacent building.

"Real property" means all lands, including improvements and fixtures thereon, and property of any nature appurtenant thereto or used in connection therewith, and every estate, interest and right, legal or equitable, therein, including terms for years and liens by way of judgment, mortgage or otherwise, and indebtedness secured by such liens.

"Redeveloper" means any person, firm, corporation or public body that shall enter into or propose to enter into a contract with a municipality or other redevelopment entity for the redevelopment or rehabilitation of an area in need of redevelopment, or an area in need of rehabilitation, or any part thereof, under the provisions of this act, or for any construction or other work forming part of a redevelopment or rehabilitation project.

"Redevelopment" means clearance, replanning, development and redevelopment; the conservation and rehabilitation of any structure or improvement, the construction and provision for construction of residential, commercial, industrial, public or other structures and the grant or dedication of spaces as may be appropriate or necessary in the interest of the general welfare for streets, parks, playgrounds, or other public purposes, including recreational and other facilities incidental or appurtenant thereto, in accordance with a redevelopment plan.

"Redevelopment agency" means a redevelopment agency created pursuant to subsection a. of section 11 of P.L.1992, c.79 (C.40A:12A-11) or established heretofore pursuant to the "Redevelopment Agencies Law," P.L.1949, c.306 (C.40:55C-1 et al.), repealed by this act, which has been permitted in accordance with the provisions of P.L.1992, c.79 (C.40A:12A-1 et seq.) to continue to exercise its redevelopment functions and powers.

"Redevelopment area" or "area in need of redevelopment" means an area determined to be in need of redevelopment pursuant to sections 5 and 6 of P.L.1992, c.79 (C.40A:12A-5 and C.40A:12A-6) or determined heretofore to be a "blighted area" pursuant to P.L.1949, c.187 (C.40:55-21.1 et seq.) repealed by this act, both determinations as made pursuant to the authority of Article VIII, Section III, paragraph 1 of the Constitution.  A redevelopment area may include lands, buildings, or improvements which of themselves are not detrimental to the public health, safety or welfare, but the inclusion of which is found necessary, with or without change in their condition, for the effective redevelopment of the area of which they are a part.

"Redevelopment entity" means a municipality or an entity authorized by the governing body of a municipality pursuant to subsection c. of section 4 of P.L.1992, c.79 (C.40A:12A-4) to implement redevelopment plans and carry out redevelopment projects in an area in need of redevelopment, or in an area in need of rehabilitation, or in both.

"Redevelopment plan" means a plan adopted by the governing body of a municipality for the redevelopment or rehabilitation of all or any part of a redevelopment area, or an area in need of rehabilitation, which plan shall be sufficiently complete to indicate its relationship to definite municipal objectives as to appropriate land uses, public transportation and utilities, recreational and municipal facilities, and other public improvements; and to indicate proposed land uses and building requirements in the redevelopment area or area in need of rehabilitation, or both.

"Redevelopment project" means any work or undertaking pursuant to a redevelopment plan; such undertaking may include any buildings, land, including demolition, clearance or removal of buildings from land, equipment, facilities, or other real or personal properties which are necessary, convenient, or desirable appurtenances, such as but not limited to streets, sewers, utilities, parks, site preparation, landscaping, and administrative, community, health,

P.L. 2024, CHAPTER 2
30

recreational, educational, and welfare facilities, and zero-emission vehicle fueling and charging infrastructure.

"Rehabilitation" means an undertaking, by means of extensive repair, reconstruction or renovation of existing structures, with or without the introduction of new construction or the enlargement of existing structures, in any area that has been determined to be in need of rehabilitation or redevelopment, to eliminate substandard structural or housing conditions and arrest the deterioration of that area.

"Rehabilitation area" or "area in need of rehabilitation" means any area determined to be in need of rehabilitation pursuant to section 14 of P.L.1992, c.79 (C.40A:12A-14).

"Zero-emission vehicle" means a vehicle certified as a zero emission vehicle pursuant to the California Air Resources Board zero emission vehicle standards for the applicable model year, including but not limited to, battery electric-powered vehicles and hydrogen fuel cell vehicles.

"Zero-emission vehicle fueling and charging infrastructure" means infrastructure to charge or fuel zero-emission vehicles, including but not limited to, public electric vehicle charging stations and public hydrogen fueling stations.

21.  Section 16 of P.L.1992, c.79 (C.40A:12A-16) is amended to read as follows:

C.40A:12A-16  Powers of municipality, county, housing authority.

16. a. In order to carry out the housing purposes of this act, a municipality, county, or housing authority may exercise the following powers, in addition to those set forth in section 22 of P.L.1992, c.79 (C.40A:12A-22):

(1) Plan, construct, own, and operate housing projects; maintain, reconstruct, improve, alter, or repair any housing project or any part thereof; and for these purposes, receive and accept from the State or federal government, or any other source, funds or other financial assistance;

(2) Lease or rent any dwelling house, accommodations, lands, buildings, structures or facilities embraced in any housing project; and pursuant to the provisions of this act, establish and revise the rents and charges therefor;

(3) Acquire property pursuant to subsection i. of section 22 of P.L.1992, c.79 (C.40A:12A-22);

(4) Acquire, by condemnation, any land or building which is necessary for the housing project, pursuant to the provisions of the "Eminent Domain Act of 1971," P.L.1971, c.361 (C.20:3-1 et seq.);

(5) Issue bonds in accordance with the provisions of section 29 of P.L.1992, c.79 (C.40A:12A-29);

(6) Cooperate with any other municipality, private, county, State or federal entity to provide funds to the municipality or other governmental entity and to homeowners, tenant associations, nonprofit or private developers to acquire, construct, rehabilitate or operate publicly assisted housing, and to provide rent subsidies for persons of low and moderate income, including the elderly, pursuant to applicable State or federal programs;

(7) Encourage the use of demand side subsidy programs such as certificates and vouchers for low-income families and promote the use of project based certificates which provide subsidies for units in newly constructed and substantially rehabilitated structures, and of tenant based certificates which subsidize rent in existing units;

(8) Cooperate with any State or federal entity to secure mortgage assistance for any person of low or moderate income;

(9) Provide technical assistance and support to nonprofit organizations and private developers interested in constructing low- and moderate-income housing;

P.L. 2024, CHAPTER 2
31

(10) If it owns and operates public housing units, provide to the tenants public safety services, including protection against substance use disorder, and social services, including counseling and financial management, in cooperation with other agencies;

(11) Provide emergency shelters, transitional housing and supporting services to homeless families and individuals.

b.   All housing projects, programs and actions undertaken pursuant to this act shall accord with the housing element of the master plan of the municipality within which undertaken, and with any fair share housing plan of the municipality, adopted pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).

22.  Section 10 of P.L.1985, c.222 (C.52:27D-310) is amended to read as follows:

C.52:27D-310  Essential components of municipality's housing element.

10.  A municipality's housing element shall be designed to achieve the goal of access to affordable housing to meet present and prospective housing needs, with particular attention to low- and moderate-income housing, and shall contain at least:

a.  An inventory of the municipality's housing stock by age, condition, purchase or rental value, occupancy characteristics, and type, including the number of units affordable to low- and moderate-income households and substandard housing capable of being rehabilitated, and in conducting this inventory the municipality shall have access, on a confidential basis for the sole purpose of conducting the inventory, to all necessary property tax assessment records and information in the assessor's office, including but not limited to the property record cards;

b.  A projection of the municipality's housing stock, including the probable future construction of low- and moderate-income housing, for the next ten years, taking into account, but not necessarily limited to, construction permits issued, approvals of applications for development and probable residential development of lands;

c.  An analysis of the municipality's demographic characteristics, including but not necessarily limited to, household size, income level and age;

d.  An analysis of the existing and probable future employment characteristics of the municipality;

e.  A determination of the municipality's present and prospective fair share for low- and moderate-income housing and its capacity to accommodate its present and prospective housing needs, including its fair share for low- and moderate-income housing, as established pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1);

f.  A consideration of the lands that are most appropriate for construction of low- and moderate-income housing and of the existing structures most appropriate for conversion to, or rehabilitation for, low- and moderate-income housing, including a consideration of lands of developers who have expressed a commitment to provide low- and moderate-income housing;

g.  An analysis of the extent to which municipal ordinances and other local factors advance or detract from the goal of preserving multigenerational family continuity as expressed in the recommendations of the Multigenerational Family Housing Continuity Commission, adopted pursuant to paragraph (1) of subsection f. of section 1 of P.L.2021, c.273 (C.52:27D-329.20);

h.  For a municipality located within the jurisdiction of the Highlands Water Protection and Planning Council, established pursuant to section 4 of P.L.2004, c.120 (C.13:20-4), an analysis of compliance of the housing element with the Highlands Regional Master Plan of lands in the Highlands Preservation Area, and lands in the Highlands Planning Area for Highlands-conforming municipalities.  This analysis shall include consideration of the municipality's most recent Highlands Municipal Build Out Report, consideration of opportunities for

P.L. 2024, CHAPTER 2
32

redevelopment of existing developed lands into inclusionary or 100 percent affordable housing, or both, and opportunities for 100 percent affordable housing in both the Highlands Planning Area and Highlands Preservation Area that are consistent with the Highlands regional master plan; and

i.  An analysis of consistency with the State Development and Redevelopment Plan, including water, wastewater, stormwater, and multi-modal transportation based on guidance and technical assistance from the State Planning Commission.

23.  Section 1 of P.L.1995, c.231 (C.52:27D-310.1) is amended to read as follows:

C.52:27D-310.1  Computing municipal adjustment, exclusions.

1.  Any municipality that receives an adjustment of its prospective need obligations for the fourth round or subsequent rounds based on a lack of vacant land shall, as part of the process of adopting and implementing its housing element and fair share plan, identify sufficient parcels likely to redevelop during the current round of obligations to address at least 25 percent of the prospective need obligation that has been adjusted and adopt realistic zoning that allows for such adjusted obligation, or demonstrate why the municipality is unable to do so.  When computing a municipal adjustment regarding available land resources as part of the determination of a municipality's fair share of affordable housing, the municipality, in filing a housing element and fair share plan pursuant to subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1), shall exclude from designating, and the process set forth pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1) and section 13 of P.L.1985, c.222 (C.52:27D-313) shall confirm was correctly excluded, as vacant land:

(a) any land that is owned by a local government entity that as of January 1, 1997, has adopted, prior to the institution of a lawsuit seeking a builder's remedy or prior to the filing of a petition for substantive certification of a housing element and fair share plan, a resolution authorizing an execution of agreement that the land be utilized for a public purpose other than housing;

(b) any land listed on a master plan of a municipality as being dedicated, by easement or otherwise, for purposes of conservation, park lands or open space and which is owned, leased, licensed, or in any manner operated by a county, municipality or tax-exempt, nonprofit organization including a local board of education, or by more than one municipality by joint agreement pursuant to P.L.1964, c.185 (C.40:61-35.1 et seq.), for so long as the entity maintains such ownership, lease, license, or operational control of such land;

(c) any vacant contiguous parcels of land in private ownership of a size which would accommodate fewer than five housing units based on appropriate standards pertaining to housing density;

(d) historic and architecturally important sites listed on the State Register of Historic Places or National Register of Historic Places prior to the date of filing a housing element and fair share plan pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1) or initiation of an action pursuant to section 13 of P.L.1985, c.222 (C.52:27D-313);

(e) agricultural lands when the development rights to these lands have been purchased or restricted by covenant;

(f) sites designated for active recreation that are designated for recreational purposes in the municipal master plan; and

(g) environmentally sensitive lands where development is prohibited by any State or federal agency, including, but not limited to, the Highlands Water Protection and Planning Council, established pursuant to section 4 of P.L.2004, c.120 (C.13:20-4), for lands in the

Highlands Preservation Area, and lands in the Highlands Planning Area for Highlands-conforming municipalities.

No municipality shall be required to utilize for affordable housing purposes land that is excluded from being designated as vacant land.

24.  Section 11 of P.L.1985, c.222 (C.52:27D-311) is amended to read as follows:

C.52:27D-311  Provision of fair share by municipality.

11. a. In adopting its housing element, the municipality may provide for its fair share of low- and moderate-income housing by means of any technique or combination of techniques which provide a realistic opportunity for the provision of the fair share.  The housing element shall contain an analysis demonstrating that it will provide such a realistic opportunity, and the municipality shall establish that its land use and other relevant ordinances have been revised to incorporate the provisions for low- and moderate-income housing.  In preparing the housing element, the municipality shall consider the following techniques for providing low- and moderate-income housing within the municipality, as well as such other appropriate techniques as have been established through applicable precedent and may be employed by the municipality:

(1) Rezoning for densities necessary to assure the economic viability of any inclusionary developments, either through mandatory set-asides or density bonuses, as may be necessary to meet all or part of the municipality's fair share in accordance with the provisions of subsection h. of this section;

(2) Determination of the total residential zoning necessary to assure that the municipality's fair share is achieved;

(3) Determination of measures that the municipality will take to assure that  low- and moderate-income units remain affordable to  low- and moderate-income households for an appropriate period of not less than the period required by the regulations adopted by the Department of Community Affairs pursuant to section 21 of P.L.1985, c.222 (C.52:27D-321);

(4) A plan for infrastructure expansion and rehabilitation and conversion or redevelopment of unused or underutilized real property, including existing structures, if necessary to assure the achievement of the municipality's fair share of low- and moderate-income housing;

(5) Donation or use of municipally owned land or land condemned by the municipality for purposes of providing low- and moderate-income housing;

(6) Tax abatements for purposes of providing low- and moderate-income housing;

(7) Utilization of funds obtained from any State or federal subsidy toward the construction of low- and moderate-income housing;

(8) Utilization of municipally generated funds toward the construction of low- and moderate-income housing; and

(9) The purchase of privately owned real property used for residential purposes at the value of all liens secured by the property, excluding any tax liens, notwithstanding that the total amount of debt secured by liens exceeds the appraised value of the property, pursuant to regulations promulgated by the Commissioner of Community Affairs pursuant to subsection b. of section 41 of P.L.2000, c.126 (C.52:27D-311.2).

b.  The municipality may provide for a phasing schedule for the achievement of its fair share of low- and moderate-income housing.

c.  (Deleted by amendment, P.L.2008, c.46)

d.  Nothing in P.L.1985, c.222 (C.52:27D-301 et al.) shall require a municipality to raise or expend municipal revenues in order to provide low- and moderate-income housing.

P.L. 2024, CHAPTER 2
34

e.   When a municipality's housing element includes the provision of rental housing units in a community residence for the developmentally disabled, for the mentally ill, or for persons with head injuries, as those terms are defined in section 2 of P.L.1977, c.448 (C.30:11B-2), or in transitional housing, which will be affordable to persons of low- and moderate-income, and for which adequate measures to retain such affordability pursuant to paragraph (3) of subsection a. of this section are included in the housing element, those housing units shall be fully credited towards the fulfillment of the municipality's fair share of low- and moderate-income housing.  A municipality shall not credit transitional housing units towards more than 10 percent of the municipality's fair share obligation.

f.   It having been determined by the Legislature that the provision of housing under P.L.1985, c.222 (C.52:27D-301 et al.) is a public purpose, a municipality or municipalities may utilize public monies to make donations, grants or loans of public funds for the rehabilitation of deficient housing units and the provision of new or substantially rehabilitated housing for low- and moderate-income persons, providing that any private advantage is incidental.

g.   A municipality that has received approval of its housing element and fair share plan for the current round, and that has actually effected the construction of the affordable housing units it is obligated to provide, may amend its affordable housing element or zoning ordinances without losing immunity from exclusionary zoning litigation.

h.   Whenever affordable housing units are proposed to be provided through an inclusionary development, a municipality shall provide, through its zoning powers, incentives to the developer, which shall include increased densities and reduced costs.

i.   A municipality and a developer may request a modification of a compliance certification involving reduced affordable housing set-asides or increased densities to ensure the economic feasibility of an inclusionary development, if any such application demonstrates how any shortfall in meeting the municipal fair share obligation will then be addressed.  Such a request may be granted only if the municipality and developer have demonstrated that the project has been impacted by market conditions beyond their reasonable control.

j.   A municipality may enter into an agreement with a developer or residential development owner to provide a preference for affordable housing to low- and moderate-income veterans who served in time of war or other emergency, as defined in section 1 of P.L.1963, c.171 (C.54:4-8.10), of up to 50 percent of the affordable units in that particular project.  This preference shall be established in the applicant selection process for available affordable units so that applicants who are veterans who served in time of war or other emergency, as referenced in this subsection, and who apply within 90 days of the initial marketing period shall receive preference for the rental of the agreed-upon percentage of affordable units.  After the first 90 days of the initial 120-day marketing period, if any of those units subject to the preference remain available, then applicants from the general public shall be considered for occupancy.  Following the initial 120-day marketing period, previously qualified applicants and future qualified applicants who are veterans who served in time of war or other emergency, as referenced in this subsection, shall be placed on a special waiting list as well as the general waiting list.  The veterans on the special waiting list shall be given preference for affordable units, as the units become available, whenever the percentage of preference-occupied units falls below the agreed upon percentage.  Any agreement to provide affordable housing preferences for veterans pursuant to this subsection shall not affect a municipality's ability to receive credit for the unit.

k.   In the fourth round, and in subsequent rounds of affordable housing obligations, a municipality shall be able to receive one credit against its affordable housing obligation for each unit of low- or moderate-income housing and shall not receive bonus credit for any

particular type of low- or moderate-income housing, unless authority to obtain bonus credit is expressly provided pursuant to this section or other sections of the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).  A municipality shall not receive more than one type of bonus credit for any unit and a municipality shall not be permitted to satisfy more than 25 percent of its prospective need obligation in the fourth round or any subsequent round through the use of bonus credits.  This subsection shall not be construed to limit the ability of a municipality to receive a unit of credit for a low- or moderate-income housing unit that is subject to affordability controls that are scheduled to expire, but are extended pursuant to section 21 of P.L.1985, c.222 (C.52:27D-321), to the extent that this affordability control extension would otherwise generate this credit.  As a part of a fair share plan and housing element adopted pursuant to subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1), a municipality shall:

(1)  receive one unit of credit and one bonus credit for each unit of low- or moderate-income housing for individuals with special needs or permanent supportive housing, as those terms are defined in section 2 of P.L. 2004, c.70 (C.34:1B-21.24);

(2)  receive one unit of credit and one-half bonus credit for each low- or moderate-income ownership unit created in partnership sponsorship with a non-profit housing developer;

(3)  receive one unit of credit and one-half bonus credit for each unit of low- or moderate-income housing located within a one-half mile radius, or one-mile radius for projects located in a Garden State Growth Zone, as defined in section 2 of P.L.2011, c.149 (C.34:1B-243), surrounding a New Jersey Transit Corporation, Port Authority Transit Corporation, or Port Authority Trans-Hudson Corporation rail, bus, or ferry station, including all light rail stations. For the purpose of this subparagraph, the distance from the bus, rail, or ferry station to a housing unit shall be measured from the closest point on the outer perimeter of the station, including any associated park-and-ride lot, to the closest point of the housing project property;

(4)  receive one unit of credit and one-half bonus credit for a unit of age-restricted housing, provided that a bonus credit for age-restricted housing shall not be applied to more than 10 percent of the units of age-restricted housing constructed in compliance with the Uniform Housing Affordability Controls promulgated by the New Jersey Housing and Mortgage Finance Agency in a municipality that count towards the municipality's affordable housing obligation for any single 10-year round of affordable housing obligations;

(5)  receive one unit of credit and one-half bonus credit for each unit of low- or moderate-income family housing with at least three bedrooms above the minimum number required by the bedroom distribution.  This bonus credit shall be calculated by taking into account the full municipal fair share plan and housing element, and the number of units with at least three bedrooms required for projects satisfying the minimum 50 percent family housing requirements.  A municipality shall receive the bonus credit pursuant to this paragraph for each unit with at least three bedrooms that are above the minimum number required for the bedroom distribution determined pursuant to the Uniform Housing Affordability Controls promulgated by the New Jersey Housing and Mortgage Finance Agency;

(6)  receive one unit of credit and one-half bonus credit for a unit of low- or moderate-income housing constructed on land that is or was previously developed and utilized for retail, office, or commercial space;

(7)  receive one unit of credit and one-half bonus credit for each existing low- or moderate-income rental housing unit for which affordability controls are extended for a new term of affordability, in compliance with the Uniform Housing Affordability Controls promulgated by the New Jersey Housing and Mortgage Finance Agency, and the municipality contributes funding towards the costs necessary for this preservation;

P.L. 2024, CHAPTER 2
36

(8)   receive one unit of credit and one bonus credit for each unit of low- or moderate-income housing in a 100 percent affordable housing project for which the municipality contributes toward the costs of the project.  This contribution may consist of: (a) real property donations that enable siting and construction of the project or (b) contributions from the municipal affordable housing trust fund in support of the project, if the contribution consists of no less than three percent of the project cost;

(9)   receive one unit of credit and one-half bonus credit for each unit of very low-income housing for families above the 13 percent of units required to be reserved for very low-income housing pursuant to section 7 of P.L.2008, c.46 (C.52:27D-329.1).  In accordance with section 7 of P.L.2008, c.46 (C.52:27D-329.1), a municipality shall not be required to provide that a specific percentage of the units in any specific project be reserved as very low-income housing in order to obtain this bonus credit, and the 13 percent level, for the purpose of bonus credits, shall be calculated against the full prospective need obligation provided pursuant to the fair share plan; and

(10)   receive one unit of credit and one bonus credit for each unit of low- or moderate-income housing created by transforming an existing rental or ownership unit from a market rate unit to an affordable housing unit.  A municipality may only rely on this bonus credit as part of its fair share plan and housing element if the municipality demonstrates that a commitment to follow through with this market to affordable agreement has been made and: (a) this agreement has been signed by the property owner; or (b) the municipality has obtained ownership of the property.

l.  A municipality may not satisfy more than 30 percent of the affordable housing units, exclusive of any bonus credits, to address its prospective need affordable housing obligation through the creation of age-restricted housing.  A municipality shall satisfy a minimum of 50 percent of the actual affordable housing units, exclusive of any bonus credits, created to address its prospective need affordable housing obligation through the creation of housing available to families with children and otherwise in compliance with the requirements and controls established pursuant to section 21 of P.L.1985, c.222 (C.52:27D-321).  A municipality shall satisfy a minimum of 25 percent of the actual affordable housing units, exclusive of any bonus credits, to address its prospective need affordable housing obligation, through rental housing, including at least half of that number available to families with children.  All units referred to in this section shall otherwise be in compliance  with the requirements and controls established pursuant to section 21 of P.L.1985, c.222 (C.52:27D-321).

m.  All parties shall be entitled to rely upon regulations on municipal credits, adjustments, and compliance mechanisms adopted by the Council on Affordable Housing unless those regulations are contradicted by statute, including but not limited to P.L.2024, c.2 (C.52:27D-304.1 et al.), or binding court decisions.

n.  P.L.2024, c.2 (C.52:27D-304.1 et al.) shall not be construed to require a municipality to fund infrastructure improvements for affordable housing projects beyond any commitments made in a fair share plan and housing element that has been provided with compliance certification.  A municipality may fund infrastructure improvements for affordable housing projects, through the adoption of a development agreement with the applicant, beyond any commitments made in a fair share plan and housing element that has been provided with compliance certification.

25.  Section 6 of P.L.2005, c.350 (C.52:27D-311b) is amended to read as follows:

C.52:27D-311b  Assurance of adaptability requirements; council measures.

P.L. 2024, CHAPTER 2
37

6.  A municipality may take such measures as are necessary to assure compliance with the adaptability requirements imposed pursuant to P.L.2005, c.350 (C.52:27D-311a et al.), including the inspection of those units which are newly constructed and receive housing credit as provided under section 1 of P.L.2005, c.350 (C.52:27D-311a) for adaptability, as part of the monitoring which occurs pursuant to P.L.1985, c.222 (C.52:27D-301 et al.).  No housing unit subject to the provisions of section 5 of P.L.2005, c.350 (C.52:27D-123.15) and to the provisions of the barrier free subcode adopted by the Commissioner of Community Affairs pursuant to the "State Uniform Construction Code Act," P.L.1975, c.217 (C.52:27D-119 et seq.) shall be eligible for inclusion in a municipal fair share plan unless the unit complies with the requirements set forth thereunder.  If any units for which credit was granted in accordance with the provisions of P.L.2005, c.350 (C.52:27D-311a et al.) are found not to conform to the requirements of P.L.2005, c.350 (C.52:27D-311a et al.), any party representing the interests of households with disabilities may seek a modification to the approval of the municipal fair share plan to require the municipality to amend its fair share plan within 90 days of such a finding, to address its fair share obligation pursuant to P.L.1985, c.222 (C.52:27D-301 et al.).  In the event that the municipality fails to amend its fair share plan within 90 days of such a finding, the municipality shall lose immunity to exclusionary zoning litigation for the portion of its obligation that is found not to conform to the requirements of P.L.2005, c.350 (C.52:27D-311a et al.).

26.  Section 20 of P.L.1985, c.222 (C.52:27D-320) is amended to read as follows:

C.52:27D-320  "New Jersey Affordable Housing Trust Fund."
20.  There is established in the Department of Community Affairs a separate trust fund, to be used for the exclusive purposes as provided in this section, and which shall be known as the "New Jersey Affordable Housing Trust Fund."  The fund shall be a non-lapsing, revolving trust fund, and all monies deposited or received for purposes of the fund shall be accounted for separately, by source and amount, and remain in the fund until appropriated for such purposes.  The fund shall be the repository of all State funds appropriated for affordable housing purposes, including, but not limited to, the proceeds from the receipts of the additional fee collected pursuant to paragraph (2) of subsection a. of section 3 of P.L.1968, c.49 (C.46:15-7), proceeds from available receipts of the Statewide non-residential development fees collected pursuant to section 35 of P.L.2008, c.46 (C.40:55D-8.4), monies lapsing or reverting from municipal development trust funds, or other monies as may be dedicated, earmarked, or appropriated by the Legislature for the purposes of the fund.  All references in any law, order, rule, regulation, contract, loan, document, or otherwise to the "Neighborhood Preservation Nonlapsing Revolving Fund" shall mean the "New Jersey Affordable Housing Trust Fund."  The department shall be permitted to utilize annually up to 7.5 percent of the monies available in the fund for the payment of any necessary administrative costs related to the administration of the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), or any costs related to administration of P.L.2008, c.46 (C.52:27D-329.1 et al.).

a.  Except as permitted pursuant to subsection g. of this section, and by section 41 of P.L.2009, c.90 (C.52:27D-320.1), the commissioner shall award grants or loans from this fund for housing projects and programs in municipalities whose housing elements have obtained compliance certification pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1) or in municipalities receiving State aid pursuant to P.L.1978, c.14 (C.52:27D-178 et seq.).

Of those monies deposited into the "New Jersey Affordable Housing Trust Fund" that are derived from municipal development fee trust funds, or from available collections of Statewide

non-residential development fees, a priority for funding shall be established for projects in municipalities that have received compliance certification.

Programs and projects in any municipality shall be funded only after receipt by the commissioner of a written statement in support of the program or project from the municipal governing body.

b.  The commissioner shall establish rules and regulations governing the qualifications of applicants, the application procedures, and the criteria for awarding grants and loans and the standards for establishing the amount, terms, and conditions of each grant or loan.

c.  For any period which the commissioner may approve, the commissioner may assist affordable housing programs that are located in municipalities that have a pending request for compliance certification; provided that the affordable housing program will meet all or part of a municipal low- and moderate-income housing obligation.

d.  Amounts deposited in the "New Jersey Affordable Housing Trust Fund" shall be targeted to regions based on the region's percentage of the State's low- and moderate-income housing need as determined pursuant to the low- and moderate-income household growth over the prior 10 years, as calculated pursuant to section 6 of P.L.2024, c.2 (C.52:27D-304.2). Amounts in the fund shall be applied for the following purposes in designated neighborhoods:

(1)  Rehabilitation of substandard housing units occupied or to be occupied by low- and moderate-income households;

(2)  Creation of accessory dwelling units to be occupied by low- and moderate-income households;

(3) Conversion of non-residential space to residential purposes; provided a substantial percentage of the resulting housing units are to be occupied by low- and moderate-income households;

(4)  Acquisition of real property, demolition and removal of buildings, or construction of new housing that will be occupied by low- and moderate-income households, or any combination thereof;

(5)  Grants of assistance to eligible municipalities for costs of necessary studies, surveys, plans, and permits; engineering, architectural, and other technical services; costs of land acquisition and any buildings thereon; and costs of site preparation, demolition, and infrastructure development for projects undertaken pursuant to an approved regional contribution agreement;

(6)  Assistance to a local housing authority, nonprofit or limited dividend housing corporation, or association or a qualified entity acting as a receiver under P.L.2003, c.295 (C.2A:42-114 et al.) for rehabilitation or restoration of housing units which it administers which: (a) are unusable or in a serious state of disrepair; (b) can be restored in an economically feasible and sound manner; and (c) can be retained in a safe, decent, and sanitary manner, upon completion of rehabilitation or restoration; and

(7)  Other housing programs for low- and moderate-income housing, including, without limitation, (a) infrastructure projects directly facilitating the construction of low- and moderate-income housing not to exceed a reasonable percentage of the construction costs of the low- and moderate-income housing to be provided and (b) alteration of dwelling units occupied or to be occupied by households of low or moderate income and the common areas of the premises in which they are located in order to make them accessible to persons with disabilities.

e.  Any grant or loan agreement entered into pursuant to this section shall incorporate contractual guarantees and procedures by which the division shall ensure that any unit of housing provided for low- and moderate-income households shall continue to be occupied by low- and moderate-income households for a period that conforms to the requirements of

subsection f. of section 21 of P.L.1985, c.222 (C.52:27D-321) following the award of the loan or grant, except that the division may approve a guarantee for a period of less duration where necessary to ensure project feasibility.

f.    Notwithstanding the provisions of any other law, rule, or regulation to the contrary, in making grants or loans under this section, the department shall not require that tenants be certified as low or moderate income or that contractual guarantees or deed restrictions be in place to ensure continued low- and moderate-income occupancy as a condition of providing housing assistance from any program administered by the department, when that assistance is provided for a project of moderate rehabilitation if the project: (1) contains 30 or fewer rental units; and (2) is located in a census tract in which the median household income is 60 percent or less of the median income for the housing region in which the census tract is located, as determined for a three-person household by the department in accordance with the latest federal decennial census. A list of eligible census tracts shall be maintained by the department and shall be adjusted upon publication of median income figures by census tract after each federal decennial census.

g.    In addition to other grants or loans awarded pursuant to this section, and without regard to any limitations on such grants or loans for any other purposes herein imposed, the commissioner shall annually allocate such amounts as may be necessary in the commissioner's discretion, and in accordance with section 3 of P.L.2004, c.140 (C.52:27D-287.3), to fund rental assistance grants under the program created pursuant to P.L.2004, c.140 (C.52:27D-287.1 et al.). Such rental assistance grants shall be deemed necessary and authorized pursuant to P.L.1985, c.222 (C.52:27D-301 et al.), in order to meet the housing needs of certain low-income households who may not be eligible to occupy other housing produced pursuant to P.L.1985, c.222 (C.52:27D-301 et al.).

h.    The department and the State Treasurer shall submit the "New Jersey Affordable Housing Trust Fund" for an audit annually by the State Auditor or State Comptroller, at the discretion of the Treasurer. In addition, the department shall prepare an annual report for each fiscal year, and submit it by November 30th of each year to the Governor and the Legislature, and the Joint Committee on Housing Affordability, or its successor, and post the information to its Internet website, of all activity of the fund, including details of the grants and loans by number of units, number and income ranges of recipients of grants or loans, location of the housing renovated or constructed using monies from the fund, the number of units upon which affordability controls were placed, and the length of those controls. The report also shall include details pertaining to those monies allocated from the fund for use by the State rental assistance program pursuant to section 3 of P.L.2004, c.140 (C.52:27D-287.3) and subsection g. of this section.

i.    The commissioner may award or grant the amount of any appropriation deposited in the "New Jersey Affordable Housing Trust Fund" pursuant to section 41 of P.L.2009, c.90 (C.52:27D-320.1) to municipalities pursuant to the provisions of section 39 of P.L.2009, c.90 (C.40:55D-8.8).

27.  Section 21 of P.L.1985, c.222 (C.52:27D-321) is amended to read as follows:

C.52:27D-321  Affordable housing assistance.

21.  The agency shall establish affordable housing programs to assist municipalities in meeting the obligation of developing communities to provide low- and moderate-income housing.

a.  Of the bond authority allocated to it under section 24 of P.L.1983, c.530 (C.55:14K-24) the agency will allocate, for a reasonable period of time established by its board, no less

than 25 percent to be used in conjunction with housing to be constructed or rehabilitated with assistance under P.L.1985, c.222 (C.52:27D-301 et al.).

b.  The agency shall to the extent of available funds, award assistance to affordable housing programs located in municipalities whose housing elements have obtained compliance certification, or which have been subject to a builder's remedy.  During any period which the agency may approve, the agency may assist affordable housing programs that have a pending request for compliance certification; provided the affordable housing program will meet all or in part a municipal low- and moderate-income housing obligation.

c.  Assistance provided pursuant to this section may take the form of grants or awards to municipalities, prospective home purchasers, housing sponsors as defined in P.L.1983, c.530 (C.55:14K-1 et seq.), or as contributions to the issuance of mortgage revenue bonds or multi-family housing development bonds which have the effect of achieving the goal of producing affordable housing.

d.  Affordable housing programs which may be financed or assisted under this provision may include, but are not limited to:

(1) Assistance for home purchase and improvement including interest rate assistance, down payment and closing cost assistance, and direct grants for principal reduction;

(2) Rental programs including loans or grants for developments containing low- and moderate-income housing, moderate rehabilitation of existing rental housing, congregate care and retirement facilities;

(3) Financial assistance for the conversion of nonresidential space to residences;

(4) Other housing programs for low- and moderate-income housing, including infrastructure projects directly facilitating the construction of low- and moderate-income housing; and

(5) Grants or loans to municipalities, housing sponsors and community organizations to encourage development of innovative approaches to affordable housing, including:

(a) Such advisory, consultative, training and educational services as will assist in the planning, construction, rehabilitation and operation of housing; and

(b) Encouraging research in and demonstration projects to develop new and better techniques and methods for increasing the supply, types and financing of housing and housing projects in the State.

e.  The agency shall establish procedures and guidelines governing the qualifications of applicants, the application procedures and the criteria for awarding grants and loans for affordable housing programs and the standards for establishing the amount, terms and conditions of each grant or loan.

f.  The agency, in consultation with the department, shall establish requirements and controls to ensure the maintenance of housing assisted under P.L.1985, c.222 (C.52:27D-301 et al.) as affordable to low- and moderate-income households for a period of not less than 40 years for newly created rental units, 30 years for for-sale units, and 30 years for housing units for which affordability controls are extended for a new term of affordability, provided that the minimum extension term may be limited to no less than 20 years as long as the original and extended terms, in combination, total at least 60 years.  Any 100 percent affordable rental property shall have a right to extinguish a deed restriction regardless of original length, beginning 30 years following the start of the deed restriction, provided a refinancing or rehabilitation, or both, for the purpose of preservation is commenced and that a new deed restriction of at least 30 years is provided.  A municipality shall be eligible to receive credits for all preserved units pursuant to this subsection, as long as the original and extended terms total at least 60 years, and this credit may be obtained at the time of preservation.  All 100

P.L. 2024, CHAPTER 2
41

percent affordable projects shall be eligible for any affordable housing preservation program administered by the State, beginning 30 years following the start of the deed restriction, regardless of original length of the deed restriction.  Any State administered preservation program may allow a refinancing funding process to commence prior to the 30th year of the deed restriction when such refinancing or rehabilitation funding is needed to preserve affordable housing.  The agency may update or amend any controls previously adopted by the agency, in consultation with the Council on Affordable Housing, prior to the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.), provided that the requirements and controls shall, at a minimum, be consistent with the controls as in effect immediately prior to the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.), including, but not limited to, any requirements concerning bedroom distributions, affordability averages, and affirmative marketing.  The controls may include, among others, requirements for recapture of assistance provided pursuant to P.L.1985, c.222 (C.52:27D-301 et al.) or restrictions on return on equity in the event of failure to meet the requirements of the program.  With respect to rental housing financed by the agency pursuant to P.L.1985, c.222 (C.52:27D-301 et al.) or otherwise which promotes the provision or maintenance of low- and moderate-income housing, the agency may waive restrictions on return on equity required pursuant to P.L.1983, c.530 (C.55:14K-1 et seq.) which is gained through the sale of the property or of any interest in the property or sale of any interest in the housing sponsor.  The agency shall promulgate updated regulations no later than nine months following the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.).  All parties may continue to rely on regulations previously adopted by the agency pursuant to the authority provided by this section as in effect immediately prior to the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.) until new rules and regulations are adopted by the agency.  Notwithstanding the provisions of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.) to the contrary, the agency, after consultation with department, may adopt, immediately, upon filing with the Office of Administrative Law, said regulations, which shall be effective for a period not to exceed one year from the date of the filing.  The agency shall thereafter amend, adopt, or readopt the regulations in accordance with the requirements of P.L.1968, c.410 (C.52:14B-1 et seq.).

g.  The agency may establish affordable housing programs through the use or establishment of subsidiary corporations or development corporations as provided in P.L.1983, c.530 (C.55:14K-1 et seq.).  The subsidiary corporations or development corporations shall be eligible to receive funds provided under P.L.1985, c.222 (C.52:27D-301 et al.) for any permitted purpose.

h.  The agency shall provide assistance, through its bonding powers or in any other manner within its powers, to the grant and loan program established pursuant to section 20 of P.L.1985, c.222 (C.52:27D-320).

i. (1) The department shall promulgate processes and standards for the certification of administrative agents and municipal housing liaisons in the State, as well as standards for measuring performance of and enforcing compliance by administrative agents and municipal housing liaisons in implementing the affordable housing requirements and controls established pursuant to subsection f. of this section.

(2)  Administrative agents shall be responsible for implementing the requirements and controls set by the regulations promulgated pursuant to subsection f. of this section.  The department may bring via summary proceeding any findings of violation of the responsibilities set forth in this section before a county-level housing judge to docket the violation and issue corrective orders and levy fines.

P.L. 2024, CHAPTER 2
42

(3)  Municipal housing liaisons shall be responsible for monitoring administrative agents within their municipality's jurisdiction to ensure compliance with the requirements and controls set by regulation under subsection f. of this section.

(4)  Municipal housing liaisons, the department, and interested parties may bring a challenge before a county-level housing judge to determine whether properties subject to the regulations set forth by this section are out of compliance with the regulations.  A finding of deliberate noncompliance may result in the department removing the administrative agent's certification.

(5) A county-level housing judge may issue fines and order corrective actions for violations and may consider patterns of violations in determining whether a municipality is meeting its obligations under the compliance certification established by section 3 of P.L.2024, c.2 (C.52:27D-304.1).

(6) Notwithstanding the provisions of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.), to the contrary, the department may adopt, immediately, upon filing with the Office of Administrative Law, regulations to implement the provisions of this subsection, which shall be effective for a period not to exceed one year from the date of the filing.  The department shall thereafter amend, adopt, or readopt the regulations in accordance with the requirements of P.L.1968, c.410 (C.52:14B-1 et seq.).

28.  Section 19 of P.L.2008, c.46 (C.52:27D-321.1) is amended to read as follows:

C.52:27D-321.1  Allocation of low-income tax credits.

19.  Notwithstanding any rules of the New Jersey Housing and Mortgage Finance Agency to the contrary, the allocation of low-income tax credits shall be made by the agency to the full extent such credits are permitted to be allocated under federal law, including allocations of four percent or nine percent federal low-income tax credits and including allocations allowable for partial credits.  The affordable portion of any mixed income or mixed-use development that is part of a fair share housing plan that has obtained compliance certification, including a court-approved judgment of repose or compliance, including, but not limited to, a development that has received a density bonus, shall be permitted to receive allocations of low-income tax credits, provided that the applicant can conclusively demonstrate that the market rate residential or commercial units are unable to internally subsidize the affordable units, and the affordable units are developed contemporaneously with the commercial or market rate residential units.

29.  Section 7 of P.L.2008, c.46 (C.52:27D-329.1) is amended to read as follows:

C.52:27D-329.1  Coordination, review of housing elements.

7.  Housing elements and fair share plans adopted pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1) shall ensure that at least 13 percent of the housing units made available for occupancy by low-income and moderate-income households to address a municipality's prospective need obligation will be reserved for occupancy by very low income households, as that term is defined pursuant to section 4 of P.L.1985, c.222 (C.52:27D-304), with at least half of such units made available for families with children.  The 13 percent shall count towards the minimum 50 percent of the housing units required to be made available for occupancy by low-income households to address a municipality's prospective need obligation.  Nothing in this section shall require that a specific percentage of the units in any specific project be reserved as very low-income housing; provided, however, that a municipality shall not receive

P.L. 2024, CHAPTER 2
43

bonus credits for the provision of housing units reserved for occupancy by very low-income households unless the 13 percent target has been exceeded within that municipality, and that the agency shall update the regulations adopted pursuant to section 21 of P.L.1985, c.222 (C.52:27D-321) to replace any requirements for very low-income housing inconsistent with the percentages and definitions established pursuant to P.L.2024, c.2 (C.52:27D-304.1 et al.) with the percentage and definition specified in this section.

30.  Section 8 of P.L.2008, c.46 (C.52:27D-329.2) is amended to read as follows:

C.52:27D-329.2  Authorization of municipality to impose, collect development fees.

8.  a.  (1) A municipality that is in the process of seeking compliance certification, has obtained compliance certification, is a qualified urban aid municipality, as determined pursuant to paragraph (1) of subsection c. of section 7 of P.L.2024, c.2 (C.52:27D-304.3), or that has been so authorized by a court of competent jurisdiction, and which has adopted a municipal development fee ordinance shall be authorized to impose and collect development fees from developers of residential property, in accordance with rules promulgated by the department. Each amount collected shall be deposited and shall be accounted for separately, by payer and date of deposit.

(2)  No later than 180 days following the enactment of P.L.2024, c.2 (C.52:27D-304.1 et al.), any municipality that is or has been authorized to impose and collect development fees from developers of residential property, or payments in lieu of constructing affordable housing, shall provide the Department of Community Affairs with a detailed accounting of all such fees that have been collected and expended since the inception of the municipal authorization to collect the fees.

(3)  Beginning with the year after the enactment of P.L.2024, c.2 (C.52:27D-304.1 et al.), by February 15, every municipality that is or has been authorized to impose and collect development fees from developers of residential property, or payments in lieu of constructing affordable housing, shall provide the Department of Community Affairs with a detailed accounting of all such fees that have been collected and expended the previous year.

(4)  A municipality may not spend or commit to spend any affordable housing development fees, including Statewide non-residential fees collected and deposited into the municipal affordable housing trust fund, without first obtaining the approval of the expenditure as part of its compliance certification or by the department.  A municipality shall include in its housing element and fair share plan adopted pursuant to section 3 of P.L.2024, c.2 (C.52:27D-304.1) a spending plan for current funds in the municipal affordable housing trust fund and projected funds through the current round.  Review of that spending plan for consistency with applicable law and the municipality's housing element and fair share plan shall be part of the process specified in section 3 of P.L.2024, c.2 (C.52:27D-304.1).  The department shall promulgate updated regulations no later than nine months following the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.) regarding the establishment, administration, reporting, and enforcement of the expenditure of affordable housing development fees by municipalities, which shall include establishing an expedited process for approving spending plan expenditures for emergent opportunities to create affordable housing after a municipality has obtained compliance certification and procedures for monitoring the collection and expenditure of trust funds.  The department shall develop and publish on the department's Internet website a detailed summary of the municipal affordable housing trust fund expenditures for each municipality and shall update each summary on an annual basis.  As part of the regulations adopted pursuant to this section and section 10 of P.L.2008, c.46 (C.52:27D-

P.L. 2024, CHAPTER 2
44

329.4), the department shall adopt reporting requirements applicable to municipal affordable housing trust funds to facilitate fulfillment of the department's obligations pursuant to this section. Municipalities may continue to rely on regulations on development fees and spending plans previously adopted by the council until new rules and regulations are adopted by the department. The department shall have jurisdiction regarding the enforcement of these regulations, provided that any municipality which is not in compliance with the regulations adopted by the department may be subject to forfeiture of any or all funds remaining within its municipal trust fund. Any funds so forfeited shall be deposited into the "New Jersey Affordable Housing Trust Fund" established pursuant to section 20 of P.L.1985, c.222 (C.52:27D-320).

b. A municipality shall deposit all fees collected, whether or not such collections were derived from fees imposed upon non-residential or residential construction into a trust fund dedicated to those purposes as required under this section, and such additional purposes as may be approved by the department.

c. (1) A municipality, other than a qualified urban aid municipality, as determined pursuant to paragraph (1) of subsection c. of section 7 of P.L.2024, c.2 (C.52:27D-304.3), may only spend development fees for an activity approved by the department to address the municipal fair share obligation or approved as part of compliance certification.

(2) Municipal development trust funds shall not be expended unless the municipality has immunity from exclusionary zoning litigation at the time of the expenditure, or said municipality has previously collected such funds while under the protection of presumptive validity or immunity from exclusionary zoning litigation and in accordance with an approved spending plan. However, municipal development trust funds may be expended by a municipality if the municipality is a qualified urban aid municipality, as determined pursuant to paragraph (1) of subsection c. of section 7 of P.L.2024, c.2 (C.52:27D-304.3), with a development fee ordinance and spending plan approved by the department or a court of competent jurisdiction, regardless of whether this approval occurs prior to or subsequent to the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.). Municipal development fee trust funds shall not be expended:

(a) to reimburse municipalities for activities which occurred prior to the authorization of a municipality to collect development fees; or

(b) (i) on administrative costs, attorney fees or court costs to obtain a judgment of repose; (ii) to contest a determination of the municipality's fair share obligation; or (iii) on costs of any challenger in connection to a challenge to the municipality's obligation, housing element, or fair share plan.

(3) A municipality shall set aside a portion of its development fee trust fund for the purpose of providing affordability assistance to low- and moderate-income households in affordable units included in a municipal fair share plan, in accordance with rules of the department.

(a) Affordability assistance programs may include down payment assistance, security deposit assistance, low-interest loans, common maintenance expenses for units located in condominiums, rental assistance, and any other program authorized by the department.

(b) Affordability assistance to households earning 30 percent or less of median income may include buying down the cost of low-income units in a municipal fair share plan to make them affordable to households earning 30 percent or less of median income. The use of development fees in this manner shall not entitle a municipality to bonus credits except as may otherwise be allowed by applicable precedent.

(4) A municipality may contract with a private or public entity to administer any part of its housing element and fair share plan, including the requirement for affordability assistance, or

any program or activity for which the municipality expends development fee proceeds, in accordance with rules of the department.

(5) Not more than 20 percent of the revenues collected from development fees shall be expended on administration, in accordance with rules of the department.  Such administration may include expending a portion of its affordable housing trust fund on actions and efforts reasonably related to the determination of its fair share obligation and the development of its housing element and fair share plan pursuant to paragraphs (1) and (2) of subsection f. of section 3 of P.L.2024, c.2 (C.52:27D-304.1) and for expenses that are reasonably necessary for compliance with the processes of the program, including, but not limited to, the costs to the municipality of resolving a challenge under the program.

d.   The department shall establish a time by which all development fees collected within a calendar year shall be expended; provided, however, that all fees shall be committed for expenditure within four years from the date of collection.  A municipality that fails to commit to expend the balance required in the development fee trust fund by the time set forth in this section shall be required by the council to transfer the remaining unspent balance at the end of the four-year period to the "New Jersey Affordable Housing Trust Fund," established pursuant to section 20 of P.L.1985, c.222 (C.52:27D-320), as amended by P.L.2008, c.46 (C.52:27D-329.1 et al.), to be used in the housing region of the transferring municipality for the authorized purposes of that fund.

e.   Notwithstanding any provision of this section, or regulations of the department, a municipality shall not collect a development fee from a developer whenever that developer is providing for the construction of affordable units, either on-site or elsewhere within the municipality.

This section shall not apply to the collection of a Statewide development fee imposed upon non-residential development pursuant to sections 32 through 38 of P.L.2008, c.46 (C.40:55D-8.1 through 40:55D-8.7) by the State Treasurer, when such collection is not authorized to be retained by a municipality.

31.  Section 10 of P.L.2008, c.46 (C.52:27D-329.4) is amended to read as follows:

C.52:27D-329.4  Maintenance, publication of up-to-date municipal status report.

10. a. The department shall maintain on its Internet website, and also publish on an annual basis, an up-to-date municipal status report based on its collection and publication of information concerning the number affordable of housing units actually constructed, construction starts, certificates of occupancy granted, the start and expiration dates of deed restrictions, and residential and non-residential development fees collected and expended, including purposes and amounts of such expenditures, along with the current balance in the municipality's affordable housing trust funds.  With respect to units actually constructed, the information shall specify the characteristics of the housing, including housing type, tenure, affordability level, number of bedrooms, date and expiration of affordability controls, and whether occupancy is reserved for families, senior citizens, or other special populations.

b. (1) No later than 180 days following the enactment of P.L.2024, c.2 (C.52:27D-304.1 et al.), each municipality shall provide the department with the information necessary to comply with this section.

(2) Beginning with the year after the enactment of P.L.2024, c.2 (C.52:27D-304.1 et al.), by February 15, each municipality shall provide the department with the information necessary to comply with this section.

c.  The department may adopt, pursuant to the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.), rules and regulations as may be necessary to effectuate the provisions of this section, including rules and regulations to ensure that municipalities and developers report any information as may be necessary for the department to fulfill its obligations pursuant to this section.

32.  Section 18 of P.L.2008, c.46 (C.52:27D-329.9) is amended to read as follows:

C.52:27D-329.9  Developments, certain, in certain regional planning entities.

18.  a.  Notwithstanding any rules to the contrary, for developments consisting of newly-constructed residential units located, or to be located, within the jurisdiction of any regional planning entity required to adopt a master plan or comprehensive management plan pursuant to statutory law, including the New Jersey Meadowlands Commission pursuant to subsection (i) of section 6 of P.L.1968, c.404 (C.13:17-6), the Pinelands Commission pursuant to section 7 of the "Pinelands Protection Act," P.L.1979, c.111 (C.13:18A-8), the Fort Monmouth Economic Revitalization Planning Authority pursuant to section 5 of P.L.2006, c.16 (C.52:27I-5), or its successor, and the Highlands Water Protection and Planning Council pursuant to section 11 of P.L.2004, c.120 (C.13:20-11), but excluding joint planning boards formed pursuant to section 64 of P.L.1975, c.291 (C.40:55D-77), there shall be required to be reserved for occupancy by low- or moderate-income households at least 20 percent of the residential units constructed with affordability controls as required pursuant to the rules and regulations of the agency.

b.  Subject to the provisions of subsection d. of this section, a developer of a project consisting of newly-constructed residential units being financed in whole or in part with State funds, including, but not limited to, transit villages designated by the Department of Transportation and units constructed on State-owned property, shall be required to reserve at least 20 percent of the residential units constructed for occupancy by low- or moderate-income households, as those terms are defined in section 4 of P.L.1985, c.222 (C.52:27D-304), with affordability controls as required under the rules of the agency.

c.  (Deleted by amendment, P.L.2024, c.2)

d.  Notwithstanding the provisions of subsection b. of this section, or any other law or regulation to the contrary, for purposes of mixed-use projects or qualified residential projects in which a business receives a tax credit pursuant to P.L.2007, c.346 (C.34:1B-207 et seq.) or a tax credit pursuant to section 35 of P.L.2009, c.90 (C.34:1B-209.3), or both, an "eligible municipality," as defined in section 2 of P.L.2007, c.346 (C.34:1B-208), shall have the option of deciding the percentage of newly-constructed residential units within the project, up to 20 percent of the total, required to be reserved for occupancy by low- or moderate-income households.  For a mixed-use project or a qualified residential project that has received preliminary or final site plan approval prior to the effective date of P.L.2011, c.89, the percentage shall be deemed to be the percentage, if any, of units required to be reserved for low- or moderate-income households in accordance with the terms and conditions of such approval.

33.  Section 3 of P.L.1995, c.343 (C.55:14K-56) is amended to read as follows:

C.55:14K-56  Definitions.

3.  As used in this act:

"Affordable Home Ownership Opportunities Bonds" means any bonds of the New Jersey Housing and Mortgage Finance Agency that provide funds to facilitate the provisions of this act.

"Agency" means the New Jersey Housing and Mortgage Finance Agency.

"Annual income" means total income, from all sources, during the last full calendar year preceding the filing of an application for a loan pursuant to this act.

"Bonds" means bonds, notes or any other form of evidence of indebtedness of the agency, bearing either a fixed rate or a variable rate of interest, issued by the agency.

"Eligible project" means a project for the creation of low- or moderate-income housing which meets the standards of eligibility for loans under the program created by this act.

"Eligible purchaser" means a purchaser of a dwelling unit in an eligible project to whom a loan may be made under the program pursuant to section 5 of this act.

"Fund" means the Affordable Home Ownership Opportunities Fund established by section 5 of this act.

"Housing region" means a housing region as defined in subsection b. of section 4 of the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-304) and determined pursuant to subsection b. of section 6 of P.L.2024, c.2 (C.52:27D-304.2).

"Local enforcement authority" means any officer or agency of local government responsible for the implementation or enforcement of land-use and building regulations established by or pursuant to the "State Uniform Construction Code Act," P.L.1975, c.217 (C.52:27D-119 et seq.) or the "Municipal Land Use Law," P.L.1975, c.291 (C.40:55D-1 et seq.).

"Low income" means a gross annual household income equal to 50% or less of the median gross annual household income for households of the same size within the relevant housing region.

"Moderate income" means a gross annual household income equal to not more than 80%, but more than 50% of the median gross annual household income for households of the same size within the relevant housing region.

"Program" means the Affordable Home Ownership Opportunities Program created by this act.

"Qualified nonprofit organization" means any corporation or association of persons organized under Title 15A of the New Jersey Statutes, having for its principal purpose, or as a purpose ancillary to its principal purpose, the improvement of realistic opportunities for low income and moderate income housing, as defined pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), being within the description of section 501(c)(3) of the United States Internal Revenue Code (26 U.S.C. 501(c)(3)), having been determined by the agency to be a bona fide organization not under the effective control of any for-profit organization or governmental entity, and appearing capable, by virtue of past activities, qualifications of staff or board, or other features, of furthering the purposes of this act.

"Substantial rehabilitation" means repair, reconstruction or renovation which (1) costs in excess of 60% of the fair market value of a rehabilitated dwelling after such repair, reconstruction or renovation, or (2) renders a previously vacant and uninhabitable dwelling safe, sanitary and decent for residential purposes, or (3) converts to safe, sanitary and decent residential use a structure previously in non-residential use.

34.  Section 7 of P.L.1995, c.343 (C.55:14K-60) is amended to read as follows:

C.55:14K-60  Eligibility for loans.

7.  A project of new construction or substantial rehabilitation by a nonprofit organization shall be eligible for a loan under this act if (1) the homes to be constructed or substantially rehabilitated under the project are located within an identifiable neighborhood in which median family income does not exceed the current standard of "moderate income" pursuant to the contemporaneous standards established pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.); (2) the homes to be constructed or substantially rehabilitated under the

project are sufficient in number and located on the same or contiguous parcels of land or within such proximity to each other as to render the cost per unit of housing practicable for acquisition by lower-income purchasers; and (3) each home constructed or substantially rehabilitated within the project will conform to all requirements of the State Uniform Construction Code, except as to the waiver of any fee or other requirement pursuant to subsection b. of section 9 of this act.

35.  Section 3 of P.L.1998, c.128 (C.55:14K-74) is amended to read as follows:

C.55:14K-74  Definitions relative to cooperative housing for certain purchasers.

3.   As used in this act:

"Agency" means the New Jersey Housing and Mortgage Finance Agency.

"Annual income" means total income, from all sources, during the last full calendar year preceding the filing of an application for a loan pursuant to this act.

"Bonds" means bonds, notes or any other form of evidence of indebtedness of the agency, bearing either a fixed rate or a variable rate of interest, issued by the agency.

"Eligible project" means a project undertaken by a qualified housing sponsor  to create housing for shared occupancy by seniors or persons with disability of low or moderate income, whether for home ownership or rental, which meets the standards of eligibility for loans under the program created by section 4 of P.L.1998, c.128 (C.55:14K-75).

"Eligible purchaser" means a purchaser of a dwelling unit in an eligible project who fulfills the definition of a senior or person with disability pursuant to this section, is of low or moderate income and to whom a loan may be made under the program pursuant to section 4 of P.L.1998, c.128 (C.55:14K-75).

"Fund" means the Senior and Disabled Cooperative Housing Incentive Fund established by section 6 of P.L.1998, c.128 (C.55:14K-77).

"Housing region" means a housing region as defined in subsection b. of section 4 of P.L.1985, c.222 (C.52:27D-304) and determined pursuant to subsection b. of section 6 of P.L.2024, c.2 (C.52:27D-304.2).

"Low income" means a gross annual household income equal to 50% or less of the median gross annual household income for households of the same size within the relevant housing region.

"Moderate income" means a gross annual household income equal to not more than 80%, but more than 50% of the median gross annual household income for households of the same size within the relevant housing region.

"Person with disability" means any person who is 18 years of age or older and who fulfills the definition of having a "disability" pursuant to section 3 of the "Americans with Disabilities Act of 1990," 42 U.S.C. s.12102.

"Program" means the New Jersey Senior and Disabled Cooperative Housing Finance Incentive Program created by P.L.1998, c.128 (C.55:14K-72 et seq.).

"Qualified housing sponsor" means any corporation or association of persons organized under the New Jersey Statutes,  or any other corporation having for one of its purposes the improvement of realistic opportunities for low income and moderate income housing, as defined pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.), and appearing capable, by virtue of past activities, qualifications of staff or board, or other features, of furthering the purposes of P.L.1998, c.128 (C.55:14K-72 et seq.).

"Retrofitting" means renovating or remodeling an existing residential or non-residential structure to allow for cooperative living.

"Senior" means an individual who is 55 years of age or older.

P.L. 2024, CHAPTER 2
49

"Substantial rehabilitation" means repair, reconstruction or renovation which (1) costs in excess of 60% of the fair market value of a rehabilitated dwelling after such repair, reconstruction or renovation, or (2) renders a previously vacant and uninhabitable dwelling safe, sanitary and decent for residential purposes or (3) converts to safe, sanitary and decent residential use a structure previously in non-residential use.

C.52:27D-313.3   Adoption of transitional rules, regulations, implementation, affordable housing, timeline; Uniform Housing Affordability Controls, update.

36. a. (1)  Notwithstanding the provisions of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.) to the contrary, the Commissioner of Community Affairs shall, in consultation with the Administrative Director of the Courts and the Executive Director of the New Jersey Housing and Mortgage Finance Agency, adopt, immediately upon filing with the Office of Administrative Law, no later than nine months after the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.), such transitional rules and regulations as necessary for the implementation of P.L.2024, c.2 (C.52:27D-304.1 et al.), including for: (a) the identification of any vestigial duties of the Council on Affordable Housing and the transfer of those duties within the Department of Community Affairs to the extent that those duties are not otherwise assumed, pursuant to P.L.2024, c.2 (C.52:27D-304.1 et al.), by municipalities or the Affordable Housing Dispute Resolution Program; and (b) the establishment of policies regarding the cost of the assessments and fees of planned real estate developments, as defined in section 3 of P.L.1977, c.419 (C.45:22A-23), on low- and moderate-income housing units.

(2)  The department, in consultation with the agency, shall thereafter amend, adopt, or readopt the regulations in accordance with the requirements of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.).

b.  The Executive Director of the New Jersey Housing and Mortgage Finance Agency, in consultation with the department, shall adopt, pursuant to the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.), no later than nine months after the effective date of P.L.2024, c.2 (C.52:27D-304.1 et al.), rules and regulations to update the Uniform Housing Affordability Controls as required pursuant to the "Fair Housing Act," P.L.1985, c.222 (C.52:27D-301 et al.).  As part of updating the Uniform Housing Affordability Controls, the agency shall set rules establishing that, for the purpose of newly created low- and moderate-income rental units, a 40-year minimum deed restriction shall be required.  For the purpose of for-sale units, a 30-year minimum deed restriction shall be required.  For the purpose of housing units for which affordability controls are extended for a new term of affordability, a 30-year minimum deed restriction shall be required, provided that the minimum extension term may be limited to no less than 20 years as long as the original and extended terms, in combination, total at least 60 years.  Any 100 percent affordable rental property shall have a right to extinguish a deed restriction regardless of original length, beginning 30 years following the start of the deed restriction, provided a refinancing or rehabilitation, or both, for the purpose of preservation is commenced and that a new deed restriction of at least 30 years is provided.  A municipality shall be eligible to receive credits for all preserved units pursuant to this subsection, as long as the original and extended terms total at least 60 years, and this credit may be obtained at the time of preservation.  All 100 percent affordable projects shall be eligible for any affordable housing preservation program administered by the State, beginning 30 years following the start of the deed restriction, regardless of original length of the deed restriction.  Any State administered preservation program may allow a refinancing funding process to commence prior to the 30th year of the deed restriction when such refinancing or rehabilitation funding is needed to preserve affordable housing.

P.L. 2024, CHAPTER 2
50

37.  The following sections are repealed:
Section 5 of P.L.1985 c.222 (C.52:27D-305);
Section 6 of P.L.1985, c.222 (C.52:27D-306);
Section 7 of P.L.1985, c.222 (C.52:27D-307);
Section 1 of P.L.1991, c.479 (C.52:27D-307.1);
Section 2 of P.L.1991, c.479 (C.52:27D-307.2);
Section 3 of P.L.1991, c.479 (C.52:27D-307.3);
Section 4 of P.L.1991, c.479 (C.52:27D-307.4);
Section 5 of P.L.1991, c.479 (C.52:27D-307.5);
Section 6 of P.L.2001, c.435 (C.52:27D-307.6);
Section 8 of P.L.1985, c.222 (C.52:27D-308);
Section 9 of P.L.1985, c.222 (C.52:27D-309);
Section 40 of P.L.2009, c.90 (C.52:27D-311.3);
Section 2 of P.L.1989, c.142 (C.52:27D-313.1);
Section 14 of P.L.1985, c.222 (C.52:27D-314);
Section 15 of P.L.1985, c.222 (C.52:27D-315);
Section 16 of P.L.1985, c.222 (C.52:27D-316);
Section 17 of P.L.1985, c.222 (C.52:27D-317);
Section 18 of P.L.1985, c.222 (C.52:27D-318);
Section 19 of P.L.1985 c.222 (C.52:27D-319);
Section 22 of P.L.1985, c.222 (C.52:27D-322);
Section 26 of P.L.1985, c.222 (C.52:27D-326);
Section 28 of P.L.1985, c.222 (C.52:27D-328); and
Section 9 of P.L.2008, c.46 (C.52:27D-329.3).

38.  a.  There is appropriated to the Affordable Housing Dispute Resolution Program, established pursuant to subsection a. of section 5 of P.L.2024, c.2 (C.52:27D-313.2), from the General Fund $12,000,000 for the purposes of carrying out its responsibilities for the fourth round of affordable housing obligations, as established pursuant to section 5 of P.L.2024, c.2 (C.52:27D-313.2).

b.  There is appropriated to the Department of Community Affairs, from the General Fund, $4,000,000 for the purposes of carrying out responsibilities allocated to it pursuant to P.L.2024, c.2 (C.52:27D-304.1 et al.).

39.  This act shall take effect immediately and shall apply to each new round of affordable housing obligations that begins following enactment.

Approved March 20, 2024.

# **EXHIBIT B**

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

# Memorandum

To:          Borough of Montvale, New Jersey

From:        Econsult Solutions, Inc.

Date:        October 29, 2024

RE:          Trends in Household Change and the Urban Aid Exemption, 1970-2020

Authors:     Peter Angelides, Ph.D., AICP – President; David Stanek, Ph.D. – Vice President

---

## 1   Introduction

ESI was asked to synthesize data on household growth trends and affordable housing production in New Jersey's urban aid and non-urban aid municipalities from 1970 to 2020. The goal was to evaluate changes in the number of households and the distribution of affordable housing units, particularly in the context of the state's fair share housing obligations and the impact of the urban aid exemption. This analysis aims to inform discussions on the relevance of the exemption policy given the significant shifts in demographic and housing patterns over the past five decades.

### 1.1   Sources

The analysis uses two primary data sources:

1. **U.S. Decennial Census Data (1970, 1980, 1990, 2000, 2010, and 2020):** Household data from the U.S. Census Bureau's decennial censuses for the years mentioned.[1] This data provides insights into the trends of household growth and decline across both exempt and non-exempt municipalities in New Jersey over a 50-year period.

2. **Low-Income Housing Tax Credit (LIHTC) Program Data from NJHMFA:** Information on newly constructed affordable housing units from the New Jersey Housing and Mortgage Finance Agency (NJHMFA). The data cover affordable housing units built under the LIHTC program between 1990 and 2019. This allows for an assessment of affordable housing production in both exempt and non-exempt municipalities.

By combining these data sources, the analysis offers an evaluation of how household dynamics and affordable housing development have evolved in New Jersey's municipalities, particularly in relation to the urban aid exemption and fair share housing requirements.

---

[1] Steven Manson, Jonathan Schroeder, David Van Riper, Katherine Knowles, Tracy Kugler, Finn Roberts, and Steven Ruggles. IPUMS National Historical Geographic Information System: Version 18.0. 1970 Census: Count 1 - 100% Data, 1980 Census: STF 1 - 100% Data, 1990 Census: STF 1 - 100% Data, 2000 Census: SF 1a - 100% Data, 2010 Census: SF 1a - P&H Tables, 2020 Census: DHC - P&H Tables. Minneapolis, MN: IPUMS. 2023. http://doi.org/10.18128/D050.V18.0

RE:  Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

## 2    Urban Aid Exemptions

Under the fair share methodology that was first adopted in 1983 and has since been maintained, existing urban aid municipalities that meet specific criteria are exempt from the obligation to provide affordable housing to meet the prospective affordable housing need of the state. In the 2024 Fourth Round calculations, 47 municipalities are exempt.[2] The remaining 517 municipalities are assigned a fair share obligation.

Throughout this memo, two sets of exempt municipalities are considered:

- The first set are those exempt under the current Fourth Round calculations, which are referred to as 2024 exempt municipalities throughout.[3] The remaining municipalities that are required to contribute to the fair share housing requirement are referred to as 2024 non-exempt municipalities. These 2024 exempt municipalities are used to estimate exempt households between 1990 and 2020.
- The second set of exempt municipalities are the 31 municipalities that qualified as urban aid municipalities pursuant to Chapter 64 of Public Law 1971 as of 1978.[4] The list from 1978 was the closest contemporaneous list of urban aid municipalities available to the Legislature when they drafted the Fair Housing Act. These municipalities are referred to as 1978 urban aid municipalities throughout. The information below treats all of these 1978 municipalities as if they were exempt under the Fair Housing Act. These municipalities are used to estimate exempt households between 1970 and 1990.[5]

## 3    Prospective Need Requirements

Under the 2024 legislation on affordable housing and earlier affordable housing legislation, the prospective need for affordable housing is calculated across six regions in the state.[6] The prospective need of low- and moderate-income for each region is determined by finding the change in households between the most recent U.S. Decennial Census and the second most recent U.S. Decennial Census. If

---

[2] These exempt municipalities change over time. For example, there were 31 urban aid municipalities in 1978 and 42 in 1983, both dates prior to the establishment of the Fair Housing Act of 1985. More recently, there were 44 "qualifying" urban aid municipalities that were exempt in 2015.

[3] New Jersey Department of Community Affairs, 2024. 2025-2035 Affordable Housing Calculations. Fourth Round Calculations Workbook. https://www.nj.gov/dca/dlps/pdf/FourthRoundCalculation_Workbook.xlsx

[4] State of New Jersey, Department of Treasury, 1979. State Owned Lands in New Jersey, Phase I: Urban Aid Municipalities. rucore.libraries.rutgers.edu/rutgers-lib/56359/PDF/1/play/

[5] A more precise accounting of the numbers below would use actual exempt municipalities for each decade between 1970 and 2020. However, the overall story remains the same as the list of urban aid municipalities since the 1970s has stayed relatively constant. Only four municipalities among the 1978 urban aid municipalities are not among the 2024 exempt municipalities. These four municipalities, Millville, Keansburg, Neptune, and Phillipsburg, comprised just 2 percent of the total households of the combined 1978 urban aid municipalities.

[6] Region 1: Bergen, Hudson, Passaic and Sussex counties; Region 2: Essex, Morris, Union and Warren counties; Region 3: Hunterdon, Middlesex, and Somerset counties; Region 4: Mercer, Monmouth and Ocean counties; Region 5: Burlington, Camden, and Gloucester counties; Region 6: Atlantic, Cape May, Cumberland, and Salem counties. New Jersey Department of Community Affairs, 2024. 2025-2035 Affordable Housing Calculations. Fourth Round Calculations Workbook. https://www.nj.gov/dca/dlps/pdf/FourthRoundCalculation_Workbook.xlsx

RE:  Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

positive, this change in households is then divided by 2.5 to determine the region's prospective need. If negative, this change is households is adjusted to zero. For the Fourth Round calculations, this prospective need is based on the 2010 and 2020 U.S. Decennial Censuses. The prospective need of past decades is calculated below using this same method.

Under the new fair housing legislation, the prospective need for affordable housing generated by exempt municipalities is redistributed among the non-exempt municipalities within the same region. This means that while exempt municipalities contribute to the overall housing need through their household growth, they are not responsible for fulfilling that need under the fair share obligations. Additionally, the construction of new affordable housing in exempt municipalities does not count toward the region's prospective need calculations. As described below, the proportion of statewide household growth in exempt municipalities has increased significantly relative to non-exempt municipalities in recent years.

## 4    Trends in Changes in the Number of Households, 1970-2020

In the 1980s, when the urban aid exemption was first established, many exempt municipalities were in decline as evidenced by large losses in population and households that began in the mid-twentieth century and carried through to the 1990s. Today, nearly 40 years later, while some of the underlying conditions that affected many of these exempt municipalities persist, several exempt municipalities are growing, overall, and exempt municipalities now comprise half of the state's growth in households (see Figure 1).

**Figure 1: Percent Share of Change in Households Statewide by 2024 Exemption / 1978 Urban Aid Status\*, 1970-2020**



\*Percentages for 1970-1990 are based on the 31 Urban Aid municipalities in 1978. Percentages for 1990-2020 are based on the 2024 exempt municipalities in the Fourth Round Calculations workbook from NJ DCA.
Source: State of New Jersey, Department of Treasury (1979); NJ DCA Fourth Round Calculations Workbook (2024); NHGIS; U.S. Decennial Census, 1970 (Count 1), 1980 (STF-1); Calculations by ESI (2024); Calculations by ESI (2024).

RE:  Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

The following section presents data about trends in the growth and decline in the number of households in exempt and non-exempt municipalities in New Jersey between 1970 and 2020.

## 4.1    1970-1990 Household Change

In the 1970s and 1980s, New Jersey was quickly suburbanizing and urban areas were in decline. Between 1970 and 1980, New Jersey gained a net total of 343,465 households. 2024 non-urban aid municipalities gained 348,820 households (102 percent of the statewide net total), while the 1978 urban aid municipalities lost a net total of 5,355 households. The loss in households was concentrated in Region 1 (4,818 households lost), Region 2 (6,730 households lost) and Region 5 (4,361 households lost) (see Figure 2).

Losses in 1978 urban aid municipalities were more severe in the 1980s, and overall household growth slowed significantly across the state. Between 1980 and 1990, New Jersey gained a net total of 246,117 households, with 273,350 new households in 1978 non-urban aid municipalities and 27,233 households lost in 1978 urban aid municipalities. The loss in households was again concentrated in Region 1 (2,431 households lost), Region 2 (24,255 households lost), and Region 5 (1,578 households lost) (see Figure 3).

**Figure 2: Change in Households by 1978 Urban Aid Municipalities, 1970-1990**

| Region | Urban Aid Status | 1970-1980 | | 1980-1990 | |
|---|---|---|---|---|---|
| | | *Households* | *% of State Total* | *Households* | *% of State Total* |
| 1 | Non-Urban Aid | 46,622 | 14% | 20,824 | 8% |
| | Urban Aid | (4,818) | -1% | (2,431) | -1% |
| 2 | Non-Urban Aid | 38,976 | 11% | 26,320 | 11% |
| | Urban Aid | (6,730) | -2% | (24,255) | -10% |
| 3 | Non-Urban Aid | 58,411 | 17% | 72,437 | 29% |
| | Urban Aid | 1,076 | 0% | 57 | 0% |
| 4 | Non-Urban Aid | 100,330 | 29% | 78,442 | 32% |
| | Urban Aid | 6,845 | 2% | (37) | 0% |
| 5 | Non-Urban Aid | 74,004 | 22% | 53,208 | 22% |
| | Urban Aid | (4,361) | -1% | (1,578) | -1% |
| 6 | Non-Urban Aid | 30,477 | 9% | 22,110 | 9% |
| | Urban Aid | 2,633 | 1% | 1,011 | 0% |
| Statewide | Non-Urban Aid | 348,820 | 102% | 273,341 | 111% |
| | Urban Aid | (5,355) | -2% | (27,233) | -11% |
| | Total | 343,465 | 100% | 246,108 | 100% |

*Source: State of New Jersey, Department of Treasury (1979); NHGIS (2023), U.S. Decennial Census, 1970 (Count 1), 1980 (STF-1), 1990 (STF-1); Calculations by ESI (2024).*

RE:  Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

## 4.2    1990-2020 Household Change

The declines in New Jersey's urban municipalities reversed in the 1990s. Between 1990 and 2000, 2024 exempt municipalities accounted for 33,652 new households and between 2000 and 2010, they accounted for 23,097 new households. The 1990-2000 and 2000-2010 decades of growth for 2024 exempt municipalities accounted for 12 and 15 percent of the state's growth respectively (see Figure 3).

By the 2010s, the 2024 exempt municipalities were driving a much larger share of the state's growth. Between 2010 and 2020, the 41 2024 exempt municipalities accounted for essentially half of the state's growth. Exempt municipalities grew by 105,145 new households as compared to the 106,597 in 2024 non-exempt municipalities.[7] Forty percent of the state's households growth occurred in Region 1 (24 percent) and Region 2 (16 percent) 2024 exempt municipalities (see Figure 3).

**Figure 3: Change in Households by 2024 Exempt Municipalities, 1990-2020**

| Region | Exemption Status | 1990-2000 | | 2000-2010 | | 2010-2020 | |
|---|---|---|---|---|---|---|---|
| | | *Households* | *% of State Total* | *Households* | *% of State Total* | *Households* | *% of State Total* |
| 1 | Not Exempt | 32,111 | 12% | 12,242 | 8% | 17,797 | 8% |
| | Exempt | 26,595 | 10% | 15,412 | 10% | 51,561 | 24% |
| 2 | Not Exempt | 34,425 | 13% | 15,121 | 10% | 18,209 | 9% |
| | Exempt | 2,239 | 1% | 492 | 0% | 33,055 | 16% |
| 3 | Not Exempt | 51,164 | 19% | 25,113 | 17% | 23,462 | 11% |
| | Exempt | 2,228 | 1% | 2,524 | 2% | 5,547 | 3% |
| 4 | Not Exempt | 64,637 | 24% | 35,126 | 23% | 24,426 | 12% |
| | Exempt | 3,150 | 1% | 2,678 | 2% | 10,128 | 5% |
| 5 | Not Exempt | 38,516 | 14% | 30,264 | 20% | 20,024 | 9% |
| | Exempt | (1,841) | -1% | 473 | 0% | 2,811 | 1% |
| 6 | Not Exempt | 15,438 | 6% | 8,752 | 6% | 2,679 | 1% |
| | Exempt | 1,281 | 0% | 1,518 | 1% | 2,043 | 1% |
| Statewide | Not Exempt | 236,291 | 88% | 126,618 | 85% | 106,597 | 50% |
| | Exempt | 33,652 | 12% | 23,097 | 15% | 105,145 | 50% |
| | Total | 269,943 | 100% | 149,715 | 100% | 211,742 | 100% |

*Source: NJ DCA Fourth Round Calculations Workbooks (2024); NHGIS (2023), U.S. Decennial Census, 1990 (STF-1), 2000 (SF 1a), 2010 (SF 1a), 2020 (DHC). Calculations by ESI (2024)*

# 5    Affordable Housing Production

The Low-Income Housing Tax Credit (LIHTC) is used to fund a large portion of affordable housing in New Jersey. It incentivizes private developers to build or rehabilitate affordable rental housing by providing them with tax credits. Between 1990 and 2019, according to data from the New Jersey Housing and

---

[7] For comparison, between 2010 and 2020, the 1978 urban aid municipalities made up 40 percent of the state's household growth.

RE:  Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

Mortgage Financing Agency, there were 35,036 new affordable housing units built under the Low-Income Housing Tax Credit (LIHTC) program. Of these units, 16,162 were built in 2024 exempt municipalities, and 18,873 were built in 2024 non-exempt municipalities (See Figure 4).

Between 2010 and 2019, exempt municipalities utilized this program to build 6,635 affordable housing units as compared to 8,118 in non-exempt municipalities. These affordable units built in 2024 exempt municipalities comprise about 8 percent of the state's prospective need (see Figure 5). These contributions to the state's prospective need are not counted toward their region's fair share housing obligations.[8]

**Figure 4: Prospective Need and New Construction LIHTC Affordable Housing Units**

|                                     | 1990-2000 | 2000-2010 | 2010-2020 | Total  |
|-------------------------------------|-----------|-----------|-----------|--------|
| Prospective Housing Need            | 107,977   | 59,886    | 84,698    | -      |
| LIHTC Affordable Units - Exempt     | 2,710     | 6,817     | 6,635     | 16,162 |
| LIHTC Affordable Units - Non Exempt | 4,602     | 6,154     | 8,118     | 18,874 |
| LIHTC Affordable Units - Total      | 7,312     | 12,971    | 14,753    | 35,036 |

*Source: ESI (2024), New Jersey Home Mortgage and Financing Agency (2024)*

**Figure 5: New Construction LIHTC Affordable Housing Units by Region as a Percentage of Regional Prospective Need**

| Region    | 1990-2000 | 2000-2010 | 2010-2020 |
|-----------|-----------|-----------|-----------|
| 1         | 3%        | 13%       | 4%        |
| 2         | 7%        | 32%       | 11%       |
| 3         | 3%        | 6%        | 5%        |
| 4         | 0%        | 3%        | 8%        |
| 5         | 1%        | 11%       | 11%       |
| 6         | 2%        | 24%       | 38%       |
| Statewide | 3%        | 11%       | 8%        |

*Source: New Jersey Housing Mortgage and Finance Agency (2024); NHGIS (2023), U.S. Decennial Census, 1970 (Count 1), 1980 (STF-1), 1990 (STF-1), 2000 (SF-1a), 2010 (SF-1a), 2020 (DHC). Calculations by ESI (2024).*

---

[8] The exclusion of affordable housing units built in exempt municipalities from counting toward regional fair share obligations is grounded in the New Jersey Fair Housing Act and the administrative regulations established by COAH (N.J.A.C. 5:93 and N.J.A.C. 5:94). While defunct, the methodologies used under COAH underpin the current fair housing legislation.

RE:  Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

**Appendix Figure 1: 2024 Exempt and 1978 Urban Aid Municipalities**

| County | Municipality | 2024 Exempt Urban Aid | 1978 Urban Aid |
|---|---|---|---|
| Atlantic | Atlantic City | X | X |
| Atlantic | Pleasantville | X | |
| Bergen | Bergenfield | X | |
| Bergen | Cliffside Park | X | |
| Bergen | Garfield | X | |
| Bergen | Hackensack | X | |
| Bergen | Lodi | X | |
| Camden | Camden | X | X |
| Camden | Lindenwold | X | |
| Camden | Pennsauken | X | |
| Cumberland | Bridgeton | X | X |
| Cumberland | Millville | | X |
| Cumberland | Vineland | X | X |
| Essex | Belleville | X | |
| Essex | Bloomfield | X | X |
| Essex | City of Orange | X | X |
| Essex | East Orange | X | X |
| Essex | Irvington | X | X |
| Essex | Montclair | X | X |
| Essex | Newark | X | X |
| Essex | Nutley | X | |
| Gloucester | Glassboro | X | |
| Gloucester | Woodbury | X | |
| Hudson | Bayonne | X | X |
| Hudson | Harrison | X | |
| Hudson | Hoboken | X | X |
| Hudson | Jersey City | X | X |
| Hudson | Kearny | X | |
| Hudson | North Bergen | X | X |
| Hudson | Union City | X | X |
| Hudson | Weehawken | X | |
| Hudson | West New York | X | X |
| Mercer | Trenton | X | X |
| Middlesex | Carteret | X | |
| Middlesex | New Brunswick | X | X |
| Middlesex | Perth Amboy | X | X |
| Middlesex | Woodbridge | X | |
| Monmouth | Asbury Park | X | X |
| Monmouth | Keansburg | | X |
| Monmouth | Long Branch | X | X |
| Monmouth | Neptune City | | X |
| Ocean | Lakewood | X | X |
| Passaic | Clifton | X | |
| Passaic | Passaic | X | X |
| Passaic | Paterson | X | X |
| Union | Elizabeth | X | X |
| Union | Hillside | X | |
| Union | Plainfield | X | X |
| Union | Rahway | X | X |
| Union | Roselle | X | |
| Warren | Phillipsburg | | X |

*Source: NJ DCA Fourth Round Calculations Workbook (2024); State of New Jersey, Department of the Treasury (1979)*

RE:  Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

**Appendix Figure 2a: Total Households by 2024 Exempt Urban Aid Municipalities, 1970-2020**

| Region | Exemption Status | 1970 Households | 1970 % of State Total | 1980 Households | 1980 % of State Total | 1990 Households | 1990 % of State Total | 2000 Households | 2000 % of State Total | 2010 Households | 2010 % of State Total | 2020 Households | 2020 % of State Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Not Exempt | 312,909 | 14% | 351,966 | 14% | 372,556 | 13% | 404,667 | 13% | 416,909 | 13% | 434,706 | 13% |
|   | Exempt | 344,238 | 16% | 346,985 | 14% | 344,788 | 12% | 371,383 | 12% | 386,795 | 12% | 438,356 | 13% |
|   | Total | 657,147 | 30% | 698,951 | 27% | 717,344 | 26% | 776,050 | 25% | 803,704 | 25% | 873,062 | 25% |
| 2 | Not Exempt | 290,970 | 13% | 327,589 | 13% | 353,503 | 13% | 387,928 | 13% | 403,049 | 13% | 421,258 | 12% |
|   | Exempt | 316,286 | 14% | 311,913 | 12% | 288,064 | 10% | 290,303 | 9% | 290,795 | 9% | 323,850 | 9% |
|   | Total | 607,256 | 28% | 639,502 | 25% | 641,567 | 23% | 678,231 | 22% | 693,844 | 22% | 745,108 | 22% |
| 3 | Not Exempt | 173,202 | 8% | 229,514 | 9% | 298,093 | 11% | 349,257 | 11% | 374,370 | 12% | 397,832 | 12% |
|   | Exempt | 59,902 | 3% | 63,077 | 2% | 66,992 | 2% | 69,220 | 2% | 71,744 | 2% | 77,291 | 2% |
|   | Total | 233,104 | 11% | 292,591 | 11% | 365,085 | 13% | 418,477 | 14% | 446,114 | 14% | 475,123 | 14% |
| 4 | Not Exempt | 237,215 | 11% | 338,422 | 13% | 417,147 | 15% | 481,784 | 16% | 516,910 | 16% | 541,336 | 16% |
|   | Exempt | 59,863 | 3% | 65,831 | 3% | 65,511 | 2% | 68,661 | 2% | 71,339 | 2% | 81,467 | 2% |
|   | Total | 297,078 | 13% | 404,253 | 16% | 482,658 | 17% | 550,445 | 18% | 588,249 | 18% | 622,803 | 18% |
| 5 | Not Exempt | 217,850 | 10% | 286,669 | 11% | 338,009 | 12% | 376,525 | 12% | 406,789 | 13% | 426,813 | 12% |
|   | Exempt | 55,034 | 2% | 55,858 | 2% | 56,148 | 2% | 54,307 | 2% | 54,780 | 2% | 57,591 | 2% |
|   | Total | 272,884 | 12% | 342,527 | 13% | 394,157 | 14% | 430,832 | 14% | 461,569 | 14% | 484,404 | 14% |
| 6 | Not Exempt | 93,064 | 4% | 125,298 | 5% | 146,810 | 5% | 162,248 | 5% | 171,000 | 5% | 173,679 | 5% |
|   | Exempt | 44,596 | 2% | 45,472 | 2% | 47,081 | 2% | 48,362 | 2% | 49,880 | 2% | 51,923 | 2% |
|   | Total | 137,660 | 6% | 170,770 | 7% | 193,891 | 7% | 210,610 | 7% | 220,880 | 7% | 225,602 | 7% |
| State | Not Exempt | 1,325,210 | 60% | 1,659,458 | 65% | 1,926,118 | 69% | 2,162,409 | 71% | 2,289,027 | 71% | 2,395,624 | 70% |
|   | Exempt | 879,919 | 40% | 889,136 | 35% | 868,584 | 31% | 902,236 | 29% | 925,333 | 29% | 1,030,478 | 30% |
|   | Total | 2,205,129 | 100% | 2,548,594 | 100% | 2,794,702 | 100% | 3,064,645 | 100% | 3,214,360 | 100% | 3,426,102 | 100% |

*Source: NJ DCA Fourth Round Calculations Workbook (2024); NHGIS (2023), U.S. Decennial Census, 1970 (Count 1), 1980 (STF-1), 1990 (STF-1), 2000 (SF-1a), 2010 (SF-1a), 2020 (DHC); Calculations by ESI (2024).*

RE: Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date: October 29, 2024

**Appendix Figure 2b: Total Households by 1978 Urban Aid Municipalities, 1970-2020**

| Region | Urban Aid Status | 1970 | | 1980 | | 1990 | | 2000 | | 2010 | | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Households | % of State Total | Households | % of State Total | Households | % of State Total | Households | % of State Total | Households | % of State Total | Households | % of State Total |
| 1 | Non Urban Aid | 410,490 | 19% | 457,112 | 18% | 477,936 | 17% | 517,460 | 17% | 529,099 | 16% | 558,101 | 16% |
| | Urban Aid | 246,657 | 11% | 241,839 | 9% | 239,408 | 9% | 258,590 | 8% | 274,605 | 9% | 314,961 | 9% |
| | Total | 657,147 | 30% | 698,951 | 27% | 717,344 | 26% | 776,050 | 25% | 803,704 | 25% | 873,062 | 25% |
| 2 | Non Urban Aid | 320,726 | 15% | 359,702 | 14% | 386,022 | 14% | 421,180 | 14% | 436,352 | 14% | 456,928 | 13% |
| | Urban Aid | 286,530 | 13% | 279,800 | 11% | 255,545 | 9% | 257,051 | 8% | 257,492 | 8% | 288,180 | 8% |
| | Total | 607,256 | 28% | 639,502 | 25% | 641,567 | 23% | 678,231 | 22% | 693,844 | 22% | 745,108 | 22% |
| 3 | Non Urban Aid | 207,319 | 9% | 265,730 | 10% | 338,167 | 12% | 390,858 | 13% | 416,576 | 13% | 442,600 | 13% |
| | Urban Aid | 25,785 | 1% | 26,861 | 1% | 26,918 | 1% | 27,619 | 1% | 29,538 | 1% | 32,523 | 1% |
| | Total | 233,104 | 11% | 292,591 | 11% | 365,085 | 13% | 418,477 | 14% | 446,114 | 14% | 475,123 | 14% |
| 4 | Non Urban Aid | 232,457 | 11% | 332,787 | 13% | 411,229 | 15% | 475,691 | 16% | 510,972 | 16% | 535,419 | 16% |
| | Urban Aid | 64,621 | 3% | 71,466 | 3% | 71,429 | 3% | 74,754 | 2% | 77,277 | 2% | 87,384 | 3% |
| | Total | 297,078 | 13% | 404,253 | 16% | 482,658 | 17% | 550,445 | 18% | 588,249 | 18% | 622,803 | 18% |
| 5 | Non Urban Aid | 240,319 | 11% | 314,323 | 12% | 367,531 | 13% | 406,655 | 13% | 437,094 | 14% | 460,019 | 13% |
| | Urban Aid | 32,565 | 1% | 28,204 | 1% | 26,626 | 1% | 24,177 | 1% | 24,475 | 1% | 24,385 | 1% |
| | Total | 272,884 | 12% | 342,527 | 13% | 394,157 | 14% | 430,832 | 14% | 461,569 | 14% | 484,404 | 14% |
| 6 | Non Urban Aid | 90,476 | 4% | 120,953 | 5% | 143,063 | 5% | 158,607 | 5% | 167,013 | 5% | 170,161 | 5% |
| | Urban Aid | 47,184 | 2% | 49,817 | 2% | 50,828 | 2% | 52,003 | 2% | 53,867 | 2% | 55,441 | 2% |
| | Total | 137,660 | 6% | 170,770 | 7% | 193,891 | 7% | 210,610 | 7% | 220,880 | 7% | 225,602 | 7% |
| State | Non Urban Aid | 1,501,787 | 68% | 1,850,607 | 73% | 2,123,948 | 76% | 2,370,451 | 77% | 2,497,106 | 78% | 2,623,228 | 77% |
| | Urban Aid | 703,342 | 32% | 697,987 | 27% | 670,754 | 24% | 694,194 | 23% | 717,254 | 22% | 802,874 | 23% |
| | Total | 2,205,129 | 100% | 2,548,594 | 100% | 2,794,702 | 100% | 3,064,645 | 100% | 3,214,360 | 100% | 3,426,102 | 100% |

*Source: State of New Jersey, Department of Treasury (1979); NHGIS, 1970 (Count 1), 1980 (STF-1), 1990 (STF-1), 2000 (SF-1a), 2010 (SF-1a), 2020 (DHC); Calculations by ESI (2024).*

RE: Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

**Appendix Figure 3a: Change in Number of Households by 2024 Exempt Urban Aid Municipalities, 1970-2020**

| Region | Exemption Status | 1970-1980 | | 1980-1990 | | 1990-2000 | | 2000-2010 | | 2010-2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Households | % of State Total | Households | % of State Total | Households | % of State Total | Households | % of State Total | Households | % of State Total |
| 1 | Not Exempt | 39,057 | 11% | 20,590 | 8% | 32,111 | 12% | 12,242 | 8% | 17,797 | 8% |
| | Exempt | 2,747 | 1% | (2,197) | -1% | 26,595 | 10% | 15,412 | 10% | 51,561 | 24% |
| | Total | 41,804 | 12% | 18,393 | 7% | 58,706 | 22% | 27,654 | 18% | 69,358 | 33% |
| 2 | Not Exempt | 36,619 | 11% | 25,914 | 11% | 34,425 | 13% | 15,121 | 10% | 18,209 | 9% |
| | Exempt | (4,373) | -1% | (23,849) | -10% | 2,239 | 1% | 492 | 0% | 33,055 | 16% |
| | Total | 32,246 | 9% | 2,065 | 1% | 36,664 | 14% | 15,613 | 10% | 51,264 | 24% |
| 3 | Not Exempt | 56,312 | 16% | 68,579 | 28% | 51,164 | 19% | 25,113 | 17% | 23,462 | 11% |
| | Exempt | 3,175 | 1% | 3,915 | 2% | 2,228 | 1% | 2,524 | 2% | 5,547 | 3% |
| | Total | 59,487 | 17% | 72,494 | 29% | 53,392 | 20% | 27,637 | 18% | 29,009 | 14% |
| 4 | Not Exempt | 101,207 | 29% | 78,725 | 32% | 64,637 | 24% | 35,126 | 23% | 24,426 | 12% |
| | Exempt | 5,968 | 2% | (320) | 0% | 3,150 | 1% | 2,678 | 2% | 10,128 | 5% |
| | Total | 107,175 | 31% | 78,405 | 32% | 67,787 | 25% | 37,804 | 25% | 34,554 | 16% |
| 5 | Not Exempt | 68,819 | 20% | 51,340 | 21% | 38,516 | 14% | 30,264 | 20% | 20,024 | 9% |
| | Exempt | 824 | 0% | 290 | 0% | (1,841) | -1% | 473 | 0% | 2,811 | 1% |
| | Total | 69,643 | 20% | 51,630 | 21% | 36,675 | 14% | 30,737 | 21% | 22,835 | 11% |
| 6 | Not Exempt | 32,234 | 9% | 21,512 | 9% | 15,438 | 6% | 8,752 | 6% | 2,679 | 1% |
| | Exempt | 876 | 0% | 1,609 | 1% | 1,281 | 0% | 1,518 | 1% | 2,043 | 1% |
| | Total | 33,110 | 10% | 23,121 | 9% | 16,719 | 6% | 10,270 | 7% | 4,722 | 2% |
| State | Not Exempt | 334,248 | 97% | 266,660 | 108% | 236,291 | 88% | 126,618 | 85% | 106,597 | 50% |
| | Exempt | 9,217 | 3% | (20,552) | -8% | 33,652 | 12% | 23,097 | 15% | 105,145 | 50% |
| | Total | 343,465 | 100% | 246,108 | 100% | 269,943 | 100% | 149,715 | 100% | 211,742 | 100% |

*Source: NJ DCA Fourth Round Calculations Workbook (2024); NHGIS (2023), U.S. Decennial Census, 1970 (Count 1), 1980 (STF-1), 1990 (STF-1), 2000 (SF-1a), 2010 (SF-1a), 2020 (DHC); Calculations by ESI (2024).*

RE: Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

**Appendix Figure 3b: Change in Number of Households by 1978 Urban Aid Municipalities, 1970-2020**

| Region | Urban Aid Status | 1970-1980 | | 1980-1990 | | 1990-2000 | | 2000-2010 | | 2010-2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Households | % of State Total | Households | % of State Total | Households | % of State Total | Households | % of State Total | Households | % of State Total |
| 1 | Non Urban Aid | 46,622 | 14% | 20,824 | 8% | 39,524 | 15% | 11,639 | 8% | 29,002 | 14% |
| | Urban Aid | (4,818) | -1% | (2,431) | -1% | 19,182 | 7% | 16,015 | 11% | 40,356 | 19% |
| | Total | 41,804 | 12% | 18,393 | 7% | 58,706 | 22% | 27,654 | 18% | 69,358 | 33% |
| 2 | Non Urban Aid | 38,976 | 11% | 26,320 | 11% | 35,158 | 13% | 15,172 | 10% | 20,576 | 10% |
| | Urban Aid | (6,730) | -2% | (24,255) | -10% | 1,506 | 1% | 441 | 0% | 30,688 | 14% |
| | Total | 32,246 | 9% | 2,065 | 1% | 36,664 | 14% | 15,613 | 10% | 51,264 | 24% |
| 3 | Non Urban Aid | 58,411 | 17% | 72,437 | 29% | 52,691 | 20% | 25,718 | 17% | 26,024 | 12% |
| | Urban Aid | 1,076 | 0% | 57 | 0% | 701 | 0% | 1,919 | 1% | 2,985 | 1% |
| | Total | 59,487 | 17% | 72,494 | 29% | 53,392 | 20% | 27,637 | 18% | 29,009 | 14% |
| 4 | Non Urban Aid | 100,330 | 29% | 78,442 | 32% | 64,462 | 24% | 35,281 | 24% | 24,447 | 12% |
| | Urban Aid | 6,845 | 2% | (37) | 0% | 3,325 | 1% | 2,523 | 2% | 10,107 | 5% |
| | Total | 107,175 | 31% | 78,405 | 32% | 67,787 | 25% | 37,804 | 25% | 34,554 | 16% |
| 5 | Non Urban Aid | 74,004 | 22% | 53,208 | 22% | 39,124 | 14% | 30,439 | 20% | 22,925 | 11% |
| | Urban Aid | (4,361) | -1% | (1,578) | -1% | (2,449) | -1% | 298 | 0% | (90) | 0% |
| | Total | 69,643 | 20% | 51,630 | 21% | 36,675 | 14% | 30,737 | 21% | 22,835 | 11% |
| 6 | Non Urban Aid | 30,477 | 9% | 22,110 | 9% | 15,544 | 6% | 8,406 | 6% | 3,148 | 1% |
| | Urban Aid | 2,633 | 1% | 1,011 | 0% | 1,175 | 0% | 1,864 | 1% | 1,574 | 1% |
| | Total | 33,110 | 10% | 23,121 | 9% | 16,719 | 6% | 10,270 | 7% | 4,722 | 2% |
| State | Non Urban Aid | 348,820 | 102% | 273,341 | 111% | 246,503 | 91% | 126,655 | 85% | 126,122 | 60% |
| | Urban Aid | (5,355) | -2% | (27,233) | -11% | 23,440 | 9% | 23,060 | 15% | 85,620 | 40% |
| | Total | 343,465 | 100% | 246,108 | 100% | 269,943 | 100% | 149,715 | 100% | 211,742 | 100% |

*Source: State of New Jersey, Department of Treasury (1979); NHGIS (2023), U.S. Decennial Census, 1970 (Count 1), 1980 (STF-1), 1990 (STF-1), 2000 (SF-1a), 2010 (SF-1a), 2020 (DHC); Calculations by ESI (2024).*

RE: Trends in Household Change and the Urban Aid Exemption, 1970-2020
Date:  October 29, 2024

**Appendix Figure 4: New Construction LIHTC Affordable Housing Unit Production by Percentage of Estimated Regional Prospective Need, 1990-2019**

| Region | Exemption Status | 1990-1999 | | 2000-2009 | | 2010-2019 | |
|---|---|---|---|---|---|---|---|
| | | Affordable Housing Units | % of Region Prospective Need | Affordable Housing Units | % of Region Prospective Need | Affordable Housing Units | % of Region Prospective Need |
| 1 | Not Exempt | 774 | 3% | 227 | 2% | 586 | 2% |
| | Exempt | 672 | 3% | 1,489 | 13% | 1,001 | 4% |
| | Total | 1,446 | 6% | 1,715 | 16% | 1,587 | 6% |
| 2 | Not Exempt | 614 | 4% | 297 | 5% | 386 | 2% |
| | Exempt | 1,080 | 7% | 2,025 | 32% | 2,263 | 11% |
| | Total | 1,694 | 12% | 2,322 | 37% | 2,649 | 13% |
| 3 | Not Exempt | 580 | 3% | 667 | 6% | 1,816 | 16% |
| | Exempt | 563 | 3% | 618 | 6% | 594 | 5% |
| | Total | 1,143 | 5% | 1,285 | 12% | 2,410 | 21% |
| 4 | Not Exempt | 920 | 3% | 1,900 | 13% | 2,657 | 19% |
| | Exempt | 79 | 0% | 400 | 3% | 1,073 | 8% |
| | Total | 999 | 4% | 2,300 | 15% | 3,730 | 27% |
| 5 | Not Exempt | 1,217 | 8% | 1,927 | 16% | 1,949 | 21% |
| | Exempt | 209 | 1% | 1,310 | 11% | 983 | 11% |
| | Total | 1,426 | 10% | 3,237 | 26% | 2,932 | 32% |
| 6 | Not Exempt | 496 | 7% | 1136 | 28% | 724 | 38% |
| | Exempt | 107 | 2% | 976 | 24% | 720.22 | 38% |
| | Total | 603 | 9% | 2112 | 51% | 1444.22 | 76% |
| Statewide | Not Exempt | 4,602 | 4% | 6,154 | 10% | 8,118 | 10% |
| | Exempt | 2,710 | 3% | 6,817 | 11% | 6,635 | 8% |
| | Total | 7,312 | 7% | 12,971 | 22% | 14,753 | 17% |

*Source: NJ DCA Fourth Round Calculations Workbook (2024); NHGIS; U.S. Decennial Census, 1970 (Count 1), 1980 (STF-1), 1990 (STF-1), 2000 (SF-1a), 2010 (SF-1a), 2020 (DHC); New Jersey Housing Mortgage and Financing Agency (2024). Calculations by ESI (2024).*