**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BOROUGH OF MONTVALE,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **MATTHEW J. PLATKIN,** *et al.*, <br><br> Defendants. | Civil Action No. 25-3220 (ZNQ) (JBD) <br><br> **OPINION** |

**QURAISHI, District Judge**

      **THIS MATTER** comes before the Court upon: (1) a Motion to Dismiss filed by the New Jersey Attorney General, the Administrative Director of the Courts, and members of the Affordable Housing Dispute Resolution Program (collectively, "Defendants") (ECF No. 16); (2) a Motion for a Preliminary Injunction filed by Plaintiffs, various municipalities and their elected representatives (ECF No. 19); and (3) a Motion for Leave to Appear Amicus Curiae by Fair Share Housing Center (ECF No. 33). This matter has been fully briefed (ECF Nos. 27, 29, 36, 37, 45, and 48) and the Court heard oral argument on Plaintiffs' Motion for a Preliminary Injunction on January 7, 2026 (ECF No. 46). For the reasons set forth below, the Court will **GRANT** Defendants' Motion to Dismiss and **DENY AS MOOT** Plaintiffs' Motion for a Preliminary Injunction and FSHC's Motion for Leave to Appear Amicus Curiae.

1

I.   **BACKGROUND AND PROCEDURAL HISTORY**

    A.   **PROCEDURAL HISTORY**

On April 24, 2025, Plaintiffs filed a complaint in federal court against Defendants alleging a violation of the Equal Protection Clause under the Fourteenth Amendment (Count I) and a violation of the Equal Protection Rights under the New Jersey Constitution (Count II). (ECF No. 1.) Plaintiffs subsequently filed the First Amended Complaint on August 15, 2025, which added additional defendants. (ECF No. 12.) On October 2, 2025, Plaintiffs filed the Second Amended Complaint, which included additional plaintiffs. ("SAC," ECF No. 15.) Thereafter, Plaintiffs dismissed the state-law equal protection claim against Defendants. (ECF No. 28.)

Defendants filed a Motion to Dismiss the SAC on November 3, 2025. ("MTD Mot.," ECF No. 16.) On November 21, 2025, Plaintiffs filed a Motion for a Preliminary Injunction. ("PI Mot.," ECF No. 19.) After these motions had been fully briefed (ECF Nos. 27, 29, 36, 37), the Court held a hearing on Plaintiffs' Motion for a Preliminary Injunction on January 7, 2026. (ECF No. 46.)

    B.   **BACKGROUND**

        1.   The *Mount Laurel* Doctrine

Before the Court can discuss the legislation at issue in this litigation, it is necessary to provide a brief history of the *Mount Laurel* doctrine that was established by the New Jersey Supreme Court in *S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel I)*, 67 N.J. 151 (1975). There, the New Jersey Supreme Court held that in New Jersey a municipality must, "by its land use regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who may desire to live there, of course including those of low and moderate income." *Id.* at 187. As further explained:

2

> [Municipalities] must permit multifamily housing, without bedroom or similar restrictions, as well as small dwellings on very small lots, low cost housing of other types and, in general, high density zoning, without artificial and unjustifiable minimum requirements as to lot size, building size and the like, to meet the full panoply of these needs. Certainly when a municipality zones for industry and commerce for local tax benefit purposes, it without question must zone to permit adequate housing within the means of the employees involved in such uses. (If planned unit developments are authorized, one would assume that each must include a reasonable amount of low and moderate income housing in its residential 'mix,' unless opportunity for such housing has already been realistically provided for elsewhere in the municipality.) The amount of land removed from residential use by allocation to industrial and commercial purposes must be reasonably related to the present and future potential for such purposes. In other words, such municipalities must zone primarily for the living welfare of people and not for the benefit of the local tax rate.

*Id.* This decision by the New Jersey Supreme Court came to be known as the *Mount Laurel* doctrine.

Eight years later Mount Laurel returned to the New Jersey Supreme Court. *See S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel II)*, 92 N.J. 158 (1983). Despite the New Jersey Supreme Court's clear mandate, Mount Laurel township "remain[ed] afflicted with a blatantly exclusionary ordinance," which "at its core is true to nothing but Mount Laurel's determination to exclude the poor." *Id.* at 198. But Mount Laurel was not alone in its disregard of the New Jersey Supreme Court's opinion. *See id.* at 199. To ensure municipal compliance with their *Mount Laurel* obligations, the New Jersey Supreme Court created a judicial remedy that allowed developers to sue municipalities for the opportunity to build higher-density housing than would otherwise be allowed. *See id.* at 279. As explained in *Mount Laurel II*:

> We hold that where a developer succeeds in *Mount Laurel* litigation and proposes a project providing a substantial amount of lower income housing, a builder's remedy should be granted unless the municipality establishes that because of environmental or other substantial planning concerns, the plaintiff's proposed project is clearly contrary to sound land use planning. We emphasize that the

> builder's remedy should not be denied solely because the municipality prefers some other location for lower income housing, even if it is in fact a better site. Nor is it essential that considerable funds be invested or that the litigation be intensive.

*Id.* at 279–80.[1]

Despite this judicial remedy, the New Jersey Supreme Court invited the Legislature to enter the field:

> No one has challenged the *Mount Laurel* doctrine on these appeals. Nevertheless, a brief reminder of the judicial role in this sensitive area is appropriate, since powerful reasons suggest, and we agree, that the matter is better left to the Legislature. We act first and foremost because the Constitution of our State requires protection of the interests involved and because the Legislature has not protected them. We recognize the social and economic controversy (and its political consequences) that has resulted in relatively little legislative action in this field. We understand the enormous difficulty of achieving a political consensus that might lead to significant legislation enforcing the constitutional mandate better than we can, legislation that might completely remove this Court from those controversies. But enforcement of constitutional rights cannot await a supporting political consensus. So while we have always preferred legislative to judicial action in this field, we shall continue—until the Legislature acts—to do our best to uphold the constitutional obligation that underlies the *Mount Laurel* doctrine. That is our duty. We may not build houses, but we do enforce the Constitution.

*Id.* at 212–13.

To effectuate the *Mount Laurel II* judicial remedy, designated New Jersey Superior Court judges "adopted methodologies to determine need and to allocate the need on a regional basis." *In re Adoption of N.J.A.C. 5:94 & 5:95 By N.J. Council on Affordable Hous.*, 390 N.J. Super. 1, 17 (N.J. Super. Ct. App. Div. 2007). In *AMG Realty Co. v. Twp. of Warren*, Judge Serpentelli set

---

[1] In New Jersey, a builders remedy is a "court-imposed site-specific relief for a litigant who seeks to build affordable housing for which the court requires a municipality to utilize zoning techniques, such as mandatory set-asides or density bonuses, including techniques which provide for the economic viability of a residential development by including housing that is not for low- and moderate-income households." N.J. Stat. Ann. 52:27D-304(o).

4

forth such a methodology, which among other things, established an exclusion for urban aid municipalities. 207 N.J. Super. 388, 442 (N.J. Super. Ct. App. Div. 1984). As he explained:

> [S]elected urban aid municipalities do not have an obligation to handle more than the regional average of substandard housing and, therefore, they have no regional obligation, because realism requires a recognition that their present circumstances render it impossible for them to absorb more than the regional average.
>
> * * *
>
> This formula excludes selected urban towns from the growth area calculation because they are the traditional core areas or similar towns not likely to attract *Mount Laurel* type housing and because they generally lack significant vacant land. Non-growth municipalities obviously cannot contribute to a count of growth acreage.

*Id.* at 442–43.

In response to *Mount Laurel II*, the New Jersey Legislature enacted the Fair Housing Act ("FHA"). As explained in *Hills Development Co. v. Bernards Twp. in Somerset Cnty.*, "[t]he act creates an administrative agency (the Council on Affordable Housing) with power to define housing regions within the state and the regional need for low and moderate income housing, along with the power to promulgate criteria and guidelines to enable municipalities within each region to determine their fair share of that regional need." 103 N.J. 1, 19–20 (1986). Each municipality may petition the Council on Affordable Housing ("COAH") for a "substantive certification," which must contain "an analysis demonstrating that it will provide . . . a realistic opportunity [for its fair share of low and moderate income housing], and the municipality shall establish that its land use and other relevant ordinances have been revised to incorporate provisions for low and moderate income housing." *Id.* at 33 (alterations in original). If there are any objections to the substantive certification, the matter is referred to an Administrative Law Judge (the exhaustion-of-administrative-remedies requirement). *See id.* at 34. Ultimately, if the substantive certification

5

is granted, a municipality's housing element and ordinances are presumptively valid in any exclusionary zoning litigation for a finite period. *See id.* at 33–35. The COAH is also required to periodically adjust the present and prospective need for low- and moderate-income housing in New Jersey and each region. *See id.* at 33. The urban aid exception was also continued through regulations promulgated by COAH. *See In re Mun. of Princeton*, 480 N.J. Super. 70, 150 (N.J. Super. Ct. Law Div. 2018).

Over the ensuing years, litigation continued over the COAH's rules. *See In re Six Month Extension of N.J.A.C. 5:91-1, et seq.*, 372 N.J. Super. 61 (N.J. Super. Ct. App. Div. 2004). Ultimately, however, COAH failed to adopt updated regulations for calculating housing obligations. *See In re Adoption of N.J.A.C. 5:96 and 5:97 ex rel. N.J. Council on Affordable Housing (Mount Laurel IV)*, 221 N.J. 1, 5 (2015). The New Jersey Supreme Court then effectively dissolved the FHA's exhaustion-of-administrative-remedies requirement and allowed, in the first instance, challenges in the courts to resolve municipalities' constitutional obligations under *Mount Laurel*. *See id.* at 20 ("[W]e hold that the courts may resume their role as the forum of first instance for evaluating municipal compliance with *Mount Laurel* obligations, as hereinafter directed."). Importantly, however, the New Jersey Supreme Court noted that its decision "does not prevent either COAH or the Legislature from taking steps to restore a viable administrative remedy that towns can use in satisfaction of their constitutional obligation." *Id.* at 34.

    2.    <u>The March 20, 2024 FHA</u>

On March 20, 2024, the New Jersey Legislature amended the FHA (the "2024 FHA"). *See* N.J. Stat. Ann. T. 52, Subt. 3, Ch. 27D. The 2024 FHA recognized that the court-led system that had developed since *Mount Laurel IV* could be operated more expeditiously through appropriate policies, including ones that provide more clarity on the calculation of municipal housing obligations. *See* N.J. Stat. Ann. 52:27D-302(n). The 2024 FHA modified the calculation of

6

municipal and regional obligations and abolished COAH.  *See id.* at -304.1(a), -304.3.  Relevant to this suit, the 2024 FHA also stated that a municipality would have immunity from exclusionary zoning litigation if the municipality complied with various deadlines for determining present and prospective need housing obligations and adopted a housing element and fair share plan to meet those obligations.  *See id.* at -304.1(b).  By January 31, 2025, participating municipalities had to adopt and file resolutions calculating their housing obligations.  *See id.* at -304.1(f)(1)(b).  By June 30, 2025, participating municipalities had to adopt a housing element and fair share plan and propose drafts of the appropriate zoning and other ordinances and resolutions to implement their present and prospective housing obligations.  *See id.* -304.1(f)(2)(a).  By March 15, 2026, the municipalities must adopt the proposed ordinances and resolutions.  *See id.* -304.1(f)(2)(c).  Interested parties may challenge the municipalities' proposals and housing calculations through the Affordable Housing Dispute Resolution Program (the "Program").  *See id.* at -313.2(a).  Municipalities that comply with these deadlines retain immunity from exclusionary zoning litigation, and their ordinances and housing plans are entitled to a presumption of validity.  *See id.* at -304.1(b).

A municipality has other options.  It may decline to participate in this process and instead choose to seek a judgment of repose by filing for a declaratory judgment.  *See id.* at -304(f)(1)(b).  Alternatively, a municipality may do nothing and instead wait to defend itself from any potential litigation.  *See id.* at -304(f)(1)(b).  Of course, a municipality that declines to participate in this new process also forsakes the presumption of validity and immunity from exclusionary zoning litigation.

At issue in this litigation is the qualified urban aid municipality ("QUAM") exception that was first promulgated by Judge Serpentelli in *AMG Realty Co.* and later adopted by the COAH.

7

In the 2024 FHA, the Legislature codified the QUAM exception, which exempts a QUAM from responsibility for its region's prospective need obligations. *See id.* -304.3(c)(1). According to Plaintiffs, this classification (i.e., QUAM vs. non-QUAM) lacks any rational basis and therefore violates the Equal Protection Clause. (SAC ¶¶ 122–33.) Specifically, Plaintiffs allege that when the QUAM exception was promulgated in *AMG Realty Co.*, "many exempt municipalities were in decline as evinced by large losses in population and households that began in the mid-twentieth century and carried through to the 1990s." (SAC ¶ 91.) Today, however, Plaintiffs allege that many of these exempt municipalities are growing and comprise half of the state's growth in New Jersey households. (*Id.* ¶ 92.) In other words, "[t]he economic conditions that supported the judicial establishment of an urban aid exception in 1983 no longer exist." (*Id.* ¶ 97.) Accordingly, Plaintiffs argue that the 2024 FHA statutory establishment of the QUAM exception was arbitrary, capricious, and unreasonable, in violation of the Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶ 102.)

## II.    SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## III.   LEGAL STANDARD

Under Rule 12(b)(1), a court must dismiss a claim if it lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), and to "raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 122 n.5 (3d Cir. 2016) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)). A Rule

12(b)(1) motion can raise a facial attack or a factual attack, which determines the standard of review. *See Mazo v. Way*, 551 F. Supp. 3d 478, 489 (D.N.J. 2021).

A facial attack "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law . . . or because some other jurisdictional defect is present." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). In reviewing a facial attack, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* at 358. By contrast, "[a] factual attack concerns the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *CAN v. United States*, 535 F.3d 132, 139 (3d Cir. 2008); *see id.* ("So, for example, while diversity of citizenship might have been adequately pleaded by the plaintiff, the defendant can submit proof that, in fact, diversity is lacking."). When considering a factual challenge, "the plaintiff [has] the burden of proof that jurisdiction does in fact exist," the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to [the] plaintiff's allegations . . . ." *Mortenson v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

**IV.   DISCUSSION**

Defendants argue that the SAC should be dismissed because Plaintiffs lack standing. (MTD Br. at 20.) For the reasons set forth below, the Court agrees.[2]

For a plaintiff to have Article III standing, he must show that there is: (1) an injury in fact; (2) causation; and (3) redressability. *See Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 218 (3d Cir. 2023). The injury in fact must be "concrete, particularized, and imminent

---

[2] Because the Court decides the Motion to Dismiss on standing grounds and therefore concludes that it lacks subject matter jurisdiction, it does not reach Defendants' remaining arguments for dismissal.

9

rather than conjectural or hypothetical." *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)). An injury is imminent if it is "certainly impending" or if there is "a substantial risk that the harm will occur." *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). The second element, causation, requires the injury to be "fairly...trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). Lastly, the injury must be "legally and judicially cognizable." *United States v. Texas*, 599 U.S. 670, 676 (2023) (citation omitted). "That requires, among other things, that the dispute is traditionally thought to be capable of resolution through the judicial process—in other words, that the asserted injury is traditionally redressable in federal court." *Id.* (citation modified). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561; *see also Road-Con, Inc. v. City of Phila.*, 120 F.4th 346, 354 (3d Cir. 2024) ("The plaintiff bears the burden of showing these three elements . . . and likewise must demonstrate standing separately for each form of relief sought.").

### A. MUNICIPAL PLAINTIFFS

Defendants first assert that the various municipalities joined as Plaintiffs ("Municipal Plaintiffs") lack standing to bring an Equal Protection Clause claim under the political subdivision doctrine.[3] (MTD Br. at 20–21.) This doctrine, which dates back centuries, holds that a

---

[3] The Court considers the potential barriers presented by the political subdivision doctrine as a standing issue because the broad language of the Supreme Court's seminal cases recognizing the doctrine has generally been treated by courts as a matter of standing. *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 660–61 (1819); *Hunter v. Pittsburgh*, 207 U.S. 161, 179 (1907); *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1932). On at least one occasion, however, the Third Circuit has signaled that the political subdivision doctrine might more appropriately be analyzed as a merits issue. *See Amato v. Wilentz*, 952 F.2d 742, 755 (3d Cir. 1991) ("Although we agree . . . that these cases may not be standing cases (in the modern sense of the term) but instead holdings on the merits, we agree . . . that the cases nevertheless reflect the general reluctance of federal courts to meddle in disputes between state governmental units.") (citing *Rogers v. Brockette*, 588 F.2d 1057, 1067–71 (5th Cir. 1979); *see also Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 370 (D.N.J. 2020) ("[A]t the time those cases were decided, judicial standing was a markedly different concept than what it is today.") Beyond its observation, the Third Circuit has

10

municipality, or political subdivision, "has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40 (1933); *see also Trenton v. New Jersey*, 262 U.S. 182, 187 (1923) ("A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit.").

Plaintiffs, in opposition, argue that the political subdivision doctrine has been eroded over the years, and that under the unique circumstances of this case, the Municipal Plaintiffs have standing. ("MTD Opp.," ECF No. 29 at 16.) In support of this argument, Plaintiffs cite to *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, in which the Third Circuit held that a political subdivision had standing to sue its creator state under the Supremacy Clause. 8 F.4th 176, 181 (3d Cir. 2021). The Third Circuit joined several other circuit courts of appeals and held that the "unique federalism concerns" of the Supremacy Clause "means that a state is not free to enforce within its boundaries laws preempted by federal law." *Id.* As such, a political subdivision could invoke the Supremacy Clause against its creator state to ensure that does not occur. *See id.*

But, as Defendants point out in their Reply, the rationale for allowing political subdivisions to sue their creator state under the Supremacy Clause is inapplicable to claims brought under the Equal Protection Clause. ("Reply," ECF No. 36 at 2.) While the Supremacy Clause concerns structural rights under the Constitution, cases brought under the Equal Protection Clause concern individual rights. *See Branson School Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998) ("[The Political Subdivision doctrine] stand[s] only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision

---

offered no further direction. Accordingly, this Court continues to analyze the political subdivision doctrine as a standing issue.

11

that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights.").

Plaintiffs only cite to one case in which it appears a municipality was permitted to bring an Equal Protection claim against its creator state. (MTD Opp. at 17.) In *Romer v. Evans*, individual plaintiffs and the municipalities of Aspen, Boulder, and Denver brought suit to challenge a Colorado constitutional amendment that repealed city ordinances prohibiting discrimination based on sexual orientation. 517 U.S. 620, 624 (1996). The Supreme Court held that the amendment violated the Equal Protection Clause. *Id.* at 632. *Romer*, however, did not discuss Article III standing and was based on the equal protection of individual (not municipal) rights. And since *Romer*, the validity of the political subdivision doctrine has been reaffirmed both by the Supreme Court and the Third Circuit. *See Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (holding that a "political subdivision," unlike a private corporation, has no "privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator"); *see also Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 180 (noting that the political subdivision doctrine does not bar claims brought under the Supremacy Clause but does bar claims brought under the Equal Protection Clause). In light of this long-standing precedent, the Court finds no reason to depart from the political subdivision doctrine. As such, the Municipal Plaintiffs have not established that they have an injury-in-fact for standing purposes.

Even if they could establish an injury-in-fact, that injury would not be redressable by the Court. As previously explained, redressability requires that the dispute "be capable of resolution through the judicial process." *Texas*, 599 U.S. at 676. In other words, if a favorable decision by the Court would only eliminate "one of multiple causes of an injury without actually decreasing the injury at all," then it is not redressable under Article III. *Fischer v. Governor of N.J.*, 842 F.

App'x 741, 750–51 (3d Cir. 2021). Here, the QUAM exception was first established as part of the constitutional *Mount Laurel II* remedy in *AMG Realty Co.* Given that Plaintiffs are not challenging the *Mount Laurel* doctrine or *AMG Realty Co.*, even if the Court invalidated the 2024 FHA, the QUAM exemption would still exist under New Jersey judicial precedent. Plaintiffs argue that the QUAM exemption is simply a judicial remedy and not a constitutional requirement, and therefore a favorable decision by this Court would redress their supposed injuries. (MTD Opp. at 11.) The Court disagrees, as that distinction is of no consequence because the QUAM exemption would still exist under New Jersey judicial precedent, and Plaintiffs would be in the same position they were in before the Court invalidated the 2024 FHA. *See In re Municipality of Princeton*, 480 N.J. Super. at 150 (utilizing urban aid classification to calculate municipalities housing obligations).[4] Accordingly, the Court finds that Municipal Plaintiffs lack standing under Article III to bring their Equal Protection Clause claim.

### B. INDIVIDUAL PLAINTIFFS

Defendants next argue that the various elected municipal officials joined as Plaintiffs ("Individual Plaintiffs") lack standing because they "do not have *Mount Laurel* obligations and thus are not governed by the challenged provisions of the Act at all." (MTD Br. at 24.) Moreover, Defendants assert that Individual Plaintiffs' claimed injuries are necessarily derivative of the municipalities they represent and therefore lack standing to assert institutional injuries that do not

---

[4] Plaintiffs alternatively argue that even if the QUAM exemption is a part of the *Mount Laurel* doctrine, they would still assert a redressable injury because "state constitutional provisions and state common law are akin to a state statute for federal constitutional purposes." (MTD Opp. at 12.) To that end, Plaintiffs ask the Court *in a footnote* to interpret the SAC as encompassing a parallel request to invalidate *Mount Laurel* as state common law. (*Id.* at 12 n.11.) Plaintiffs ask the Court to read into the SAC unpled allegations and claims for relief. As currently alleged, it is the 2024 FHA's QUAM exemption that violates the Equal Protection Clause. (SAC ¶¶ 122–32.) No other plausible reading of the SAC changes that, and it would be improper for Plaintiffs or the Court to expand the scope of the allegations or relief sought on a motion to dismiss. *See Greer v. Cumberland Cnty. Prosecutor's Office*, Civ. No. 14-3032, 2015 WL 3603986, at *4 n.5 (D.N.J. June 8, 2015) ("Plaintiffs may not supplement the claims in their complaint through their opposition to a motion to dismiss.").

13

belong to them. (*Id.* at 25.)  In response, Plaintiffs argue that Defendants misstate their injury, and that the Individual Plaintiffs will suffer reputational harm if they act and vote contrary to their desires and the interests of their constituents.  (MTD Opp. at 12–14.)

It is well-established that reputational harm may constitute an "injury in fact" that is sufficient to confer Article III standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021).  Nevertheless, a reputational injury must still be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F. 4th 200, 205 (3d Cir. 2021).  As such, standing theories may not be premised on speculative injuries.  *See Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 414 (2013).

There is nothing alleged in the SAC with respect to the reputational injury Individual Plaintiffs assert in their briefing.  To the extent that Individual Plaintiffs' raise their unpled reputational injury as a *factual* response to Defendants' challenge to their standing, the Court finds that injury inadequate because it would not be "fairly traceable" to Defendants' conduct.  As set forth above, the 2024 FHA's Program is voluntary, and Individual Plaintiffs have the option of voting for or against 2024 FHA-related ordinances.  While Individual Plaintiffs have ostensibly chosen to participate in the Program because of the various benefits that the Program provides, nothing in the FHA requires them to participate or to vote a certain way.  Indeed, the 2024 FHA specifically contemplates such a scenario and states that a municipality may choose to file a declaratory judgment action or wait to defend itself from any potential litigation.  While Individual Plaintiffs may not like these options, they are nonetheless free to pursue them.[5]  Any potential reputational harm therefore flows from Individual Plaintiffs' voluntary decisions to participate in

---

[5] As discussed at the Preliminary Injunction hearing, there appears to be at least one municipality, Mannington Township, that has taken these courses of action.  *See* Order Denying Pls.' Req. for Injunctive Relief at 14 n.1, *Montvale v. State of New Jersey*, Civ. No. L-1778-24 (N.J. Super. Ct. Law Div. Jan. 2, 2025).

the Program and reap the benefits the Program provides. *See Campeau v. Social Sec. Admin.*, 575 F. App'x 35, 38 (3d Cir. 2014) (holding that a plaintiff's voluntary and self-inflicted injury was not fairly traceable to the defendant's conduct).

Moreover, any purported reputational injury to Individual Plaintiffs separately fails because it is not "actual or imminent" as required for Article III standing. Individual Plaintiffs fear their reputations may suffer[6] *if* they follow what they believe to be the will of their constituents by either voting against participating in the Program (and *if* they win that vote because a sufficient number of other officials vote with them) or they decide to do nothing (again, *if* a sufficient number of other officials join them), and *if* their respective municipalities lost any resulting suits (either declaratory suits for repose or builder's remedy litigation), and *if* they are unable to persuade their constituents that they are not responsible for the ultimate outcome. But as the Third Circuit has succinctly explained, "an injury does not meet the imminence requirement if one cannot describe how the [plaintiffs] will be injured without beginning the explanation with the word 'if.'" *Williams v. Gov. of Pa.*, 552 F. App'x 158, 162 (3d Cir. 2014) (citation modified). Individual Plaintiffs have suffered no injury to date and there are at least four "ifs" between them and any hypothetical future reputational injury. This is not sufficiently actual or imminent to grant them Article III standing.

Plaintiffs also assert an alternative standing theory based on the Individual Plaintiffs' status as municipal taxpayers. (MTD Opp. at 15.) To have standing under this theory, "a municipal taxpayer plaintiff must show (1) that he pays taxes to the municipal entity, and (2) that more than

---

[6] At the hearing, Brian Foster testified that in his most recent primary election his opponents ran negative campaign ads focusing on his votes in favor of building affordable housing, and that he believes these ads harmed his reputation. Even so, the damage to his reputation is still speculative because it depends on whether his constituents believed the ads, whether he was unable to persuade his constituents that his vote was the correct one given the circumstances, and whether he was responsible for the outcome. More importantly, Mr. Foster won reelection, which substantially undercuts his claim of reputational harm. For these reasons, the Court nevertheless finds that his concerns are too speculative to warrant standing.

a de minimis amount of tax revenue has been expended on the challenged practice itself." *Nichols v. City of Rehoboth Beach*, 836 F.3d 275, 281 (3d Cir. 2016). Here, Plaintiffs allege that the Individual Plaintiffs are taxpayers and residents of municipalities that are not QUAMs. (SAC ¶ 60.) Plaintiffs further allege that the Individual Plaintiffs, as taxpayers, will have to pay additional costs associated with complying the 2024 FHA, such as expenditures on infrastructure, services, and affordable housing developments. (*Id.* ¶ 62.) Plaintiffs also allege that the municipalities have already incurred costs (that taxpayers must fund) to pay for attorneys, engineers, and professional planners. (*Id.* ¶ 66.)

Even assuming Plaintiffs could demonstrate an injury-in-fact based on municipal taxpayer standing, that injury would still not be redressable by the Court. As explained above, even if the 2024 FHA was invalidated by the Court, the municipalities would still need to expend taxpayer dollars to comply with their *Mount Laurel* obligations. Such expenditures would necessarily include costs for infrastructure, services, and affordable housing developments. In other words, these funds would be expended regardless of whether the 2024 FHA was invalidated. Because the Individual Plaintiffs cannot establish a redressable injury, they lack Article III standing on this basis as well.

V.      **CONCLUSION**

Given the Court's lack of subject matter jurisdiction, it will **DISMISS WITHOUT PREJUDICE** the Second Amended Complaint without further leave to amend. Insofar as the Court has found, as a factual matter, that Plaintiffs lack standing, the Court also finds that further amendment to the Complaint would be futile. *See Hill v. Nassberg*, 130 F. App'x 615, 616 (3d Cir. 2005) (affirming denial of leave to amend as futile where dismissal was premised on lack of standing). Finally, given the Court's lack of subject matter jurisdiction, it will also **DENY AS**

**MOOT** Plaintiffs' Motion for a Preliminary Injunction and FSHC's Motion for Leave to Appear Amicus Curiae.  An appropriate Order will follow.


Date: January 20, 2026

                                                                         s/ Zahid N. Quraishi
                                                                         **ZAHID N. QURAISHI**
                                                                         **UNITED STATES DISTRICT JUDGE**